In the

# United States Court of Appeals
## For the Fourth Circuit

———————————

NORTH CAROLINA COASTAL FISHERIES REFORM GROUP, et al.,

*Plaintiffs-Appellants,*

v.

CAPT. GASTON LLC, et al.,

*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the Eastern District of North Carolina at Greenville
Case No. 4:20-cv-00151-FL
The Honorable Louise W. Flanagan

———————————

## BRIEF OF APPELLEES
———————————

David N. Ventker
Marissa M. Henderson
VENTKER HENDERSON, PLLC
256 West Freemason Street
Norfolk, VA 23510
T: (757) 625-1192
F: (757) 625-1475
dventker@ventkerlaw.com
mhenderson@ventkerlaw.com

*Counsel for Defendant-Appellee
Esther Joy, Inc.*

Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
bschmalzbach@mcguirewoods.com

*Counsel for Defendants-Appellees
Capt. Gaston LLC; Lady Samaira, Inc.;
Trawler Capt. Alfred, Inc.; Trawler
Christina Ann, Inc.; Hobo Seafood, Inc.
and Trawlers Garland and Jeff, Inc.*

*(Counsel continued on inside cover)*

*(Counsel continued)*

Stevenson L. Weeks
WHEATLY, WHEATLY, WEEKS
& LUPTON, PA
710 Cedar Street
Beaufort, NC 28516
slw@wheatlylaw.com

Charles D. Case
W. Dixon Snukals
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27601
ccase@mcguirewoods.com
wsnukals@mcguirewoods.com

Henry L. Kitchin, Jr.
MCGUIREWOODS LLP
300 North 3rd Street
Suite 320
Wilmington, NC 28401
hkitchin@mcguirewoods.com

*Counsel for Defendants-Appellees*
*Capt. Gaston LLC; Lady Samaira, Inc.;*
*Trawler Capt. Alfred, Inc.; Trawler*
*Christina Ann, Inc.; Hobo Seafood, Inc.*
*and Trawlers Garland and Jeff, Inc.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-2184     Caption: NC Coastal Fisheries Reform Group, et al. v. Capt. Gaston LLC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Capt. Gaston LLC
(name of party/amicus)

who is _____Defendant-Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brian D. Schmalzbach        Date:    February 9, 2022

Counsel for: Defendants-Appellees

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __21-2184__    Caption: __NC Coastal Fisheries Reform Group, et a. v. Captain Gaston LLC, et al__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Esther Joy, Inc.__
(name of party/amicus)

_____

 who is _____Defendant/Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    YES ☑NO


2.    Does party/amicus have any parent corporations?    ☑YES    NO
       If yes, identify all parent corporations, including all generations of parent corporations:

       Daniels Trawlers, Inc.



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    YES ☑NO
       If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _Mr Henderson_    Date: _2/9/22_

Counsel for: _Esther Joy, Inc_

Print to PDF for Filing

iv

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _21-2184_        Caption: _NC Coastal Fisheries Reform Group, et al. v. Capt. Gaston LLC, et al._

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Hobo Seafood, Inc._
(name of party/amicus)

_____

who is _____Defendant-Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.  Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.  Does party/amicus have any parent corporations?  ☐YES ☑NO
    If yes, identify all parent corporations, including all generations of parent corporations:

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
    If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brian D. Schmalzbach          Date:    February 9, 2022

Counsel for: Defendants-Appellees

Print to PDF for Filing

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-2184   Caption: NC Coastal Fisheries Reform Group, et al. v. Capt. Gaston LLC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Lady Samaira, Inc.
(name of party/amicus)

_____

who is _____Defendant-Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.   Is party/amicus a publicly held corporation or other publicly held entity?   ☐YES ☑NO

2.   Does party/amicus have any parent corporations?   ☐YES ☑NO
     If yes, identify all parent corporations, including all generations of parent corporations:

3.   Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?   ☐YES ☑NO
     If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brian D. Schmalzbach          Date:  February 9, 2022

Counsel for: Defendants-Appellees

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __21-2184__        Caption: __NC Coastal Fisheries Reform Group, et al. v. Capt. Gaston LLC, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Trawler Capt. Alfred, Inc.__
(name of party/amicus)

_____

 who is _____Defendant-Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO

2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                            ☐ YES ☑ NO
      If yes, identify all such owners:

4.   Is there any other publicly held corporation or other publicly held entity that has a direct
     financial interest in the outcome of the litigation?                    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected
     substantially by the outcome of the proceeding or whose claims the trade association is
     pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?                     ☐YES ☑NO
     If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
     party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
     caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
     corporation that owns 10% or more of the stock of the debtor.

7.   Is this a criminal case in which there was an organizational victim?     ☐YES ☑NO
     If yes, the United States, absent good cause shown, must list (1) each organizational
     victim of the criminal activity and (2) if an organizational victim is a corporation, the
     parent corporation and any publicly held corporation that owns 10% or more of the stock
     of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brian D. Schmalzbach                    Date:    February 9, 2022

Counsel for: Defendants-Appellees

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. <u>21-2184</u>          Caption: <u>NC Coastal Fisheries Reform Group, et al. v. Capt. Gaston LLC, et al.</u>

Pursuant to FRAP 26.1 and Local Rule 26.1,

<u>Trawler Christina Ann, Inc.</u>
(name of party/amicus)


_____

 who is _____<u>Defendant-Appellee</u>_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brian D. Schmalzbach          Date: February 9, 2022

Counsel for: Defendants-Appellees

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 21-2184        Caption: NC Coastal Fisheries Reform Group, et al. v. Capt. Gaston LLC, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

Trawlers Garland and Jeff, Inc.
(name of party/amicus)

who is _____Defendant-Appellee_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
   If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
   If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
   If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
   If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Brian D. Schmalzbach          Date:   February 9, 2022

Counsel for: Defendants-Appellees

Print to PDF for Filing

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

JURISDICTIONAL STATEMENT ................................................................. 3

STATEMENT OF ISSUES ............................................................................... 3

STATEMENT OF THE CASE.......................................................................... 4

I.  Statutory and Regulatory Background .......................................................... 4

    A.  The Clean Water Act ............................................................................... 4

    B.  State Fisheries Management Laws and Regulations ............................ 5

    C.  Federal Fisheries Laws and Regulations .............................................. 8

II. Procedural History ........................................................................................ 9

    A.  Plaintiffs assert Clean Water Act claims against North
        Carolina's shrimping industry. .............................................................. 9

    B.  The district court dismissed the claims as beyond the scope of
        the Clean Water Act. ............................................................................ 10

STANDARD OF REVIEW ............................................................................. 13

SUMMARY OF ARGUMENT ....................................................................... 13

ARGUMENT .................................................................................................... 15

I.  The district court correctly held that bycatch is not a "pollutant" under
    the Clean Water Act ................................................................................. 15

    A.  Interpreting bycatch as a pollutant would upset the federal-state
        balance in violation of the Clean Water Act and established
        canons of statutory construction .......................................................... 15

        1.  Federal law mainly relies on the states for fisheries
            management, including bycatch regulation. ............................ 16

        2.  The Clean Water Act may not be construed to impair
            states' jurisdiction over their coastal waters. ........................ 19

        3.  The Federalism Canon dictates that, absent a clear
            statement of intent by Congress, statutes should not be
            interpreted so as to intrude on areas traditionally
            regulated by states. ................................................................. 20

4.    Plaintiffs' construction is impermissible because it conflicts with a larger federal and state statutory scheme. .......23

5.    Plaintiffs' construction would conflict with more specific regulatory schemes..................................................29

B.    Construing bycatch as a pollutant would create absurd results. ........34

C.    The text of the Clean Water Act does not compel federal regulation of bycatch as a pollutant....................................37

1.    The district court correctly determined that the meaning of "pollutant" is ambiguous in this context. ..........................38

2.    No precedent supports resolving the ambiguity in "pollutant" to cover bycatch. ...................................43

II.   The district court correctly held that trawling does not result in the discharge of "dredged spoils" or "dredged materials." ...............48

A.    Plaintiffs do not plausibly allege that sediments are discharged into navigable waters..........................................49

B.    Defendants' trawling activities do not require 404 Permits...............51

CONCLUSION .......................................................55

CERTIFICATE OF COMPLIANCE....................................57

CERTIFICATE OF SERVICE .........................................58

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
141 S. Ct. 2485 (2021) ...................................................21

*Am. Frozen Food Inst. v. Train*,
539 F.2d 107 (D.C. Cir. 1976)...................................35

*Am. Min. Congress v. E.P.A.*,
824 F.2d 1177 (D.C. Cir. 1987) ...........................47

*Am. Min. Cong. v. U.S. Army Corps of Eng'rs*,
951 F. Supp. 267 (D.D.C. 1997)............................. 52-53

*Andrus v. Charlestone Stone Prod. Co.*,
436 U.S. 604 (1978)........................................23, 40

*Ass'n of Pac. Fisheries v. E.P.A.*,
615 F.2d 794 (9th Cir. 1980) ............................. 43-44

*Ass'n to Protect Hammersley, Eld & Totten Inlets v. Taylor Res., Inc.*,
299 F.3d 1007 (9th Cir. 2002) .......................... 45-46

*Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*,
140 S. Ct. 1462 (2020).......................................37

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)..........................................26

*Greenhouse v. MCG Cap. Corp.*,
392 F.3d 650 (4th Cir. 2004) ...............................13

*Gregory v. Ashcroft*,
501 U.S. 452 (1991)..........................................21

*Griffin v. Oceanic Contractors, Inc.*,
458 U.S. 564 (1982)..........................................34

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
968 F.3d 454 (5th Cir. 2020), *as revised* (Aug. 4, 2020) ......................30, 32, 44

*Kentuckians for Commonwealth Inc. v. Rivenburgh*,
    317 F.3d 425 (4th Cir. 2003) ..............................................................38

*Massachusetts v. E.P.A.*,
    549 U.S. 497 (2007)..........................................................................41

*MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*,
    512 U.S. 218 (1994)..........................................................................24

*Minnesota v. Clover Leaf Creamery Co.*,
    449 U.S. 456 (1981)..........................................................................19

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)..........................................................................29

*Morton v. Mancari*,
    417 U.S. 535 (1974)..........................................................................29

*N. Plains Res. Council v. Fid. Expl. & Dev. Co.*,
    325 F.3d 1155 (9th Cir. 2003) ..........................................................36

*Nat'l Ass'n of Home Builders v. Defs. of Wildlife*,
    551 U.S. 644 (2007)..........................................................................28

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*,
    142 S. Ct. 661 (2022)..................................................................22, 32

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*,
    145 F.3d 1399 (D.C. Cir. 1998) ................................................. 52-54

*Nat'l Wildlife Fed'n v. Consumers Power Co.*,
    862 F.2d 580 (6th Cir. 1988) ..................................................... 43-44

*United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*,
    707 F.3d 451 (4th Cir. 2013) ............................................................53

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) ............................................................13

*New York State Trawlers Ass'n v. Jorling*,
    16 F.3d 1303 (2d Cir. 1994) .............................................................19

*Nw. Env't Advocs. v. E.P.A.*,
537 F.3d 1006 (9th Cir. 2008) ................................................................ 35, 44-45

*Oceana, Inc. v. Penny Pritzker*,
26 F. Supp. 3d 33 (D.D.C. 2014) ...................................................................27

*Owens v. Balt. City State's Att'ys Off.*,
767 F.3d 379 (4th Cir. 2014) ..................................................................... 13

*Pub. Citizen v. U.S. Dep't of Just.*,
491 U.S. 440 (1989) ..........................................................................38

*Rapanos v. United States*,
547 U.S. 715 (2006) ................................................................11, 22, 38

*S.C. Dep't of Health & Env't Control v. Commerce & Indus. Ins. Co.*,
372 F.3d 245 (4th Cir. 2004) .....................................................................29

*Se. Fisheries Ass'n, Inc. v. Chiles*,
979 F.2d 1504 (11th Cir. 1992) ...................................................................23

*Shannon v. United States*,
512 U.S. 573 (1994) ..........................................................................31

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*,
531 U.S. 159 (2001) ...................................................................... 19-20

*Train v. Colorado Public Int. Research Grp., Inc.*,
426 U.S. 1 (1976) ..................................................................... 25, 38-40

*U.S. PIRG v. Atl. Salmon of Me., LLC*,
215 F. Supp. 2d 239 (D. Me. 2002) ........................................................... 43-45

*United States v. Deaton*,
209 F.3d 331 (4th Cir. 2000) ....................................................................50

*United States Forest Serv. v. Cowpasture River Pres. Ass'n*,
140 S. Ct. 1837 (2020) .................................................................... 21-22

*United States v. Babenko*,
No. 13-4016, 2014 U.S. Dist. LEXIS 104913 (W.D. Mo. June 24,
2014) ................................................................................. 16-17

*United States v. M.C.C. of Fla., Inc.*,
  772 F.2d 1501 (11th Cir. 1985) ..........................................................51

*Util. Air Regul. Grp. v. E.P.A.*,
  573 U.S. 302 (2014)............................................23-24, 37, 41-42

*Varity Corp. v. Howe*,
  516 U.S. 489 (1996).........................................................................29

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001).................................................................25, 29

*Yates v. United States*,
  574 U.S. 528 (2015).................................................................. 40-41

**Federal Statutes**

16 U.S.C.

  § 742a.............................................................................................9

  § 742i ........................................................................................9, 18

  § 1221 ...........................................................................................9

  § 1801.....................................................................................*passim*

  § 1802...............................................................................8, 10, 47

  § 1811.............................................................................................8

  § 1851(a)(9) .......................................................................... 27, 30-31

  § 1853...........................................................................................30

  § 1854.............................................................................................8

  § 1855.............................................................................................8

  § 1856................................................................................8, 21, 23

  § 1865...........................................................................................30

28 U.S.C.

§ 1291 .................................................................................................3

§ 1331 .................................................................................................3

§ 1367 .................................................................................................3

33 U.S.C.

§ 401 ..................................................................................................17

§ 1251 ...............................................................................................1, 5

§ 1311(a) ........................................................................................*passim*

§ 1316 ................................................................................................44

§ 1322 ................................................................................................45

§ 1328 ................................................................................................44

§ 1342 .............................................................................................5, 35

§ 1344 .............................................................................................5, 51

§ 1362 .............................................................................4, 37, 45-46, 49

§ 1365 ................................................................................................10

§ 1370 ...........................................................................................5, 11, 20

43 U.S.C.

§ 1301(e) ...........................................................................................17

§ 1311(a)(1) .......................................................................................17

§ 1312 ..................................................................................................8

§ 1314 ................................................................................................17

Reaffirmation of State Regulation of Resident and Nonresident
  Hunting and Fishing Act, Pub. L. No. 109-13, § 6035(b)(1), 119
  Stat. 289 (2005) ................................................................................16

Sustainable Fisheries Act, Pub. L. No. 104-297, § 106, 110 Stat. 3559, 3570 (Oct. 11, 1996) .........................................................................30

**State Statutes**

N.C. Gen. Stat. § 113-129(2) ...................................................................18

N.C. Gen. Stat. § 113-181(a) ....................................................................6

N.C. Gen. Stat. § 113-182(a) ..................................................................5-6

N.C. Gen. Stat. § 143B-289.51(b)(2) .........................................................6

N.C. Gen. Stat. § 143B-289.52(c)(2) .........................................................6

N.C. Gen. Stat. § 143B-289.54(a)(9) ......................................................6-7

N.C. Gen. Stat § 143B-289.57(b)(4) ..........................................................7

**Other Authorities**

33 C.F.R. § 323.2(c)..................................................................................51

33 C.F.R. § 323.2(d)(5)........................................................................13, 52

50 C.F.R. § 600.350 .......................................................................28, 46, 48

142 Cong. Rec. H11397 (daily ed. Sept. 27, 1997) (statement of Rep. Don Young) ...........................................................................................31

15A N.C. Admin. Code 3J.0104(d) ..........................................................18

15A N.C. Admin. Code 3L.0103 ................................................................7

15A N.C. Admin. Code 3M.0101 .............................................................19

North Carolina Department of Environmental Quality ("DEQ"), *Shrimp – FMP under review*, available at https://deq.nc.gov/about/divisions/marine-fisheries/managing-fisheries/fishery-management-plans#shrimp---fmp-under-review.......................7

N.C. Div. Marine Fisheries, N.C. Dep't of Env't Quality, FF-55-2012, *Proclamation Re: Weakfish Commercial Fishing Operations* (2012)....................................................................................................19

N.C. Div. Marine Fisheries, N.C. Dep't of Env't Quality, SH-3-2019,
*Proclamation Re: Shrimp Trawl Bycatch Reduction Device
Requirements – Pamlico Sound and Portions of the Pamlico Bay
and Neuse Rivers* (2019)....................................................................19

# INTRODUCTION

This is a fisheries management dispute masquerading as a Clean Water Act case. Plaintiffs, frustrated by the refusal of state legislators and regulators to enact their preferred fishery management policies, seek a judicial end-run around state policy makers. JA183-84, 199. At first, Plaintiffs sued the North Carolina Division of Marine Fisheries ("DMF") for "failing to adequately regulate" shrimp trawling operations like those of Defendants, which Plaintiffs say conflict with their recreational fishing interests. JA30. At the same time, they asserted that Defendants violated the Federal Water Pollution Prevention and Control Act, 33 U.S.C. § 1251 *et seq*. ("Clean Water Act" or "CWA"), by returning incidentally caught fish to the waters whence they came and using trawling gear to harvest shrimp. The district court correctly dismissed those unprecedented claims that strike at the heart of fisheries management, a core state prerogative that the CWA itself and fundamental principles of statutory interpretation entrust to North Carolina.

Fisheries management is *not* the province of the Clean Water Act. Rather, Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act of 1976, 16 U.S.C. § 1801 *et seq.* ("Magnuson-Stevens Act" or "MSA") to regulate fisheries in federal waters. Within state coastal waters, fishery management authority is expressly vested in the states.

Unsurprisingly, then, the Clean Water Act has never been applied to discarding bycatch or bottom trawling, or any other aspect of commercial or recreational fishing. Nor has the Environmental Protection Agency ("EPA") ever attempted to regulate this conduct. Yet Plaintiffs purport to find such a regulatory mandate in the Clean Water Act's definitions of "pollutants" and "dredged material." That interpretation cannot survive the specific provisions of federal and state fishery management programs that expressly authorize what Plaintiffs seek to prohibit. After examining the extensive federal and state fishery regulatory structures that were enacted and refined after the passage of the Clean Water Act, the district court determined it would be absurd to think Congress would ban a practice such as bycatch discharge or bottom trawling "and then, without reference to the prior ban, specifically recogniz[e] the current impracticality of such a ban." JA889-90.

The results of Plaintiffs' interpretation defy common sense. Congress did not intend for the Clean Water Act to require an individual to obtain a permit to extract a dead crab out of the water and later return it. Nor did it intend to expose an individual fishing in his dinghy to a citizen suit, with the threat of civil penalties, for throwing an accidently caught and killed guppy back into the water.

As for Plaintiffs' claim that Defendants discharge "dredged materials," the complaint merely recites the elements of the cause of action. It does not allege that Defendants' trawling activities have the effect of "destroying or degrading" the

Pamlico Sound. At most, Plaintiffs alleged incidental fallback of sediment, which does not require a CWA permit.

The district court held that Plaintiffs' theories "would stretch the statute beyond its boundaries and are contrary to Congress's intent in passing the Clean Water Act." JA876. The district court was correct, and this Court should affirm.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiffs' Clean Water Act claims under 28 U.S.C. § 1331.[1] JA16. The district court entered judgment and an order dismissing all claims for failure to state a claim on September 17, 2021. JA859, 902. Plaintiffs noticed their appeal on October 15, 2021. JA904. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.    Did the district court correctly hold that bycatch returned to the waters from which it came is not a "pollutant" under the Clean Water Act?

2.    Did the district court correctly hold that the suspension and redeposition of sediment during trawling operations is not an unpermitted discharge of "dredged and fill materials" under the Clean Water Act?

---

[1] The district court had supplemental jurisdiction over Plaintiffs' public trust doctrine claim under 28 U.S.C. § 1367. Plaintiffs have not appealed that dismissal.

# STATEMENT OF THE CASE

## I. Statutory and Regulatory Background

Plaintiffs' CWA claims target two aspects of fishery management: (1) bycatch and (2) fishing gear. Both bycatch and fishing gear are regulated extensively by state and federal fisheries management laws. Defendants' activities are subject to state regulations applicable to commercial fishing generally as well as specific provisions pertinent to the state's shrimp fishery. These state regulations govern Defendants' fishing methods, allowable fishing equipment, and locations where they can fish to reduce bycatch and minimize habitat impacts from trawling. *See* JA72-88. The remedies Plaintiffs seek – the further reduction of bycatch and habitat impacts – are, therefore, within the authority of DMF, as Plaintiffs agree. JA25 ¶ 55, JA30 ¶ 79; JA40.

### A. The Clean Water Act

The Clean Water Act prohibits the unpermitted "discharge of any pollutant by any person." 33 U.S.C. § 1311(a); *id.* § 1362(12). The Act defines "pollutant" as

> dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water.

*Id.* § 1362(6). "[D]ischarge of a pollutant" means "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12).

The Clean Water Act requires a permit from EPA to discharge pollutants, 33 U.S.C. § 1342, or a permit from the United States Army Corps of Engineers ("USACE") to "discharge … dredged or fill material into the navigable waters[.]" *Id*. § 1344(a). Neither EPA nor USACE have ever required a Clean Water Act permit to harvest wild fish in state coastal waters.

The Clean Water Act's purpose "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," to be accomplished, among other ways, through "the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife . . . be achieved." 33 U.S.C. § 1251(a). But the Act instructs that "[e]xcept as expressly provided in the [Act], nothing in [it] shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." *Id.* § 1370.

**B.  State Fisheries Management Laws and Regulations**

North Carolina has delegated its fisheries management authority to the Marine Fisheries Commission ("MFC"). N.C. Gen. Stat. § 113-182(a). The MFC is charged with "implement[ing] the laws relating to coastal fisheries, coastal fishing, shellfish, crustaceans, and other marine and estuarine resources enacted by the General Assembly by the adoption of rules and policies, to provide a sound, constructive, *comprehensive*, continuing, and economical coastal fisheries program directed by

citizens who are knowledgeable in the protection, restoration, proper use, and management of marine and estuarine resources." N.C. Gen. Stat. § 143B-289.51(b)(2) (emphasis added). DMF is charged with enforcing those laws and regulations. *Id*. § 113-181(a).

The MFC has broad authority to restrict the "[t]ime, place, character, or dimensions of any methods or equipment that may be employed in taking fish," establish "[s]easons for taking fish," and impose "[s]ize limits on and maximum quantities of fish that may be taken." N.C. Gen. Stat. § 113-182(a)(1)-(3). The MFC also regulates "[t]he possession, cultivation, transportation, importation, exportation, sale, purchase, acquisition, and *disposition of all marine* and estuarine *resources* and all related equipment, implements, vessels, and conveyances as necessary to carry out its duties." *Id*. § 143B-289.52(c)(2) (emphasis added).

Protection of water quality goes hand-in-hand with protecting coastal habitats and fisheries resources. And protection of water quality within North Carolina's jurisdictional waters is central to MFC's purpose. A standing member of MFC must be a "fisheries scientist" with "special training and expertise in marine and estuarine fisheries biology, ecology, population dynamics, *water quality*, *habitat protection*, or similar knowledge." N.C. Gen. Stat. § 143B-289.54(a)(9) (emphasis added). Recognizing that North Carolina's marine and estuarine resources "belong to the people of the State as a whole," the General Assembly ensured that the MFC's

membership balances a broad array of interests and expertise. *Id*. § 143B-289.54(a) (designating three members each of commercial and recreational fishermen, two at-large members, and a sport-fisherman). The MFC has established a standing Habitat and Water Quality Committee to consider "matters concerning *habitat and water quality* that may affect coastal fisheries resources." *Id*. § 143B-289.57(b)(4) (emphasis added).

For commercial shrimp fisheries, the MFC has established a Shrimp Fishery Management Plan Advisory Committee. *See, e.g*., JA72-73. The MFC adopted a Shrimp Fishery Management Plan ("FMP") in 2006, adopted Amendment 1 to that plan in 2015, and revised Amendment 1 in 2018; Amendment 2 is pending approval. (North Carolina Department of Environmental Quality ("DEQ"), *Shrimp – FMP under review*, available at https://deq.nc.gov/about/divisions/marine-fisheries/managing-fisheries/fishery-management-plans#shrimp---fmp-under-review). The Shrimp FMP addresses bycatch reduction devices on commercial fishing gear extensively. *See* JA82-87. Other mandates on shrimping gear affect the amount of shrimp and bycatch caught and impact to the sea bottom. *See* 15A N.C. Admin. Code 3L.0103(a) (stating net and mesh lengths); *id.* 3L.0103(c)-(d) (limiting shrimp trawling gear by headrope size and allowing larger sizes in certain waters); *id.* 3L.0103(h) (requiring the federal fisheries-required Turtle Excluder Devices).

## C.     Federal Fisheries Laws and Regulations

In the MSA, Congress expressly affirmed the states' exclusive authority over state waters:[2]

> [N]othing in this [Act] shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries. . . . [T]he jurisdiction and authority of a State shall extend to any pocket of waters that is adjacent to the State and totally enclosed by lines delimiting the territorial sea of the United States pursuant to the Geneva Convention on the Territorial Sea and Contiguous Zone[.]

16 U.S.C. § 1856(a)(1)-(a)(2)(A). The Pamlico Sound is such a body of water. Indeed, to ensure there is no intrusion into the exclusive authority of the states, the fishery management provisions of MSA apply in the Exclusive Economic Zone ("EEZ"), which starts at "the seaward boundary of each of the coastal States," 16 U.S.C. § 1802(11), which is three miles from the coastal baseline, *see, e.g.*, 43 U.S.C. § 1312. In the MSA, Congress delegated to the Department of Commerce expansive authority to regulate, manage, and conserve fish in federal waters and the EEZ. Under that framework, 16 U.S.C. §§ 1854-55, the National Marine Fisheries Service ("NMFS") and regional fishery management councils created by the MSA "exercise … exclusive fishery management authority over all fish, all Continental Shelf fishery resources, within the [EEZ]," 16 U.S.C. § 1811(a).

---

[2] Congress retained some oversight of state fisheries management in state waters, in limited circumstances not applicable here. 16 U.S.C. § 1856(b).

Other federal acts regulate fisheries while also respecting state authority over fishing within state waters. JA884-85. These include the Fish and Wildlife Act, 16 U.S.C. §§ 742a *et seq.*, which states "[n]othing in this Act shall be construed . . . to supersede any regulatory authority over fisheries exercised by the States either individually or under interstate compacts," 16 U.S.C. § 742i, and the Estuarine Areas Act of 1968, 16 U.S.C. §§ 1221 *et seq.*, which states "[i]n connection with the exercise of jurisdiction over the estuaries of the Nation and in consequence of the benefits resulting to the public, it is declared to be the policy of Congress to recognize, preserve, and protect the responsibilities of the States in protecting, conserving, and restoring the estuaries in the United States," *id.* § 1221. So for fisheries in state waters, Congress and the federal government advise and assist, but never control. It is up to the states to legislate and regulate what goes on with fisheries *in their own waters*.

## II. Procedural History

### A. Plaintiffs assert Clean Water Act claims against North Carolina's shrimping industry.

Defendants operate commercial shrimp fishing vessels in North Carolina's Pamlico Sound. JA19-20. They harvest mature shrimp species in the Pamlico Sound by towing trawl nets behind their boats. JA22-23. Commercial shrimp fishermen

began using this technology in 1916. *Id.* Incidental to catching target shrimp species, trawl nets may also capture non-target finfish, called bycatch.[3] JA24.

Plaintiffs brought a citizen suit under 33 U.S.C. § 1365 alleging that discarding "bycatch directly back into the Pamlico Sound's coastal waters . . . constitutes an illegal discharge of a pollutant" under the Clean Water Act. JA27. They also allege that the "disturbance, removal, and re-depositing of sediment as a result of pulling shrimp trawling equipment across the bottom of North Carolina coastal waters, including the Pamlico Sound, constitutes an illegal discharge of a pollutant" under the Clean Water Act. *Id.*

## B. The district court dismissed the claims as beyond the scope of the Clean Water Act.

Defendants moved to dismiss Plaintiffs' claims for failure to state a claim, and the district court granted the motions. JA902. First, the district court rejected Plaintiffs' claim that discarding bycatch constitutes the unlawful discharge of pollutants under the Clean Water Act. The court reasoned that the term "pollutant" must be interpreted in the context of the entire Act and other laws addressing the fishery management, and discussed the absurd results that Plaintiffs' interpretation would yield. JA879-91. Plaintiffs' interpretation of "pollutants" as "applying to

---

[3] "The term 'bycatch' means fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards." 16 U.S.C. § 1802(2).

bycatch and its inherent discard as caused by fishing in North Carolina coastal waters would extend the Act into an area of traditional state management and jurisdiction." JA882.

The district court noted that the Act specifically states that "[e]xcept as expressly provided in [the Clean Water Act], nothing in [the Act] shall . . . be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." JA880; 33 U.S.C. § 1370. Management of fisheries within state coastal waters has long been recognized by Congress as within state jurisdiction. JA881. There is no express statement or indication in the Clean Water Act that Congress intended to require an EPA or USACE permit to return bycatch back into the state waters from which the fish were taken. JA883. Rather, the district court noted Plaintiffs' interpretation would violate § 1370 with its "unprecedented intrusion into traditional state authority." *Id.* (quoting *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (plurality)).

The district court also reasoned that Plaintiffs' interpretation would make the Clean Water Act conflict with state and federal fisheries management laws. Both state and federal fisheries regulations often require that bycatch be returned to the water if caught, "without mention of the marine life's liveliness." JA887. So "it is unlikely that, despite enactment [of pertinent CWA provisions] in 1972, Congress

would then later implement a complex statutory scheme to manage and conserve fisheries, which specifically recognizes that bycatch and mortality of bycatch should be minimized and only to the extent practicable, if [the CWA] did indeed prohibit, outright, the unpermitted discharge of bycatch and bycatch carrion." *Id.*

The absurd consequences of Plaintiffs' interpretation were not lost on the district court. The court noted that under Plaintiffs' construction, activity such as picking up a floating crab momentarily then returning it to the water would violate the Clean Water Act. JA890. Further, given that the Clean Water Act allows for citizen suits, the Court noted any neighbor could bring suit under the Act for throwing a guppy back into the water after mistakenly catching it. JA891. Expanding the Clean Water Act to include these routine activities would be an unmanageable expansion of the statute into an area neither EPA nor USACE has ever regulated. *Id.*

The district court also rejected Plaintiffs' claim that Defendants' trawling activities constituted a discharge of "pollutants" or "dredged or fill material" into navigable waters. JA878-98. The court noted that the sediment that is allegedly disturbed during trawling never leaves the water and is, therefore, never returned or redeposited into the water. JA878. Thus, the court concluded that there is no "addition" of pollutants to navigable waters in violation of the Clean Water Act. *Id.* Moreover, to the extent Plaintiffs allege that Defendants should be required to obtain permits from USACE because they discharge "dredged and fill materials," the court

held that Plaintiffs' allegations, at most, alleged that trawling resulted in mere "incidental fallback." Incidental fallback is not regulated under the Clean Water Act because it does not constitute the addition or redeposit of dredged material to navigable waters. JA896-97. Such activity, the Court noted, would only be covered by the Clean Water Act if it "destroy[ed] or degrad[ed] an area of waters," and the bare allegations in the complaint failed to make plausible allegations of destruction or degradation. JA896 (citing 33 C.F.R. § 323.2(d)(5)).

## STANDARD OF REVIEW

This Court reviews the dismissal of a complaint under Rule 12(b)(6) de novo. *Greenhouse v. MCG Cap. Corp.*, 392 F.3d 650, 655 (4th Cir. 2004). "To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must "provide[] sufficient detail … to show that he has a more-than-conceivable chance of success on the merits." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 396 (4th Cir. 2014). This Court need not accept as true "legal conclusions, elements of a cause of action, … bare assertions devoid of further factual enhancement[,] … unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

## SUMMARY OF ARGUMENT

I.      Bycatch is not a "pollutant" under the Clean Water Act. The term "pollutant" includes "biological materials," "garbage," and "solid waste." Plaintiffs

argue bycatch is all of these under a literal reading, and that this Court should stop there. But rules of statutory construction require courts to delve deeper, especially where such wooden readings would trample authority entrusted to the states and create absurd results.

Congress has repeatedly declared that fishing in state waters is subject to the exclusive control of the states, and that the federal government will not usurp that authority. Upsetting that balance would require a clear signal from Congress. Not only does the Clean Water Act lack such a clear statement, it also instructs courts to construe the Act in a manner that respects the states' rights over their waters, which traditionally includes rights to exclusive jurisdiction over fishing in state waters.

Both North Carolina and Congress have established pervasive regulatory schemes to regulate fisheries within their respective jurisdictions. It is illogical that Congress would have established its regime, which also preserved states' jurisdiction over their fisheries, only to leave enough room for the Clean Water Act to come in and undercut their efforts. Again, an unambiguous statement from Congress would be necessary if it intended to engage in this kind of self-sabotage. None can be found in the Clean Water Act.

Even worse, Plaintiffs' overreaching claims would make an absurd federal case out of returning unwanted fish back into navigable waters. There is no minimum threshold to the Clean Water Act's "no discharge" prohibition. So a child releasing

her first undersized fish would violate the Clean Water Act no less than commercial shrimp fisherman discarding their bycatch. This absurd result counsels against Plaintiffs' construction.

II.     Plaintiffs also seek to proscribe another traditional aspect of fishing – the use of trawl nets. Shrimp are bottom dwellers, so to the bottom shrimp fishermen must go to harvest their catch. Plaintiffs claim that bottom trawling disturbs bottom sediments and so constitutes the discharge of dredged materials. For the same reasons Congress did not intend for the Clean Water Act to apply to bycatch discards, Congress also did not intend for the use of conventional, authorized commercial fishing gear to require a dredge and fill permit. Moreover, while this may have been Plaintiffs' intended goal, their complaint fails to sufficiently allege that Defendants' conduct amounts to a discharge of dredged materials.

## ARGUMENT

**I.      The district court correctly held that bycatch is not a "pollutant" under the Clean Water Act.**

**A.      Interpreting bycatch as a pollutant would upset the federal-state balance in violation of the Clean Water Act and established canons of statutory construction.**

The district court recognized that construing the Clean Water Act to regulate discarding bycatch would wreak havoc on the careful system of fisheries management that implicates core state regulatory jurisdiction. For at least four reasons, that disruption forbids the unprecedented construction sought by Plaintiffs.

First, the Clean Water Act itself instructs that it may not be construed to impair state jurisdiction over coastal waters. Second, even without that instruction, federal courts avoid interpretations (like Plaintiffs') that would seriously disrupt the federal-state balance of power. Third, federal statutes likewise should be construed to avoid creating conflicts with detailed regulatory schemes like those covering bycatch. Fourth, the district court correctly held that the very general provisions of the Clean Water Act should not trump the specific federal provisions addressing fisheries regulation. The district court correctly rejected Plaintiffs' wooden interpretation of "pollutants" under the Clean Water Act because it would upset the delicate balance of fisheries management that federal and state law protect.

> **1.** **Federal law mainly relies on the states for fisheries management, including bycatch regulation.**

Congress has recognized that management of fisheries within state coastal waters is within that state's rights and jurisdiction, JA881-82, and that bycatch is inherently a fisheries management issue. JA882. Congress reaffirmed that states have jurisdiction over fish in state waters, as recently as 2005 in the Reaffirmation of State Regulation of Resident and Nonresident Hunting and Fishing Act, Pub. L. No. 109-13, § 6035(b)(1), 119 Stat. 289, 289-90 ("Reaffirmation Act"), stating, "It is the policy of Congress that it is in the public interest for each State to continue to regulate the taking for any purpose of fish and wildlife within its boundaries." *See also, United States v. Babenko,* No. 13-4016, 2014 U.S. Dist. LEXIS 104913, *15-

17 (W.D. Mo. June 24, 2014) (the Reaffirmation Act "was obviously intended to include the regulation of commercial fishing as well as sport fishing").

Much history preceded the Reaffirmation Act. In 1899, Congress passed the Rivers and Harbors Act, giving the Coast Guard and USACE authority over the navigable waters of the United States, which includes many state waterways. But Congress was careful to specify that authority extended only with respect to preserving *navigability* of those waterways. *See* 33 U.S.C. § 401 *et seq*. Congress further expressly recognized state authority to regulate the taking of fish and wildlife within state waters in the Submerged Lands Act of 1953, which states:

> (1) [T]itle to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters, and (2) the right and power to manage, administer, lease, develop, and use the said lands and *natural resources* all in accordance with applicable State law be, and they are, subject to the provisions hereof, recognized, confirmed, established, and *vested in and assigned to the respective States*[.]

43 U.S.C. § 1311(a)(1) (emphasis added). "Natural resources" are defined in the Submerged Lands Act as: "oil, gas, and all other minerals, and *fish, shrimp, oysters, clams, crabs, lobsters, sponges, kelp, and other marine animal and plant life*[.]" *Id.* § 1301(e) (emphasis added). Congress was careful to state in the Submerged Lands Act that federal authority over state waters was limited to "constitutional purposes of commerce, navigation, national defense, and international affairs." *Id.* § 1314. Likewise, in the Fish and Wildlife Act of 1956, Congress stated:

> Nothing in this Act shall be construed to interfere in any manner with the rights of any State under the Submerged Lands Act or otherwise provided by law, *or to supersede any regulatory authority over fisheries exercised by the States* either individually or under interstate compacts[.]

16 U.S.C. § 742i(1) (emphasis added).

North Carolina fully exercises that jurisdiction—protected by federal law—over "coastal fisheries" including "*any and every aspect* of cultivating, taking, possessing, transporting, processing, selling, utilizing, and *disposing of fish* taken in coastal fishing waters, whatever the manner or purpose of taking." N.C. Gen. Stat. § 113-129(2) (emphasis added). So "any and every aspect" of the activities Plaintiffs contend violate the Clean Water Act – trawling for shrimp and returning bycatch caught in the Pamlico Sound back to the water – is within the regulatory jurisdiction of North Carolina's fishery management authority.

The MFC has promulgated extensive regulations and policies to minimize bycatch and bycatch mortality during shrimp fishing. JA886-87. The DMF Director has the authority to "require bycatch reduction devices or codend modifications in trawl nets to reduce the catch of finfish that do not meet size limits or are unmarketable as individual foodfish by reason of size." 15A N.C. Admin. Code 3J.0104(d). The DMF Director has exercised this authority to require the use of bycatch reduction devices that achieve at least 40% finfish bycatch reduction.

JA886-87.[4] The DMF Director has also imposed a bycatch limit of 100 pounds of weakfish larger than 12 inches taken with a shrimp trawl, as long as the amount of weakfish does not exceed 50% of the total weight of the catch. JA887. *See* N.C. Div. Marine Fisheries, N.C. Dep't of Env't Quality, FF-55-2012, *Proclamation Re: Weakfish Commercial Fishing Operations* (2012). Fishermen are not allowed to possess onboard deceased bycatch if the finfish are subject to size or harvest restrictions, so they must discard those fish overboard. 15A N.C. Admin. Code 3M.0101.

### 2. The Clean Water Act may not be construed to impair states' jurisdiction over their coastal waters.

Plaintiffs concede that management of fisheries within the Pamlico Sound is squarely within the rights and jurisdiction of North Carolina. Br. 3. "The protection of the environment and conservation of natural resources—including marine resources are areas of 'legitimate local concern.'" *New York State Trawlers Ass'n v. Jorling*, 16 F.3d 1303, 1308 (2d Cir. 1994) (quoting *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 (1981)). Applying the Clean Water Act to the return of bycatch would "result in significant impingement of [North Carolina's] traditional and primary power" to regulate fisheries in its waters. *Solid Waste Agency*

---

[4] *See* N.C. Div. Marine Fisheries, N.C. Dep't of Env't Quality, SH-3-2019, *Proclamation Re: Shrimp Trawl Bycatch Reduction Device Requirements – Pamlico Sound and Portions of the Pamlico Bay and Neuse Rivers* (2019).

*of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 174 (2001). Such impingement contradicts the Clean Water Act's clear admonition that it not "be construed as impairing or in any manner affecting any right or jurisdiction of the States with respect to the waters (including boundary waters) of such States." 33 U.S.C. § 1370.

Thus, interpreting the Clean Water Act's prohibition of unpermitted discharge of "biological materials," "garbage," and "solid waste" into navigable waters as applying to bycatch from fishing in North Carolina coastal waters would extend the Act into an area of traditional state management and jurisdiction. This would contravene the Clean Water Act's explicit guidance that nothing in the Act be construed as impairing or in any manner affecting any right or jurisdiction of the states over their boundary waters. JA883.

### 3. The Federalism Canon dictates that, absent a clear statement of intent by Congress, statutes should not be interpreted so as to intrude on areas traditionally regulated by states.

Plaintiffs' entire theory depends on applying the Clean Water Act to intrude into an area traditionally regulated by the states. To reiterate, Plaintiffs contend that the Clean Water Act prohibits fishermen from returning bycatch back into North Carolina coastal waters. The power to regulate bycatch caught in these waters resides with North Carolina. While "Congress may legislate in areas traditionally regulated by the States[,] . . . . [t]his is an extraordinary power in a federalist system . . . . that

we must assume Congress does not exercise lightly." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Congress has sought to regulate fisheries, including bycatch management practices, but it avoided infringing on the balance between federal and state power. *See* 16 U.S.C. § 1856(a)(1) (regulation of federal fisheries "shall [not] be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries."). Both state and federal fishery laws recognize that bycatch is unavoidable and include provisions that allow, and even require, fishermen to return living or dead bycatch to the water. It is unlikely that Congress intended for the Clean Water Act to preempt state fisheries laws in a way that federal fishery laws do not. It is even more unlikely that Congress intended to prohibit through the Clean Water Act activities that it has explicitly authorized elsewhere.

The Supreme Court recently affirmed these federalism principles when it struck down the Centers for Disease Control and Prevention's ("CDC's") nationwide moratorium on evictions of certain tenants in areas with high levels of COVID-19. The Court found the moratorium intruded on an area that "is the particular domain of state law: the landlord-tenant relationship." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2489 (2021). Thus, the Court noted "[o]ur precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power[.]" *Id.* (quoting *United States Forest Serv. v. Cowpasture River Pres. Ass'n,* 140 S. Ct. 1837, 1850

(2020)). The Supreme Court concluded that the text of the Public Health Service Act, which authorized the CDC in broad terms to do what it deemed "necessary" to prevent the spread of disease, did not justify federal intrusion into a traditional area of state authority. *Id.* at 2487-89; *cf. Nat'l Fed'n of Indep. Bus. v. Dep't of Labor*, 142 S. Ct. 661, 665 (2022) (per curiam) (striking down OSHA's vaccine mandate on large employers for lack of a clear statement by Congress to authorize the agency to "exercise powers of vast economic and political significance"). The Supreme Court has reiterated in many contexts, including under the Clean Water Act, that "[it] ordinarily expect[s] a 'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority." *Rapanos*, 547 U.S. at 738 ("waters of the United States" in the Clean Water Act does not include intermittent water flows). No such statement can be found in the Clean Water Act.

Plaintiffs' brief misunderstands the federalism concerns raised by their claims. This is not a dispute about whether EPA or North Carolina have primary authority to enforce the Clean Water Act. Br. 15-19. Rather, the issue is whether Congress intended for the Clean Water Act to prohibit traditional fishing practices that are concomitant to the state's exclusive jurisdiction to regulate its fisheries. If Plaintiffs were to prevail, EPA and USACE could dictate to fishermen that they must obtain a federal discharge permit to fish in state waters, thereby limiting—and potentially interfering with—North Carolina's authority to regulate fishing

practices. Neither EPA nor USACE have ever attempted to extend their regulatory authority this far, and USACE declined to do so here. JA34-37. And Congress did not intend for them to extend it as such.

Congress chose to regulate fisheries, including all relevant means and methods for fishing, outside the Clean Water Act. *See Se. Fisheries Ass'n, Inc. v. Chiles*, 979 F.2d 1504, 1509 (11th Cir. 1992) ("Congress outlined a fairly complete and pervasive federal scheme in the Magnuson[-Stevens] Act, and . . . . must have intended to occupy the field of fishery management within the [Exclusive Economic Zone]."). At the same time, it explicitly preserved the states' jurisdiction to regulate fisheries in their waters. *See* 16 U.S.C. § 1856(a)(1).

### 4. Plaintiffs' construction is impermissible because it conflicts with a larger federal and state statutory scheme.

Besides requiring a "clear and manifest" statement from Congress before upsetting the state-federal balance, the Supreme Court also requires the same statutory precision to encroach into new areas of "vast economic and political significance." *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014) ("*UARG*"). There is no "clear and manifest" statement within the Clean Water Act that expresses Congress's intent to regulate traditional fishing activities. *See Andrus v. Charlestone Stone Prod. Co.,* 436 U.S. 604, 616 (1978) (rejecting purported plain meaning construction because it would bring about a "major … alteration in established legal

relationships based on nothing more than an overly literal reading of a statute, without any regard for its context or history").

There is little doubt that a requirement that fishermen obtain discharge permits to fish in state and federal fisheries would intrude into an area of "vast economic and political significance." *UARG*, 573 U.S. at 324. Indeed, Congress declared that promoting consumption and preservation of fishery resources is in the National interest:

> The fish off the coasts of the United States, the highly migratory species of the high seas, the species which dwell on or in the Continental Shelf appertaining to the United States, and the anadromous species which spawn in United States rivers or estuaries, constitute valuable and renewable natural resources. These fishery resources contribute to the food supply, economy, and health of the Nation and provide recreational opportunities.

16 U.S.C. § 1801(a)(1).

Given the industry's significance, "[i]t is highly unlikely that Congress would leave the determination of whether" the fishing industry "will be entirely, or even substantially" regulated under the Clean Water Act to EPA's discretion. *MCI Telecommunications Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 (1994). Yet, it is this (unlikely) discretion that Plaintiffs argue Congress left to EPA. Br. 25 ("[W]hat is surprising, and perhaps even shocking to the general moral or common sense, is that EPA has heretofore failed to act, and therefore these discharges have been allowed to continue for so long."). Congress did not hide the authority to

regulate bycatch and other fisheries issues within vague and ambiguous language in the Clean Water Act. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . . does not . . . . hide elephants in mouseholes."). Instead, Congress passed the MSA to "manage the fishery resources found off the coasts of the United States," 16 U.S.C. § 1801(b)(1). In doing so, it was careful to preserve states' exclusive authority to regulate fisheries in their coastal waters.

The Supreme Court rejected a similar attempt to expand the Clean Water Act into areas that Congress regulated elsewhere in *Train v. Colorado Public Int. Research Grp., Inc.*, 426 U.S. 1 (1976). Congress had established a "pervasive regulatory scheme" to regulate "radioactive materials." *Id*. at 24. Plaintiffs brought a citizen suit arguing that those same "radioactive materials" were regulated under the Clean Water Act. Finding no clear statement from Congress to upset the established scheme for "radioactive materials," the Court rejected the citizen-plaintiffs' interpretation and attempt to expand the Clean Water Act's jurisdiction. *Id.* The same rationale applies here for the fisheries management scheme established by Congress.

Plaintiffs' construction would alter and conflict with a "pervasive" fisheries regulatory scheme. "Regulatory scheme" here refers to robust fisheries management by federal agencies, states in state waters, and multistate entities created by federal statute (the Magnuson-Stevens Act) to manage cross-border fisheries. This fisheries

management regulatory scheme includes fish stock conservation, management of bycatch and reducing bycatch mortality, gear requirements, and study to reduce bycatch and bycatch mortality. JA884-89. The regulatory scheme also authorizes fishermen to return bycatch (alive or dead), recognizing that these are unavoidable consequences of fishing. *Id*. Plaintiffs' interpretation of the Clean Water Act would not only upset this entire scheme, it would also defy the realities of fishing by prohibiting the unavoidable. JA882 ("[Bycatch] has existed since fishing began and virtually all fisheries in the world have some bycatch associated with them . . . . [B]ycatch and discards add to fishing mortality and should be considered a direct effect of fishing"). Under the clear statement rule for upsetting or conflicting with a regulatory scheme, Plaintiffs' construction of the Clean Water Act is impermissible.

The Supreme Court has rejected similar statutory interpretations that would undermine congressional policy reflected in other statutes. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp*. rejected the Food and Drug Administration's ("FDA") attempt to expand its authority under the Food, Drug, and Cosmetic Act ("FDCA") to regulating tobacco products. 529 U.S. 120 (2000). The FDA interpreted its authority to regulate "drugs" and "devices" as including the authority to regulate tobacco products as "drug delivery devices." *Id.* at 126-27. Yet given the FDA's directive to approve only "safe" and "effective" products, its tobacco regulations would inevitably result in a ban on tobacco if the FDA followed

its own FDCA guidelines. *Id.* at 134-37. This result under the FDCA would have conflicted with many other acts of Congress since the 1960s that "foreclosed the removal of tobacco products from the market." *Id*. at 137. So the Court held that FDA's attempt to regulate (and ban) tobacco products would "plainly contradict congressional policy" to keep tobacco products on the market in the interest of "commerce and the national economy." *Id*. at 138-39. "Such authority is inconsistent with the intent that Congress has expressed in the FDCA's overall regulatory scheme and in the tobacco-specific legislation that it has enacted subsequent to the FDCA." *Id.* at 126.

Here, just as regulating tobacco under the FDCA would undermine Congressional tobacco policy, imposing the Clean Water Act's discharge prohibition would flout Congress's policy of managing – without prohibiting – bycatch and bycatch mortality "to the extent practicable." 16 U.S.C. § 1851(a)(9). Congress's decision not to ban bycatch or bycatch discards reflects a careful balancing of "twin goals of conserving our nation's aquatic resources and allowing U.S. fisheries to thrive." *Oceana, Inc. v. Penny Pritzker*, 26 F. Supp. 3d 33, 36 (D.D.C. 2014). Under the MSA, fishery councils also balance these interests when developing bycatch conservation and management measures:

> the Councils must consider the net benefits to the Nation, which include, but are not limited to: Negative impacts on affected stocks; incomes accruing to participants in directed fisheries in both the short and long term; incomes accruing to participants in fisheries that target

the bycatch species; *environmental consequences*; non-market values of bycatch species, which include non-consumptive uses of bycatch species and existence values, as well as recreational values; and impacts on other marine organisms.

50 C.F.R. § 600.350(d) (emphasis added).

The bycatch management scheme under the MSA recognizes that it could not, on the one hand, promote the economic benefits of commercial fishing and, on the other hand, condition commercial fishing rights on compliance with unattainable and unrealistic standards (*e.g.*, a "no discard" rule for bycatch). In contrast, the Clean Water Act's "no discharge" rule is a blunt instrument that does not lend itself to balancing interests or nuance. As the district court explained,

> [I]t is unlikely that, despite enactment of § 1311(a) and § 1362(6) in 1972, Congress would then later implement a complex statutory scheme to manage and conserve fisheries, which specifically recognizes that bycatch and the mortality of bycatch should be minimized and only to the extent practicable, *if* § 1311(a) did indeed prohibit, outright, the unpermitted discharge of bycatch and bycatch carrion. Rather, an interpretation of the Clean Water Act to ban all bycatch discard from a fishing vessel would be in tension with the Magnuson-Stevens Act's specific directive to Regional Fishery Management Councils to prepare plans for fisheries [conservation] that only minimize bycatch and bycatch mortality.

JA887 (citing *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).

### 5. Plaintiffs' construction would conflict with more specific regulatory schemes.

Plaintiffs' construction also violates the general rule of statutory construction "that the specific governs the general," or the *lex specialis* doctrine. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Where Congress intended to give federal agencies authority to regulate fisheries, it has spoken with specificity. The same is true where Congress has regulated activities inherent to fishing, such as the management of bycatch, bycatch reduction measures, and allowable fishing gear. It is unreasonable to presume Congress intended the Clean Water Act's broad language to apply to areas it elsewhere chose to regulate specifically or where it preserved such authority in the states. JA884-90.

"Pursuant to elementary principles of statutory construction, unless the legislature has indicated that it intends otherwise, a specific statutory provision controls a more general one." *S.C. Dep't of Health & Env't Control v. Commerce & Indus. Ins. Co.,* 372 F.3d 245, 258 (4th Cir. 2004). *Lex specialis* warns "against applying a general provision when doing so would undermine limitations created by a more specific provision." *Varity Corp. v. Howe,* 516 U.S. 489, 511 (1996). So unless "there is . . .clear intention otherwise," the court will not construe a "specific statute" to "be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974); *cf. Whitman*, 531 U.S. at 468 ("Congress . . . does not alter the fundamental details of a regulatory scheme

in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Plaintiffs' "argument here is all elephant and no mousehole." *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 462 (5th Cir. 2020), *as revised* (Aug. 4, 2020). They ask this Court "to believe Congress authorized [the CWA] to . . . regulate an elaborate industry the statute does not even mention." *Id.* (rejecting NMFS' attempt to regulate aquaculture). But Congress enacted the Magnuson-Stevens Act to manage fishery resources, including bycatch measures. 16 U.S.C. § 1801(b)-(c). Congress directs fishery management councils to establish fishery management plans, *id.* §§ 1801(b)(5), 1851, 1853, and specifies that "[c]onservation and management measures shall, *to the extent practicable*, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id.* § 1851(a)(9) (emphasis added); *see also id.* § 1865(a) (requiring establishment of a bycatch reduction program).

The legislative history of the Sustainable Fisheries Act, which amended the Magnuson-Stevens Act in 1997 to add the language on the minimization of bycatch, *see* Sustainable Fisheries Act, Pub. L. No. 104-297, § 106, 110 Stat. 3559, 3570 (Oct. 11, 1996) (codified as amended at 16 U.S.C. § 1851(a)(9)), reveals that, in reference to this text:

> The use of the term 'to the extent practicable' was chosen deliberately by both the Sentence and the House. Both bodies recognize that bycatch

can occur in any fishery, and that complete avoidance of mortality is impossible . . . . However, it is not the intent of Congress that the councils ban a type of fishing gear or a type of fishing in order to comply with this standard.

142 Cong. Rec. H11397 (daily ed. Sept. 27, 1997) (statement of Rep. Don Young).[5]

Not only do these federal regulations require a reduction in bycatch, they also require a fishermen to return bycatch to the water in certain instances. JA886.

Similarly, North Carolina extensively regulates bycatch. JA886-87. And, like federal law, North Carolina law requires that certain bycatch be returned to the water if caught incidental to fishing, without regard for whether the bycatch is alive or dead. JA887.

When Congress passed the MSA and its amendments on bycatch, the Clean Water Act's prohibition on discharging pollutants was already a cornerstone of federal environmental law. Yet Congress did not prohibit returning bycatch back into navigable waters. Indeed, it adopted the opposite policy. "The fact that

---

[5] Plaintiffs criticize the district court's discussion of Rep. Young's "post-legislation statements . . . . in determining the meaning of the [CWA]'s provisions[.]" Br. 14. Rep. Young was not commenting on the Clean Water Act. Rather, he was explaining why Congress chose to amend the MSA to minimize bycatch "to the extent practicable" as opposed to prohibiting bycatch. This legislative history is "anchored" to the text of the MSA amendments. *See* 16 U.S.C. § 1851(a)(9); *see also Shannon v. United States*, 512 U.S. 573, 583 (1994). This history is instructive here because, at the time of the MSA amendments, Congress would have been aware of the CWA. If Congress understood discarding bycatch to be the "discharge of a pollutant," the practice would be effectively banned already. But that reading would conflict with Congress's later, specific regulations pertaining to bycatch, which focus on minimization, not prohibition.

[P]laintiffs' interpretation of the Clean Water Act would require that more general statute to regulate subject matter that other more specific federal and state statutes govern and, in places, nullify those more specific provisions counsels against that interpretation." JA889.

Plaintiffs view the lack of express authority in the Magnuson-Stevens Act as an invitation for EPA to regulate Defendants' fishing activities. Br. 21. But that construction "is a slippery basis for empowering an agency to create an entire industry the statute does not even mention." *Gulf Fishermens Ass'n*, 968 F.3d at 456. When Congress passed the Magnuson-Stevens Act, it knew how to regulate pollutant discharges. Yet it did not regulate fishing practices – discarding bycatch and harvesting fish with trawls – as regulable discharges under the Clean Water Act. That "lack of historical precedent, coupled with the breadth of authority" for which Plaintiffs advocate, "is a telling indication that the [authority] extends beyond [EPA]'s legitimate reach." *See Nat'l Fed'n of Indep. Bus.*, 142 S. Ct. at 666. !

Moreover, while attempting to distinguish fishery management from regulation of discharges, Plaintiffs' complaint blurs these concepts. State and federal fisheries regulators universally treat bycatch as a fisheries management issue. And so does Plaintiffs' complaint, which alleges:

- "Commercial shrimping equipment and practices are non-selective and routinely result in non-shrimp species being caught, injured, killed, and discarded." JA22.

- "This discarded bycatch equates to a huge number of fish . . . . One [DMF] study found 21.8 individuals in each pound of Pamlico Sound by-catch, meaning that in 2017 the total number of non-shrimp caught and discarded by shrimp trawlers would have been on the order of 740 million individuals." JA23.

- "Shrimping bycatch removes these many millions of juvenile fish, preventing them from joining the adult population, and also preventing them from spawning and adding to future juvenile populations. As a result, some of North Carolina's fisheries have experienced steep and species-threatening declines in certain finfish populations, which at times have resulted in the fishing seasons for those species to close prematurely or not open." JA25.

Plaintiffs tellingly sued the North Carolina DMF for allowing Defendants "to continue shrimp trawling operations in the Pamlico Sound, as described above, despite its mandate to ensure sustainable marine and estuarine fisheries and habitats for the benefit and health of all North Carolinians." JA25; *see also* JA30 (alleging that DMF "fail[ed] to adequately regulate Defendant Trawling Companies' shrimp trawling operations and allowing them to degrade and diminish North Carolina coastal waters' fisheries."). Plaintiffs' Notice of Intent even states, "[w]ithout [DMF's] approval, shrimp trawling in the Pamlico Sound and the bycatch disposal and turbidity that ensues *could not occur*." JA40 (emphasis added). Plaintiffs cannot deny seeking to alter the regulatory balance through the Clean Water Act when they initially did just that.

In short, "Congress would not "ban[ ] a practice and then, without reference to the prior ban, specifically recogniz[e] the current impracticality of such a ban."

JA889-90. Accordingly, the district correct was correct to reject Plaintiffs' attempt to construe the general provisions in the Clean Water Act to override specific state and federal fishery management laws.

### B. Construing bycatch as a pollutant would create absurd results.

Plaintiffs' overly literal interpretation of the Clean Water Act would yield absurdity. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). The district court provided two practical examples to illustrate why Plaintiffs' construction could not be the law:

> Plaintiffs assert that the Clean Water Act prohibits defendants from casting bycatch and bycatch carrion back into North Carolina coastal waters. Yet, per this interpretation of the Act, for example, any person on a dinghy off of Ocracoke Island who picks up a floating crab out of the water and, moments later, places it back in the water after that person has satisfied his or her curiosity commits a literal violation of § 1311(a) due to his or her failure to first obtain a permit to discharge such a pollutant back into navigable waters.
>
> . . . .
>
> Plaintiffs' interpretation would transform § 1311(a) into a sweeping source of litigation that Congress could not have intended, given that any individual recreating at a regulated body of water could bring a Clean Water Act citizen suit against a neighbor, with the threat of civil penalties, for the neighbor's casting of an accidentally caught and killed guppy back into the waters from his or her dinghy.

JA890-91.

Plaintiffs deflect by insisting that their construction is actually "much less shocking to the general moral or common sense" because it would only "apply to the discharge of hundreds of millions of dead fish," not an individual guppy or crab. Br. 24-25. But Plaintiffs cannot urge an unlimited interpretation of the Clean Water Act then deny the consequences of that construction. The Clean Water Act contains a "flat prohibition upon *all* discharges of pollutants." *Am. Frozen Food Inst. v. Train*, 539 F.2d 107, 115 (D.C. Cir. 1976) (emphasis added) (citing 33 U.S.C. § 1311(a)). Since every "unwanted" fish would be a pollutant, JA22, discarding just one guppy would violate the Act. The number of guppies discarded would determine the severity of the violation, not whether a violation has occurred.

Plaintiffs respond that EPA should be trusted to avoid those absurd results by carving a *de minimis* exception for the "discharge[s]" of bycatch. Br. 26-28. EPA thus would exempt from the Clean Water Act the return of certain bycatch discards to the waters from which they were taken while choosing to regulate others. This argument relies on several faulty assumptions.

First, it assumes that EPA will decide to issue a permit. But "[t]he use of the word 'may' in [33 U.S.C. § 1342] means only that the [EPA] has discretion either to issue a permit or to leave the discharger subject to the total proscription of [33 U.S.C. § 1311(a)]." *Nw. Env't Advocs. v. E.P.A.*, 537 F.3d 1006, 1021-22 (9th Cir. 2008). Plaintiffs' trust in EPA to promptly issue reasonably scoped permits is no

consolation to the thousands of fishermen whose economic fate would lie in the balance.

Second, it is questionable whether EPA would even have the authority to implement Plaintiffs' exemption for certain bycatch dischargers. "EPA does not have the authority to exempt discharges otherwise subject to the CWA. Only Congress may amend the CWA to create exemptions from regulation." *N. Plains Res. Council v. Fid. Expl. & Dev. Co.*, 325 F.3d 1155, 1164 (9th Cir. 2003) (rejecting Montana's exemption of discharges of groundwater derived from methane extraction from Clean Water Act permitting requirements, and holding that only Congress has that authority). The Supreme Court rejected a similar attempt by EPA in the Clean Air Act context. In *UARG*, EPA decided it could regulate greenhouse gas emissions as "air pollutants" for land-based, stationary sources and not just vehicles. This interpretation would give EPA new authority over "millions of small sources." 573 U.S. at 328. EPA tried to mitigate its massive expansion of authority with a "Tailoring Rule" that imposed threshold amounts of emissions that would trigger permitting, thus having a much smaller circle of enforcement from the potential "millions" of entities. *Id.* at 325-28. EPA argued its rule would make its exercise of authority reasonable. *Id.* The Court rejected the attempt, finding that EPA could not rewrite express statutory thresholds and could not make an unauthorized regulation permissible with rules limiting enforcement.

Finally, even if EPA could create *de minimis* exceptions for certain bycatch "discharges," exercising that authority to mitigate absurd results would be impracticable. JA891. As the district court explained,

> [T]here is no evidence of historical practice by the EPA or another administrative agency that could assuage the court regarding possible unmanageable expansion. The factual context of potentially impacted fishers is more diverse and expansive than could practically be mitigated by a "general permit for recurring situations."

*Id*. (citing *Cnty. of Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1477 (2020)).

Plaintiffs cannot have it both ways. They cannot purport to rely on the text of the Clean Water Act to cover Defendants' conduct, then carve unwritten exceptions to mitigate the resulting absurdity. Asserting that the Clean Water Act prohibits an unavoidable fishing practice that has "existed since fishing began" defies common sense. JA882, 889.

**C.    The text of the Clean Water Act does not compel federal regulation of bycatch as a pollutant.**

Plaintiffs rely exclusively on the purported plain meaning of "pollutant" under the Clean Water Act, but that does not justify their interpretation. They argue bycatch discard falls within the plain meaning of at least three types "pollutants" under the CWA: "biological materials," "garbage," and "solid waste." *See* 33 U.S.C. § 1362(6). Plaintiffs' mistake is thinking that their assertion of plain meaning is the end of the analysis:

[F]requently words of general meaning are used in a statute, words broad enough to include an act in question, and yet a consideration of the whole legislation, or of the circumstances surrounding its enactment, or of the absurd results which follow from giving such broad meaning to the words, makes it unreasonable to believe that the legislator intended to include the particular act.

*Pub. Citizen v. D.O.J.*, 491 U.S. 440, 454 (1989).

Rather, courts must "exhaust all the textual and structural clues" bearing on that meaning. Sometimes, as here, those clues indicate the term cannot be given its broadest definition. The task when faced with interpreting a statutory term that can have a sweepingly broad definition, is to reach a *plausible* interpretation that is permissible under the statute, not just a *possible* interpretation. *Rapanos*, 547 U.S. at 739. But no plausible interpretation of "pollutant" includes the disruptive construction Plaintiffs advance here.

1. **The district court correctly determined that the meaning of "pollutant" is ambiguous in this context.**

The district court began but did not end with the statutory text. Focusing on Plaintiffs' primary contention that bycatch is "biological material," the court noted that the plain meaning of that term "sheds little light on what Congress intended" to regulate. JA879 (citing *Train*, 426 U.S. at 23-24). Moreover, "[t]he potential breadth of the term 'biological materials' alone breeds ambiguity." *Id*. (citing *Kentuckians for Commonwealth Inc. v. Rivenburgh*, 317 F.3d 425, 441 (4th Cir. 2003)). Resolving this ambiguity – and determining congressional intent – requires courts

to look beyond the plain meaning of a broad statutory term and consider the statutory context in which the term resides.

This contextual review is an inescapable part of statutory construction. In *Train* (*see supra* at 25), in rejecting an attempt to expand the Clean Water Act's jurisdiction into an area pervasively regulated by another regulatory regime, the Supreme Court considered whether the broadest interpretation of a statute's plain language was determinative. The Court considered whether the term, "radioactive materials," which is listed alongside "biological materials," "garbage," and "solid waste," applied to discharges of certain radioactive materials that were regulated under the Atomic Energy Act ("AEA"). 426 U.S. 1. EPA declined to regulate these materials under the Clean Water Act, and a group of citizens claiming harm from radioactive effluents at nuclear plants filed citizen suit to force EPA to act. *Id.* at 4-5. The appellate court agreed with the citizen-plaintiffs. *Id.* at 9.

The Supreme Court reversed, explaining that it became "abundantly clear after a review of the legislative materials that reliance on the 'plain meaning' of the words 'radioactive materials' contained in the definition of 'pollutant' in the [Clean Water Act] contributes little to our understanding of whether Congress intended the Act to encompass the regulation of source, byproduct, and special nuclear materials." *Id*. at 23-24. After concluding that the term "radioactive materials" was ambiguous in this context, the Court rejected plaintiffs' interpretation as it "would

have marked a significant alteration of the pervasive regulatory scheme" unsupported by a clear indication of legislative intent to make that change. *Id.* at 24. Thus, the Court held that the special radioactive materials at issue, though they fit the *plain meaning* of the statutory term "radioactive materials," were not "pollutants" subject to regulation under the Clean Water Act. *Id.*

Just as the Clean Water Act's use of the phrase "radioactive materials" does not include *all* radioactive materials, the Supreme Court has also found that water is not a "valuable mineral" under various mining statutes, even though water is both "'valuable'" and "a 'mineral' in the broadest sense of that word. *Andrus,* 436 U.S. at 610. The Court noted Congress' and federal agencies' treatment of water rights at the time when the mining laws were drafted, affirming repeatedly that private water rights on federal lands were to be governed by state and local law and custom. *Id.* at 614. Given that statutory and regulatory context, the Court held that it "defie[d] common sense" to assume Congress adopted that policy while also allowing for acquisition of private water rights through federal mining laws that do not expressly use the term "water." *Id.*

Likewise, in *Yates v. United States*, 574 U.S. 528, 537 (2015), the Supreme Court rejected an "unrestrained," "aggressive" reading of the term "tangible object" in the Sarbanes-Oxley Act as encompassing dead fish. Noting that "although dictionary definitions of the words 'tangible' and 'object' bear consideration, they

are not dispositive of the meaning of 'tangible object' in [this statute]." *Id.* at 538. The Court then proceeded to examine the statute's context and other textual clues. The Court borrowed the "no elephants in the mouseholes" concept, concluding, "it is highly improbable that Congress would have buried a general spoliation statute covering objects of any and every kind in a provision targeting fraud in financial recordkeeping." *Id.* at 546.

Similarly, in *UARG*, the Supreme Court addressed whether EPA's authority under the Clean Air Act ("CAA") to regulate "air pollutant[s]" *generally* applied in a particular regulatory context to authorize EPA's sweeping new regulation over "millions of previously unregulated entities" for greenhouse gas emissions. 573 U.S. at 332; *see also supra* at 36-37 (discussing the Court's determination that EPA's attempted expansion of authority would yield "unworkable" and "unreasonable," or absurd, results). The Court said no. *UARG*, 573 U.S. at 319-24. EPA's regulatory action responded to *Massachusetts v. E.P.A.*, 549 U.S. 497 (2007), in which the Court held EPA *could* regulate greenhouse gas emissions as "air pollutants" from vehicles. Following *Massachusetts,* EPA moved to expand greenhouse gas emissions regulation under the CAA to land-based facilities under two existing permitting programs. *UARG*, 573 U.S. at 309-14. The Court noted this new interpretation would result in a dramatic, largely unworkable expansion of agency authority. Indeed, the Court pointed out that its "sweeping" and "capacious"

interpretation of "air pollutant" as applied to vehicle emissions was "not a command to regulate, but a description of the universe of substances EPA may *consider* regulating under the Act's operative provisions." *Id.* at 319. The Court explained that not every use of the term "air pollutant" in the CAA means "every conceivable airborne substance," but statutory *context* should be used to interpret the term "sensibly . . . within the particular regulatory program." *Id.*; *see generally id.* at 318-22 (calling for a "reasonable, context-appropriate meaning" of the otherwise broad statutory term in specific regulatory programs). As in *Train*, *Andrus*, *Yates*, and *UARG*, a broad, literal reading of "biological waste," "garbage," and "solid waste" does not make sense in the overall regulatory scheme created by Congress.

Unlike *Train*, this Court need not look to legislative history to resolve the meaning of the Clean Water Act. Nor did the district court "rely" on legislative history, despite Plaintiffs' assertion otherwise. Br. 11-15. The district court simply mentioned a legislator's statement during passage of an amendment to the MSA as support for the point that bycatch is treated in many areas of federal law and regulation. *See* JA885-86. Moreover, the plain language of the MSA proves the district court's point. *See* 16 U.S.C. § 1801(c)(3) (expressing Congress's policy "that the national fishery conservation and management program . . . considers the effects of fishing on immature fish and encourages development of practical measures that

minimize bycatch and avoid unnecessary waste of fish; and is workable and effective[.]").

The district court's decision rests firmly on a long line of Supreme Court precedent holding that statutory terms should not always be construed to their *broadest* meaning. Under the same statutory construction principles that treat nuclear materials as not necessarily "radioactive materials," greenhouse gases as not always "air pollutants," a dead fish as not a "tangible object," and water as not a "valuable mineral," the district court correctly concluded that bycatch are not "biological materials," "garbage," or "solid waste" when returned to the waters from which they were caught.

### 2. No precedent supports resolving the ambiguity in "pollutant" to cover bycatch.

This Court has not considered the precise meaning of the term "biological materials" in the Clean Water Act. And no other court has addressed whether that term extends to bycatch. Although Plaintiffs offer several cases for their ultra-broad construction of "biological material," Br. 7, those cases support the district court's reading. *See Nat'l Wildlife Fed'n v. Consumers Power Co.*, 862 F.2d 580, 586 (6th Cir. 1988) (live fish, dead fish, and fish remains entrained in a hydroelectric turbine); *Ass'n of Pac. Fisheries v. E.P.A.*, 615 F.2d 794, 802 (9th Cir. 1980) (processed fish parts); *U.S. PIRG v. Atl. Salmon of Me., LLC*, 215 F. Supp. 2d 239, 247 (D. Me.

2002) (non-native salmon at an offshore aquaculture farm); *Nw. Env't Advocs.*, 537 F.3d at 1021 (invasive fish species in ballast water).

While the court in *Consumers Power* accepted that fish (live, dead, or dismembered) were "biological materials," the court ultimately held that there was no discharge of pollutants because pollutants already in the water could not be added to the water. 862 F.2d at 585-86. The same is true here, since bycatch is being returned to the very waters from which it came. *Id.*

*Ass'n of Pac. Fisheries* involved a dispute over effluent guidelines EPA established for the canned and preserved seafood processing industry. 615 F.2d at 801-02. There was no dispute, however, that the Clean Water Act covered discharges of the waste product from processing seafood. Indeed, Congress clearly stated its intent to cover that industry under the Clean Water Act and directed EPA to develop effluent guidelines. *See* 33 U.S.C. § 1316. By contrast, the Clean Water Act says nothing about commercial fishing and recreational fishing industries.

The same is true for the aquaculture industry — the subject of *U.S. PIRG*, 215 F. Supp. 2d 239. Congress expressly authorized EPA to regulate discharges from aquaculture projects. *See* 33 U.S.C. § 1328; *see also Gulf Fishermens Ass'n*, 968 F.3d at 466 (recognizing EPA's express authority to regulate aquaculture under the CWA is distinct from MSA's regulation of fisheries and fishing). Moreover, *U.S. PIRG* involved the introduction of non-native species of salmon that were

"biological materials" because they "do not naturally occur in the water." 215 F. Supp. 2d at 247. Any fish that escape would be added, or discharged, since they were not there before. This case undercuts Plaintiffs' argument that *native* bycatch is a "biological material" since they naturally occur in the Pamlico Sound. Nor would they be "added," since they are returned to the very waters from which they came.

The same rationale applies to invasive species in ballast water. *See Nw. Env't Advocs*, 537 F.3d at 1021. Invasive species are "biological materials" because they are non-native. *Id*. Ballast water ingested from one location may contain species of fish that are then discharged into foreign habits where they can prove invasive. Further, Congress has expressly declared its intent to regulate certain discharges from vessels as a category under the Clean Water Act. *See* 33 U.S.C. § 1322. Again, the bycatch at issue is caught and returned to the very same waters and Congress has expressed no intent to categorically regulate open-water fishing operations as dischargers.

The most extensive analysis of the term "biological materials" is found the Ninth Circuit's opinion in *Ass'n to Protect Hammersley, Eld & Totten Inlets v. Taylor Res., Inc.*, 299 F.3d 1007, 1009 (9th Cir. 2002), which Plaintiffs strenuously attempt to distinguish. Br. 29-31. At issue was whether mussel shells, mussel feces, and other biological materials emitted from mussels grown on harvesting rafts were pollutants under the Clean Water Act. *Hammersley* held that the text of 33 U.S.C. §

1362(6) cannot resolve the application of the term "biological material" because the statute was "ambiguous on whether 'biological materials' means *all* biological matter regardless of quantum and nature and regardless of whether generated by living creatures, or whether the term is limited to biological materials that are a waste product of some human process." *Hammersley,* 299 F.3d at 1016. So the court determined that "'biological materials' means the waste product of a human or industrial process." *Id*. at 1017. Thus, it held that the "mussel shells, mussel feces and other mussel byproduct," which "come from the natural growth and development of mussels" and not human processes, do not fall within the statutory term "biological materials." *Id*. at 1017-18.

As in *Hammersley*, Defendants do not process fish. Defendants catch shrimp and unavoidable bycatch in trawl nets, then separate the shrimp from bycatch species, and then return the "bycatch directly back into the Pamlico Sound's coastal waters." JA27 ¶ 61; *see also* 50 C.F.R. § 600.350 ("'bycatch' means fish that are harvested in a fishery, but that are not sold or kept for personal use" and "includes the discard of whole fish at sea").

Further, Plaintiffs' emphasis on Defendants' fishing methods yields absurd results, since it would apply equally to fishing with a pole and a hook. That, too, would be a "human process" under Plaintiffs' theory. So a juvenile finfish that dies

on the hook at the end of a fishing pole would become a "biological material," and the fisherman would need a CWA permit to return it to the water.

Plaintiffs argue, in the alternative, that if bycatch are not "biological materials," they are "garbage" or "solid waste." Br. 8. As discussed in the preceding sections of this Brief, Congress did not intend for bycatch discards to be regulable discharges under the Clean Water Act, so classifying bycatch under any category of pollutant would be impermissible. *See Am. Min. Congress v. E.P.A.*, 824 F.2d 1177, 1184 (D.C. Cir. 1987) ("a matter may be within the letter of a statute but not within its spirit"). But Plaintiffs' reliance on "solid waste" and "garbage" is even more tenuous than "biological materials." Plaintiffs send this Court on a wild goose chase through the Resource Conservation and Recovery Act's ("RCRA") to bring bycatch within the meaning of "solid waste" or "garbage" for purposes of the Clean Water Act. Br. 8.[6] They argue the reference to "discarded material" in RCRA's definition of "solid waste" brings bycatch within the meaning of both "solid waste" and "garbage" under the Clean Water Act. However, the definition of "bycatch" under the Magnuson-Stevens Act includes not only the non-target fish species that are harvested, but also the discards of those fish. *See* 16 U.S.C. § 1802(2); *see also* 50

---

[6] The memorandum of understanding cited by Plaintiffs provides no support for their argument that the Clean Water Act "borrows" from RCRA. Br. 8. Regardless, Plaintiffs cite no authority treating bycatch as "solid waste" or "garbage" under either statute.

C.F.R. § 600.350(c)(1) ("Bycatch includes the discard of whole fish at sea or elsewhere, including economic discards and regulatory discards, and fishing mortality due to an encounter with fishing gear that does not result in capture of fish (i.e., unobserved fishing mortality)."). The MSA does not prohibit bycatch discards. Instead, it seeks to minimize them through fishery conservation and management measures. Plaintiffs' emphasis on the reference to "discarded material" in RCRA only highlights the tension between their construction of the Clean Water Act, which would prohibit bycatch discards, and fisheries laws that contemplate and authorize such discards.

## II. The district court correctly held that trawling does not result in the discharge of "dredged spoils" or "dredged materials."

Plaintiffs also assert that sediments disturbed by Defendants' trawling gear result in an unlawful discharge of pollutants under the Clean Water Act. First, they assert that "disturbance, removal, and re-depositing of sediment as a result of pulling shrimp trawling equipment across the bottom of North Carolina coastal waters, including the Pamlico Sound, constitutes an illegal discharge of a pollutant under the Clean Water Act." JA27. Given that this allegation appears under the same claim as bycatch discards, Plaintiffs' theory appears to be that this activity would require an EPA-issued NPDES permit under Section 1342 to be lawful. To fit under this framework, the sediments disturbed by Defendants would have to constitute

"dredged spoil" under the Clean Water Act's definition of "pollutant." 33 U.S.C. § 1362(6).

Plaintiffs' second theory is that Defendants' "disturbance, removal, and re-depositing of large volumes of sediments beyond the sediments' original location" constitutes a discharge of "dredged or fill material" requiring a permit from USACE ("404 Permit"). JA27-28. Since Defendants did not obtain 404 Permits, on this theory their trawling activities violate 33 U.S.C. §§ 1311(a) and 1344. *Id*.

The district court correctly rejected both theories.

## A. Plaintiffs do not plausibly allege that sediments are discharged into navigable waters.

Plaintiffs do not plead that Defendants' trawling results in the discharge of sediment *into* navigable waters. The complaint alleges Defendants disturb and resuspend bottom sediment, but that sediment never leaves the water. JA24 ¶ 48. Simply alleging that sediment is disturbed and suspended in water does not transform sediment into a pollutant. Even if this Court accepts that the sediment is a pollutant, Plaintiffs do not allege that the sediment is added to the water. To the contrary, they allege it remains in the water. Thus, Plaintiffs' complaint fails to sufficiently allege two essential elements to state a claim under the Clean Water Act: (1) that the sediment is a pollutant, and (2) that the sediment is discharged into navigable waters. *See* 33 U.S.C. § 1311(a); *id*. § 1362(6), (12).

The district court correctly noted that the Clean Water Act does not regulate, via NPDES permits, all pollutants anywhere. JA877. Rather, it regulates the "addition" of pollutants to navigable waters. So Plaintiffs' reliance on *United States v. Deaton*, 209 F.3d 331 (4th Cir. 2000) is misplaced.

In *Deaton*, the Fourth Circuit considered whether dirt that was excavated from wetlands and then returned to a different area through "sidecasting" constituted the discharge of "dredged spoil" under the Clean Water Act. 209 F.3d at 334-35. As with the other listed pollutants in that section, the Clean Water Act does not define "dredged spoil." JA876. The court in *Deaton* crafted its own definition, explaining that "[o]nce it was removed, that material became 'dredged spoil' . . . . What is important is that once that material was excavated from the wetland, its redeposit in that same wetland *added* a pollutant where none had been before." *Deaton*, 209 F.3d at 335-36. The court buttressed its reasoning on the "underlying rationale for defining dredged spoil as a pollutant," explaining that Congress had "determined that plain dirt, once excavated from waters of the United States, could not be redeposited into those waters without causing harm to the environment." *Id*. at 336 (emphasis added). Congress's concern was "the reintroduction of these materials into the waters of the United States." *Id*. (emphasis added).

Trawling is nothing like the sidecasting in *Deaton*. Although Plaintiffs allege that sediment is disturbed from the bottom of the coastal waters, it is never

"removed" or "excavated" from those waters. Even if the sediments are somehow transformed into "dredged spoil," Plaintiffs do not allege that the sediment ever leaves the water. Instead, the complaint alleges that the sediment remains in the water at all times. JA24. Plaintiffs cannot prevail on this first theory because they do not allege that "dredged spoil[s]" are discharged *into* navigable waters. JA878.

Similarly, Plaintiffs' reliance on *United States v. M.C.C. of Fla., Inc.*, 772 F.2d 1501 (11th Cir. 1985) is also misplaced. *M.C.C. of Fla.* involved a tugboat propeller repeatedly traversing the same area, dredging bottom sediment and redepositing the "dredged spoil" by *pushing* the sediment onto adjacent sea grass beds. That redeposition of bottom sediment to a different area amounted to a "discharge," or addition, of a pollutant (*i.e.* dredged spoil). The court did not appear to reach whether the defendant "discharged . . . . dredged or fill materials" without a 404 Permit.

## B. Defendants' trawling activities do not require 404 Permits.

The Clean Water Act generally requires a permit from USACE, or an approved state program, to "discharge . . . dredged or fill material into the navigable waters," which must occur "at specified disposal sites." 33 U.S.C. § 1344(a); *id.*, § 1311(a). USACE regulations define "dredged material" as "material that is *excavated or dredged from waters* of the United States." 33 C.F.R. § 323.2(c) (emphasis added). Although "the term discharge of dredged materials means any

*addition* of dredged material into, including redeposit of dredged material, . . . the

Waters of the United States," that term "does not include . . . [i]ncidental fallback."

*Id*. § 323.2(d) (emphasis added). Excluding "incidental fallback" from coverage

under Section 1344 tracks Congress's understanding of the term "discharge":

> In common dredging practices, excavation is followed by the disposal of dredged material at *another location*. Thus, Congress understood the "discharge of dredged material" to involve the moving of material from one place to another . . . . Incidental fallback associated with excavation or landclearing does not add material or move it from one location to another; some material simply falls back in the *same general location from which most of it was removed*. Congress' use of the term "specified disposal sites" underscores this reading as it conveys Congress' understanding that discharges would result in the relocation of material from one site to another.

*Am. Min. Cong. v. U.S. Army Corps of Eng'rs*, 951 F. Supp. 267, 273-74 (D.D.C.

1997) (emphasis added), *aff'd sub nom. Nat'l Min. Ass'n v. U.S. Army Corps of*

*Eng'rs*, 145 F.3d 1399 (D.C. Cir. 1998).

A 404 Permit is "not required for . . . [a]ny incidental addition, including

redeposit, of dredged material associated with any activity that does not have or

would not have the effect of destroying or degrading an area of waters." 33 C.F.R. §

323.2(d)(3)(i). USACE's regulations explain that "an activity associated with a

discharge of dredged material degrades an area of waters of the United States if it

has more than a *de minimis* (*i.e.*, inconsequential) effect on the area by causing an

identifiable individual or cumulative adverse effect on any aquatic function." *Id.* §

323.2(d)(5). This rule matches congressional intent underlying § 1344, under which

"Congress understood 'discharge of dredged material' to mean open water disposal of material removed during the digging or deepening of navigable waterways . . . . This understanding of 'discharge' excludes the small-volume incidental discharge that accompanies excavation and landclearing activities." *Am. Min. Cong.*, 951 F. Supp. at 273.

Plaintiffs do not allege, beyond conclusory allegations, that the purported discharge of sediments destroys or degrades the Pamlico Sound. JA897. Thus, Plaintiffs, at most, have alleged that trawling results in "incidental fallback," which is not regulated by the Clean Water Act. This mere recitation of the elements cannot withstand a motion to dismiss.[7]

Moreover, Plaintiffs allege that the sediment disturbed by Defendants' trawl gear resuspends in – but is not removed from – navigable waters. JA24 (alleging "those sediments . . . . become re-suspended in the water"). As the court in *Nat'l Min. Ass'n* explained, "resuspension" could mean different things. 145 F.3d at 1407. If by "resuspension" Plaintiffs are "referring to activities like the one at issue in *Rybachek* (removal of dirt and gravel from a streambed and its subsequent redeposit

---

[7] Plaintiffs filed untimely exhibits to try to supplement the record. The district court properly declined to consider them. JA897-98; *see also United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 459 n.8 (4th Cir. 2013) (A plaintiff "cannot cure pleading deficiencies in the . . . complaint with later-filed supporting documentation" such as "supplemental affidavit[s] with attachments.").

in the waterway after segregation of gold) . . . ." then Plaintiffs' complaint misses the mark since they allege that no sediment leaves the water. *Id.* Alternatively, if Plaintiffs interpret "'resuspension' to cover excavation or dredging accompanied by incidental fallback (in other words, as the agencies concede, virtually every act of excavation or dredging), it contradicts the statutory requirement of an addition." *Id.* Plaintiffs allege that Defendants are engaged in "dredging" and assume that all dredging results in discharges of dredged materials.

This construction is "unreasonable" because it would "convert[ ] *all* dredging – which is regulated under the Rivers and Harbors Act – into discharge of dredged material which is regulated under the Clean Water Act." *Id.* at 1410 (Silberman, J., concurring). These are "two separate statutory frameworks. Section 10 of the [Rivers and Harbors] Act covers the act of dredging, while Section 404 [of the Clean Water Act] covers the disposal of the dredged material." *Id.* at 1404. Plaintiffs allege that Defendants are engaged in dredging, which is different from discharging dredged materials. JA25 ("shrimp trawling activities result in the bottoms of ecologically- and commercially-important fisheries being *dredged*") (emphasis added); JA28 ("dragging otter trawls and other non-selective equipment along the bottom of the Pamlico Sound to harvest shrimp results in the *dredging* of the Sound's estuarine sediments") (emphasis added). But the alleged dredging here does not result in the discharge of dredged materials.

## **CONCLUSION**

For these reasons, this Court should affirm the district court's judgment.

Dated: February 9, 2022

Respectfully submitted,

*/s/ Brian D. Schmalzbach*

David N. Ventker
Marissa M. Henderson
VENTKER HENDERSON, PLLC
256 West Freemason Street
Norfolk, VA 23510
(757) 625-1192
dventker@ventkerlaw.com
mhenderson@ventkerlaw.com

*Counsel for Defendant-Appellee*
*Esther Joy, Inc.*

Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-4746
bschmalzbach@mcguirewoods.com

Charles D. Case
W. Dixon Snukals
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27611
(919) 755-6698
ccase@mcguirewoods.com

wsnukals@mcguirewoods.com

Henry L. Kitchin, Jr.
McGuireWoods LLP
300 North 3rd Street
Suite 320
Wilmington, NC 28401
(910) 254-3800
hkitchin@mcguirewoods.com

Stevenson L. Weeks, Sr.
Wheatly, Wheatly, Weeks
   & Lupton, PA
710 Cedar Street
Beaufort, NC 28516
(252) 728-3158
slw@wheatlylaw.com

*Counsel for Defendants-Appellees
Capt. Gaston LLC, Hobo Seafood, Inc.,
Lady Samaira Inc., Trawler Capt. Alfred,
Inc., Trawler Christina Ann, Inc., and
Trawlers Garland and Jeff, Inc.*

# CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because it contains 12,989 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface and type-style requirements of Fed. R. App. P. 32(a)(5) and Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced, 14-point Times New Roman font using Microsoft Word.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach

**CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2022, the foregoing was filed with the Clerk of the United States Court of Appeals for the Fourth Circuit using the appellate CM/ECF system, which will also serve counsel of record.

*/s/ Brian D. Schmalzbach*
Brian D. Schmalzbach