**McGuireWoods**

McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

Brian D. Schmalzbach
Direct: 804.775.4746
bschmalzbach@mcguirewoods.com

June 1, 2023

**VIA Electronic Filing**

Patricia S. Connor
Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
Lewis F. Powell, Jr. United States Courthouse Annex
1100 East Main Street, Suite 501
Richmond, Virginia 23219-3517

> Re: No. 21-2184, *North Carolina Coastal Fisheries Reform Group, et al. v. Capt. Gaston LLC, et al.*

Dear Ms. Connor:

Pursuant to Rule 28(j), the Supreme Court's decision in *Sackett v. Environmental Protection Agency*, 598 U.S. __, No. 21-454 (May 25, 2023), confirms that the district court correctly refused to expand the Clean Water Act (CWA) to ban age-old shrimping practices.

*Sackett* addressed attempts by EPA and the Army Corps of Engineers to expand their CWA jurisdiction by broadly construing "waters of the United States." 33 U.S.C. § 1362(7). The Supreme Court rejected those attempts, limiting that statutory term to "relatively permanent bod[ies] of water connected to traditional interstate navigable waters" and wetlands with "a continuous surface connection" to such waters. Op. 22.

That interpretation of the CWA relied on two "background principles of construction" also applicable here. *Id.* at 23. First, Congress must "enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power." *Id.* The Supreme Court thus rejected an "overly broad interpretation of the CWA's reach" because it would impinge on the "traditional state authority" to regulate land and water use. *Id.* That principle applies with double force here: not only is fisheries management a matter of traditional state authority, but that state authority is codified in federal law. Response Br. 16-23.

Second, "EPA's interpretation [of 'waters of the United States']"—like Plaintiffs' interpretation of "pollutant" in § 1362(6)—"gives rise to serious vagueness concerns in light of the CWA's criminal penalties." Op. 24. "Where a penal statute could sweep so broadly as to render criminal a host of what might otherwise be considered ordinary activities, we have been wary about going beyond what 'Congress certainly intended the statute to cover.'" *Id.* at 25. That wariness tilts heavily against a theory that would place it within EPA's discretion to penalize every boater, fisherman, and rock-skipper in America. Oral Arg. at 10:45-12:25. And wariness is especially warranted here, where neither EPA nor the Army Corps nor any agency or court whatsoever has sought to subject shrimping to the CWA. Instead, this Court should affirm.

Respectfully submitted,

By:     */s/ Brian D. Schmalzbach*

David N. Ventker
Marissa M. Henderson
VENTKER HENDERSON, PLLC
256 West Freemason Street
Norfolk, VA 23510
T: (757) 625-1192
F: (757) 625-1475
dventker@ventkerlaw.com
mhenderson@ventkerlaw.com

*Counsel for Defendant-Appellee
Esther Joy, Inc.*

Brian D. Schmalzbach
MCGUIREWOODS LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-4746
bschmalzbach@mcguirewoods.com

W. Dixon Snukals
MCGUIREWOODS LLP
501 Fayetteville Street
Suite 500
Raleigh, NC 27611
(919) 755-6698
wsnukals@mcguirewoods.com

Henry L. Kitchin, Jr.
MCGUIREWOODS LLP
300 North 3rd Street
Suite 320
Wilmington, NC 28401
(910) 254-3800
hkitchin@mcguirewoods.com

Stevenson L. Weeks, Sr.
WHEATLY, WHEATLY, WEEKS
    & LUPTON, PA
710 Cedar Street
Beaufort, NC 28516
(252) 728-3158
slw@wheatlylaw.com

*Counsel for Defendants-Appellees
Capt. Gaston LLC, Hobo Seafood, Inc.,
Lady Samaira Inc., Trawler Capt. Alfred,
Inc., Trawler Christina Ann, Inc., and
Trawlers Garland and Jeff, Inc.*

Enclosure

cc:  All counsel of record

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SACKETT ET UX. *v.* ENVIRONMENTAL PROTECTION AGENCY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 21–454.   Argued October 3, 2022—Decided May 25, 2023

Petitioners Michael and Chantell Sackett purchased property near Priest Lake, Idaho, and began backfilling the lot with dirt to prepare for building a home. The Environmental Protection Agency informed the Sacketts that their property contained wetlands and that their backfilling violated the Clean Water Act, which prohibits discharging pollutants into "the waters of the United States." 33 U. S. C. §1362(7). The EPA ordered the Sacketts to restore the site, threatening penalties of over $40,000 per day. The EPA classified the wetlands on the Sacketts' lot as "waters of the United States" because they were near a ditch that fed into a creek, which fed into Priest Lake, a navigable, intrastate lake. The Sacketts sued, alleging that their property was not "waters of the United States." The District Court entered summary judgment for the EPA. The Ninth Circuit affirmed, holding that the CWA covers wetlands with an ecologically significant nexus to traditional navigable waters and that the Sacketts' wetlands satisfy that standard.

*Held*: The CWA's use of "waters" in §1362(7) refers only to "geographic[al] features that are described in ordinary parlance as 'streams, oceans, rivers, and lakes'" and to adjacent wetlands that are "indistinguishable" from those bodies of water due to a continuous surface connection. *Rapanos* v. *United States,* 547 U. S. 715, 755, 742, 739 (plurality opinion). To assert jurisdiction over an adjacent wetland under the CWA, a party must establish "first, that the adjacent [body of water constitutes] . . . 'water[s] of the United States' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Ibid.* Pp. 6–28.

(a) The uncertain meaning of "the waters of the United States" has been a persistent problem, sparking decades of agency action and litigation. Resolving the CWA's applicability to wetlands requires a review of the history surrounding the interpretation of that phrase. Pp. 6–14.

(1) During the period relevant to this case, the two federal agencies charged with enforcement of the CWA—the EPA and the Army Corps of Engineers—similarly defined "the waters of the United States" broadly to encompass "[a]ll . . . waters" that "could affect interstate or foreign commerce." 40 CFR §230.3(s)(3). The agencies likewise gave an expansive interpretation of wetlands adjacent to those waters, defining "adjacent" to mean "bordering, contiguous, or neighboring." §203.3(b). In *United States* v. *Riverside Bayview Homes, Inc.,* 474 U. S. 121, the Court confronted the Corps' assertion of authority under the CWA over wetlands that "actually abut[ted] on a navigable waterway." *Id.,* at 135. Although concerned that the wetlands fell outside "traditional notions of 'waters,'" the Court deferred to the Corps, reasoning that "the transition from water to solid ground is not necessarily or even typically an abrupt one." *Id.,* 132–133. Following *Riverside Bayview,* the agencies issued the "migratory bird rule," extending CWA jurisdiction to any waters or wetlands that "are or would be used as [a] habitat" by migratory birds or endangered species. 53 Fed. Reg. 20765. The Court rejected the rule after the Corps sought to apply it to several isolated ponds located wholly within the State of Illinois, holding that the CWA does not "exten[d] to ponds that are not adjacent to open water." *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers,* 531 U. S. 159, 168 (*SWANCC*) (emphasis deleted). The agencies responded by instructing their field agents to determine the scope of the CWA's jurisdiction on a case-by-case basis. Within a few years, the agencies had "interpreted their jurisdiction over 'the waters of the United States' to cover 270-to-300 million acres" of wetlands and "virtually any parcel of land containing a channel or conduit . . . through which rainwater or drainage may occasionally or intermittently flow." *Rapanos,* 547 U. S., at 722 (plurality opinion).

Against that backdrop, the Court in *Rapanos* vacated a lower court decision that had held that the CWA covered wetlands near ditches and drains that emptied into navigable waters several miles away. As to the rationale for vacating, however, no position in *Rapanos* commanded a majority of the Court. Four Justices concluded that the CWA's coverage was limited to certain relatively permanent bodies of water connected to traditional interstate navigable waters and to wetlands that are "as a practical matter indistinguishable" from those waters. *Id.,* at 755 (emphasis deleted). Justice Kennedy, concurring only in the judgment, wrote that CWA jurisdiction over adjacent wetlands

requires a "significant nexus" between the wetland and its adjacent navigable waters, which exists when "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity" of those waters. *Id.,* at 779–780. Following *Rapanos,* field agents brought nearly all waters and wetlands under the risk of CWA jurisdiction by engaging in fact-intensive "significant-nexus" determinations that turned on a lengthy list of hydrological and ecological factors.

Under the agencies' current rule, traditional navigable waters, interstate waters, and the territorial seas, as well as their tributaries and adjacent wetlands, are waters of the United States. See 88 Fed. Reg. 3143. So too are any "[i]ntrastate lakes and ponds, streams, or wetlands" that either have a continuous surface connection to categorically included waters or have a significant nexus to interstate or traditional navigable waters. *Id.,* at 3006, 3143. Finding a significant nexus continues to require consideration of a list of open-ended factors. *Ibid.* Finally, the current rule returns to the agencies' longstanding definition of "adjacent." *Ibid.* Pp. 6–12.

(2) Landowners who even negligently discharge pollutants into navigable waters without a permit potentially face severe criminal and civil penalties under the Act. As things currently stand, the agencies maintain that the significant-nexus test is sufficient to establish jurisdiction over "adjacent" wetlands. By the EPA's own admission, nearly all waters and wetlands are potentially susceptible to regulation under this test, putting a staggering array of landowners at risk of criminal prosecution for such mundane activities as moving dirt. Pp. 12–14.

(b) Next, the Court considers the extent of the CWA's geographical reach. Pp. 14–22.

(1) To make sense of Congress's choice to define "navigable waters" as "the waters of the United States," the Court concludes that the CWA's use of "waters" encompasses "only those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Rapanos,* 547 U. S., at 739 (plurality opinion). This reading follows from the CWA's deliberate use of the plural "waters," which refers to those bodies of water listed above, and also helps to align the meaning of "the waters of the United States" with the defined term "navigable waters." More broadly, this reading accords with how Congress has employed the term "waters" elsewhere in the CWA—see, *e.g.,* 33 U. S. C. §§1267(i)(2)(D), 1268(a)(3)(I)—and in other laws—see, *e.g.,* 16 U. S. C. §§745, 4701(a)(7). This Court has understood CWA's use of "waters" in the same way. See, *e.g., Riverside Bayview,* 474 U. S., at 133; *SWANCC,* 531 U. S., at 168–169, 172.

The EPA's insistence that "water" is "naturally read to encompass

wetlands" because the "presence of water is 'universally regarded as the most basic feature of wetlands'" proves too much. Brief for Respondents 19. It is also tough to square with *SWANCC*'s exclusion of isolated ponds or *Riverside Bayview*'s extensive focus on the adjacency of wetlands to covered waters. Finally, it is difficult to see how the States' "responsibilities and rights" in regulating water resources would remain "primary" if the EPA had such broad jurisdiction. §1251(b). Pp. 14–18.

(2) Statutory context shows that some wetlands nevertheless qualify as "waters of the United States." Specifically, §1344(g)(1), which authorizes States to conduct certain permitting programs, specifies that discharges may be permitted into any waters of the United States, except for traditional navigable waters, "including wetlands adjacent thereto," suggesting that at least some wetlands must qualify as "waters of the United States." But §1344(g)(1) cannot define what wetlands the CWA regulates because it is not the operative provision that defines the Act's reach. Instead, the reference to adjacent wetlands in §1344(g)(1) must be harmonized with "the waters of the United States," which is the operative term that defines the CWA's reach. Because the "adjacent" wetlands in §1344(g)(1) are "includ[ed]" within "waters of the United States," these wetlands must qualify as "waters of the United States" in their own right, *i.e.*, be indistinguishably part of a body of water that itself constitutes "waters" under the CWA. To hold otherwise would require implausibly concluding that Congress tucked an important expansion to the reach of the CWA into convoluted language in a relatively obscure provision concerning state permitting programs. Understanding the CWA to apply to wetlands that are distinguishable from otherwise covered "waters of the United States" would substantially broaden §1362(7) to define "navigable waters" as "waters of the United States *and adjacent wetlands*." But §1344(g)(1)'s use of the term "including" makes clear that it does not purport to do any such thing. It merely reflects Congress's assumption that certain "adjacent" wetlands are part of the "waters of the United States."

To determine when a wetland is part of adjacent "waters of the United States," the Court agrees with the *Rapanos* plurality that the use of "waters" in §1362(7) may be fairly read to include only wetlands that are "indistinguishable from waters of the United States." This occurs only when wetlands have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." 547 U. S., at 742.

In sum, the CWA extends to only wetlands that are "as a practical

matter indistinguishable from waters of the United States." This requires the party asserting jurisdiction to establish "first, that the adjacent [body of water constitutes] . . . 'water[s] of the United States' (*i.e.*, a relatively permanent body of water connected to traditional interstate navigable waters); and second, that the wetland has a continuous surface connection with that water, making it difficult to determine where the 'water' ends and the 'wetland' begins." *Rapanos,* 547 U. S., at 755, 742. Pp. 18–22.

(c) The EPA asks the Court to defer to its most recent rule providing that "adjacent wetlands are covered by the [CWA] if they 'possess a significant nexus to' traditional navigable waters" and that wetlands are "adjacent" when they are "neighboring" to covered waters. Brief for Respondents 32, 20. For multiple reasons, the EPA's position lacks merit. Pp. 22–27.

(1) The EPA's interpretation is inconsistent with the CWA's text and structure and clashes with "background principles of construction" that apply to the interpretation of the relevant provisions. *Bond* v. *United States*, 572 U. S. 844, 857. First, "exceedingly clear language" is required if Congress wishes to alter the federal/state balance or the Government's power over private property. *United States Forest Service* v. *Cowpasture River Preservation Assn.*, 590 U. S. ___, ___. The Court has thus required a clear statement from Congress when determining the scope of "the waters of the United States." Second, the EPA's interpretation gives rise to serious vagueness concerns in light of the CWA's criminal penalties, thus implicating the due process requirement that penal statutes be defined "'with sufficient definiteness that ordinary people can understand what conduct is prohibited.'" *McDonnell* v. *United States*, 579 U. S. 550, 576. Where penal statutes could sweep broadly enough to render criminal a host of what might otherwise be considered ordinary activities, the Court has been wary about going beyond what "Congress certainly intended the statute to cover." *Skilling* v. *United States*, 561 U. S. 358, 404. Under these two principles, the judicial task when interpreting "the waters of the United States" is to ascertain whether clear congressional authorization exists for the EPA's claimed power. Pp. 22–25.

(2) The EPA claims that Congress ratified the EPA's regulatory definition of "adjacent" when it amended the CWA to include the reference to "adjacent" wetlands in §1344(g)(1). This argument fails for at least three reasons. First, the text of §§1362(7) and 1344(g) shows that "adjacent" cannot include wetlands that are merely nearby covered waters. Second, EPA's argument cannot be reconciled with this Court's repeated recognition that §1344(g)(1) "'does not conclusively determine the construction to be placed on . . . the relevant definition of "navigable waters."'" *SWANCC*, 531 U. S., at 171. Third, the EPA

falls short of establishing the sort of "overwhelming evidence of acqui-escence" necessary to support its argument in the face of Congress's failure to amend §1362(7). Finally, the EPA's various policy arguments about the ecological consequences of a narrower definition of "adjacent" are rejected. Pp. 25–27.

8 F. 4th 1075, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, GORSUCH, and BARRETT, JJ., joined. THOMAS, J., filed a concurring opinion, in which GORSUCH, J., joined. KAGAN, J., filed an opinion concurring in the judgment, in which SOTOMAYOR and JACKSON, JJ., joined. KAVANAUGH, J., filed an opinion concurring in the judgment, in which SOTOMAYOR, KAGAN, and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———

No. 21–454

———

## MICHAEL SACKETT, ET UX., PETITIONERS *v.* ENVIRONMENTAL PROTECTION AGENCY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 25, 2023]

JUSTICE ALITO delivered the opinion of the Court.

This case concerns a nagging question about the outer reaches of the Clean Water Act (CWA), the principal federal law regulating water pollution in the United States.[1] By all accounts, the Act has been a great success. Before its enactment in 1972, many of the Nation's rivers, lakes, and streams were severely polluted, and existing federal legislation had proved to be inadequate. Today, many formerly fetid bodies of water are safe for the use and enjoyment of the people of this country.

There is, however, an unfortunate footnote to this success story: the outer boundaries of the Act's geographical reach have been uncertain from the start. The Act applies to "the waters of the United States," but what does that phrase mean? Does the term encompass any backyard that is soggy enough for some minimum period of time? Does it reach "mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, [or] playa lakes?"[2] How about ditches, swimming pools, and puddles?

———

[1] 86 Stat. 816, as amended, 33 U. S. C. §1251 *et seq.*

[2] 40 CFR §230.3(s)(3) (2008).

For more than a half century, the agencies responsible for enforcing the Act have wrestled with the problem and adopted varying interpretations. On three prior occasions, this Court has tried to clarify the meaning of "the waters of the United States." But the problem persists. When we last addressed the question 17 years ago, we were unable to agree on an opinion of the Court.[3] Today, we return to the problem and attempt to identify with greater clarity what the Act means by "the waters of the United States."

## I

### A

For most of this Nation's history, the regulation of water pollution was left almost entirely to the States and their subdivisions. The common law permitted aggrieved parties to bring nuisance suits against polluters. But as industrial production and population growth increased the quantity and toxicity of pollution, States gradually shifted to enforcement by regulatory agencies.[4] Conversely, federal regulation was largely limited to ensuring that "traditional navigable waters"—that is, interstate waters that were either navigable in fact and used in commerce or readily susceptible of being used in this way—remained free of impediments. See, *e.g.*, Rivers and Harbors Act of 1899, 30 Stat. 1151; see also *United States* v. *Appalachian Elec. Power Co.*, 311 U. S. 377, 406–407 (1940); *The Daniel Ball*, 10 Wall. 557, 563 (1871).

Congress's early efforts at directly regulating water pollution were tepid. Although the Federal Water Pollution Control Act of 1948 allowed federal officials to seek judicial abatement of pollution in interstate waters, it imposed high

_____

[3] See *Rapanos* v. *United States*, 547 U. S. 715 (2006). Neither party contends that any opinion in *Rapanos* controls. We agree. See *Nichols* v. *United States*, 511 U. S. 738, 745–746 (1994).

[4] See N. Hines, Nor Any Drop To Drink: Public Regulation of Water Quality, 52 Iowa L. Rev. 186, 196–207 (1966).

hurdles, such as requiring the consent of the State where the pollution originated. See 62 Stat. 1156–1157. Despite repeated amendments over the next two decades, few actions were brought under this framework.[5]

Congress eventually replaced this scheme in 1972 with the CWA. See 86 Stat. 816. The Act prohibits "the discharge of any pollutant" into "navigable waters." 33 U. S. C. §§1311(a), 1362(12)(A). It broadly defines the term "'pollutant'" to include not only contaminants like "chemical wastes," but also more mundane materials like "rock, sand," and "cellar dirt." §1362(6).

The CWA is a potent weapon. It imposes what have been described as "crushing" consequences "even for inadvertent violations." *Army Corps of Engineers* v. *Hawkes Co.*, 578 U. S. 590, 602 (2016) (Kennedy, J., concurring). Property owners who negligently discharge "pollutants" into covered waters may face severe criminal penalties including imprisonment. §1319(c). These penalties increase for knowing violations. *Ibid.* On the civil side, the CWA imposes over $60,000 in fines per day for each violation. See Note following 28 U. S. C. §2461; 33 U. S. C. §1319(d); 88 Fed. Reg. 989 (2023) (to be codified in 40 CFR §19.4). And due to the Act's 5-year statute of limitations, 28 U. S. C. §2462, and expansive interpretations of the term "violation," these civil penalties can be nearly as crushing as their criminal counterparts, see, *e.g.*, *Borden Ranch Partnership* v. *United States Army Corps of Engineers*, 261 F. 3d 810, 813, 818 (CA9 2001) (upholding Agency decision to count each of 348 passes of a plow by a farmer through "jurisdictional" soil on his farm as a separate violation), aff'd by an equally divided Court, 537 U. S. 99 (2002) (*per curiam*).

The Environmental Protection Agency (EPA) and the

_____

[5] See Hearings on Activities of the Federal Water Pollution Control Administration before the Subcommittee on Air and Water Pollution of the Senate Committee on Public Works, 90th Cong., 1st Sess., 674 (1967) (reporting only one abatement suit between 1948 and 1967).

Army Corps of Engineers (Corps) jointly enforce the CWA. The EPA is tasked with policing violations after the fact, either by issuing orders demanding compliance or by bringing civil actions. §1319(a). The Act also authorizes private plaintiffs to sue to enforce its requirements. §1365(a). On the front end, both agencies are empowered to issue permits exempting activity that would otherwise be unlawful under the Act. Relevant here, the Corps controls permits for the discharge of dredged or fill material into covered waters. See §1344(a). The costs of obtaining such a permit are "significant," and both agencies have admitted that "the permitting process can be arduous, expensive, and long." *Hawkes Co.*, 578 U. S., at 594–595, 601. Success is also far from guaranteed, as the Corps has asserted discretion to grant or deny permits based on a long, nonexclusive list of factors that ends with a catchall mandate to consider "in general, the needs and welfare of the people." 33 CFR §320.4(a)(1) (2022).

Due to the CWA's capacious definition of "pollutant," its low *mens rea*, and its severe penalties, regulated parties have focused particular attention on the Act's geographic scope. While its predecessor encompassed "interstate or navigable waters," 33 U. S. C. §1160(a) (1970 ed.), the CWA prohibits the discharge of pollutants into only "navigable waters," which it defines as "the waters of the United States, including the territorial seas," 33 U. S. C. §§1311(a), 1362(7), (12)(A) (2018 ed.). The meaning of this definition is the persistent problem that we must address.

## B

Michael and Chantell Sackett have spent well over a decade navigating the CWA, and their voyage has been bumpy and costly. In 2004, they purchased a small lot near Priest Lake, in Bonner County, Idaho. In preparation for building a modest home, they began backfilling their property with

dirt and rocks. A few months later, the EPA sent the Sacketts a compliance order informing them that their backfilling violated the CWA because their property contained protected wetlands. The EPA demanded that the Sacketts immediately "'undertake activities to restore the Site'" pursuant to a "'Restoration Work Plan'" that it provided. *Sackett* v. *EPA*, 566 U. S. 120, 125 (2012). The order threatened the Sacketts with penalties of over $40,000 per day if they did not comply.

At the time, the EPA interpreted "the waters of the United States" to include "[a]ll . . . waters" that "could affect interstate or foreign commerce," as well as "[w]etlands adjacent" to those waters. 40 CFR §§230.3(s)(3), (7) (2008). "[A]djacent" was defined to mean not just "bordering" or "contiguous," but also "neighboring." §230.3(b). Agency guidance instructed officials to assert jurisdiction over wetlands "adjacent" to non-navigable tributaries when those wetlands had "a significant nexus to a traditional navigable water."[6] A "significant nexus" was said to exist when "'wetlands, either alone or in combination with *similarly situated lands* in the region, *significantly affect* the chemical, physical, and biological integrity'" of those waters. 2007 Guidance 8 (emphasis added). In looking for evidence of a "significant nexus," field agents were told to consider a wide range of open-ended hydrological and ecological factors. See *id.*, at 7.

According to the EPA, the "wetlands" on the Sacketts' lot are "adjacent to" (in the sense that they are in the same neighborhood as) what it described as an "unnamed tributary" on the other side of a 30-foot road. App. 33. That tributary feeds into a non-navigable creek, which, in turn, feeds into Priest Lake, an intrastate body of water that the

_____

[6] EPA & Corps, Clean Water Act Jurisdiction Following the U. S. Supreme Court's Decision in *Rapanos* v. *United States* & *Carabell* v. *United States* 7–11 (2007) (2007 Guidance).

EPA designated as traditionally navigable. To establish a significant nexus, the EPA lumped the Sacketts' lot together with the Kalispell Bay Fen, a large nearby wetland complex that the Agency regarded as "similarly situated." According to the EPA, these properties, taken together, "significantly affect" the ecology of Priest Lake. Therefore, the EPA concluded, the Sacketts had illegally dumped soil and gravel onto "the waters of the United States."

The Sacketts filed suit under the Administrative Procedure Act, 5 U. S. C. §702 *et seq.*, alleging that the EPA lacked jurisdiction because any wetlands on their property were not "waters of the United States." The District Court initially dismissed the suit, reasoning that the compliance order was not a final agency action, but this Court ultimately held that the Sacketts could bring their suit under the APA. See *Sackett*, 566 U. S., at 131. After seven years of additional proceedings on remand, the District Court entered summary judgment for the EPA. 2019 WL 13026870 (D Idaho, Mar. 31, 2019). The Ninth Circuit affirmed, holding that the CWA covers adjacent wetlands with a significant nexus to traditional navigable waters and that the Sacketts' lot satisfied that standard. 8 F. 4th 1075, 1091–1093 (2021).

We granted certiorari to decide the proper test for determining whether wetlands are "waters of the United States." 595 U. S. ___ (2022).

## II

### A

In defining the meaning of "the waters of the United States," we revisit what has been "a contentious and difficult task." *National Assn. of Mfrs.* v. *Department of Defense*, 583 U. S. ___, ___ (2018) (slip op., at 1). The phrase has sparked decades of agency action and litigation. In order to resolve the CWA's applicability to wetlands, we begin by reviewing this history.

The EPA and the Corps initially promulgated different interpretations of "the waters of the United States." The EPA defined its jurisdiction broadly to include, for example, intrastate lakes used by interstate travelers. 38 Fed. Reg. 13529 (1973). Conversely, the Corps, consistent with its historical authority to regulate obstructions to navigation, asserted jurisdiction over only traditional navigable waters. 39 Fed. Reg. 12119 (1974). But the Corps' narrow definition did not last. It soon promulgated new, much broader definitions designed to reach the outer limits of Congress's commerce power. See 42 Fed. Reg. 37144, and n. 2 (1977); 40 Fed. Reg. 31324–31325 (1975).

Eventually the EPA and Corps settled on materially identical definitions. See 45 Fed. Reg. 33424 (1980); 47 Fed. Reg. 31810–31811 (1982). These broad definitions encompassed "[a]ll . . . waters" that "could affect interstate or foreign commerce." 40 CFR §230.3(s)(3) (2008). So long as the potential for an interstate effect was present, the regulation extended the CWA to, for example, "intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds." *Ibid.* The agencies likewise took an expansive view of the CWA's coverage of wetlands "adjacent" to covered waters. §230.3(s)(7). As noted, they defined "adjacent" to mean "bordering, contiguous, or neighboring" and clarified that "adjacent" wetlands include those that are separated from covered waters "by manmade dikes or barriers, natural river berms, beach dunes and the like." §230.3(b). They also specified that "wetlands" is a technical term encompassing "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal conditions do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." §230.3(t). The Corps released what would become a 143-page manual to guide officers when they determine whether

property meets this definition.[7]

This Court first construed the meaning of "the waters of the United States" in *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121 (1985). There, we were confronted with the Corps' assertion of authority under the CWA over wetlands that "actually abut[ted] on a navigable waterway." *Id.*, at 135. Although we expressed concern that wetlands seemed to fall outside "traditional notions of 'waters,'" we nonetheless deferred to the Corps, reasoning that "the transition from water to solid ground is not necessarily or even typically an abrupt one." *Id.*, at 132–133.

The agencies responded to *Riverside Bayview* by expanding their interpretations even further. Most notably, they issued the "migratory bird rule," which extended jurisdiction to any waters or wetlands that "are or would be used as [a] habitat" by migratory birds or endangered species. See 53 Fed. Reg. 20765 (1988); 51 Fed. Reg. 41217 (1986). As the Corps would later admit, "nearly all waters were jurisdictional under the migratory bird rule."[8]

In *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159 (2001) (*SWANCC*), this Court rejected the migratory bird rule, which the Corps had used to assert jurisdiction over several isolated ponds located wholly within the State of Illinois. Disagreeing with the Corps' argument that ecological interests supported its jurisdiction, we instead held that the CWA does not "exten[d] to ponds that are not adjacent to open water." *Id.*, at 168 (emphasis deleted).

Days after our decision, the agencies issued guidance that

––––––––––
    [7] See Corps, Wetlands Delineation Manual (Tech. Rep. Y–87–1, 1987) (Wetlands Delineation Manual); see also, *e.g.*, Corps, Regional Supplement to the Corps of Engineers Wetland Delineation Manual: Alaska Region (Version 2.0) (ERDC/EL Tr–07–24, 2007).
    [8] GAO, Waters and Wetlands: Corps of Engineers Needs To Evaluate Its District Office Practices in Determining Jurisdiction 26 (GAO–04–297, 2004) (GAO Report).

sought to minimize *SWANCC*'s impact. They took the view that this Court's holding was "strictly limited to waters that are 'nonnavigable, isolated, and intrastate'" and that "field staff should continue to exercise CWA jurisdiction to the full extent of their authority" for "any waters that fall outside of that category."[9] The agencies never defined exactly what they regarded as the "full extent of their authority." They instead encouraged local field agents to make decisions on a case-by-case basis.

What emerged was a system of "vague" rules that depended on "locally developed practices." GAO Report 26. Deferring to the agencies' localized decisions, lower courts blessed an array of expansive interpretations of the CWA's reach. See, *e.g.*, *United States* v. *Deaton*, 332 F. 3d 698, 702 (CA4 2003) (holding that a property owner violated the CWA by piling soil near a ditch 32 miles from navigable waters). Within a few years, the agencies had "interpreted their jurisdiction over 'the waters of the United States' to cover 270-to-300 million acres" of wetlands and "virtually any parcel of land containing a channel or conduit . . . through which rainwater or drainage may occasionally or intermittently flow." *Rapanos* v. *United States*, 547 U. S. 715, 722 (2006) (plurality opinion).

It was against this backdrop that we granted review in *Rapanos* v. *United States*. The lower court in the principal case before us had held that the CWA covered wetlands near ditches and drains that eventually emptied into navigable waters at least 11 miles away, a theory that had supported the petitioner's conviction in a related prosecution. *Id.*, at 720, 729. Although we vacated that decision, no position commanded a majority of the Court. Four Justices concluded that the CWA's coverage did not extend beyond two categories: first, certain relatively permanent bodies of

———————
[9] EPA & Corps, Memorandum, Supreme Court Ruling Concerning CWA Jurisdiction Over Isolated Waters 3 (2001) (alteration omitted).

water connected to traditional interstate navigable waters and, second, wetlands with such a close physical connection to those waters that they were "as a practical matter indistinguishable from waters of the United States." *Id.*, at 742, 755 (emphasis deleted). Four Justices would have deferred to the Government's determination that the wetlands at issue were covered under the CWA. *Id.*, at 788 (Stevens, J., dissenting). Finally, one Justice concluded that jurisdiction under the CWA requires a "significant nexus" between wetlands and navigable waters and that such a nexus exists where "the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity" of those waters. *Id.*, at 779–780 (Kennedy, J., concurring in judgment).

In the decade following *Rapanos*, the EPA and the Corps issued guidance documents that "recognized larger grey areas and called for more fact-intensive individualized determinations in those grey areas."[10] As discussed, they instructed agency officials to assert jurisdiction over wetlands "adjacent" to non-navigable tributaries based on fact-specific determinations regarding the presence of a significant nexus. 2008 Guidance 8. The guidance further advised officials to make this determination by considering a lengthy list of hydrological and ecological factors. *Ibid.* Echoing what they had said about the migratory bird rule, the agencies later admitted that "almost all waters and wetlands across the country theoretically could be subject to a case-specific jurisdictional determination" under this guidance. 80 Fed. Reg. 37056 (2015); see, *e.g.*, *Hawkes Co.*, 578 U. S., at 596 (explaining that the Corps found a significant nexus between wetlands and a river "some 120 miles

───────────

[10] N. Parrillo, Federal Agency Guidance and the Power To Bind: An Empirical Study of Agencies and Industries, 36 Yale J. on Reg. 165, 231 (2019); see 2007 Guidance 7–11; EPA & Corps, Clean Water Act Jurisdiction Following the U. S. Supreme Court's Decision in *Rapanos* v. *United States* & *Carabell* v. *United States* 8–12 (2008) (2008 Guidance).

away").

More recently, the agencies have engaged in a flurry of rulemaking defining "the waters of the United States." In a 2015 rule, they offered a muscular approach that would subject "the vast majority of the nation's water features" to a case-by-case jurisdictional analysis.[11] Although the rule listed a few examples of "waters" that were excluded from regulation like "[p]uddles" and "swimming pools," it categorically covered other waters and wetlands, including any within 1,500 feet of interstate or traditional navigable waters. 80 Fed. Reg. 37116–37117. And it subjected a wider range of other waters, including any within 4,000 feet of indirect tributaries of interstate or traditional navigable waters, to a case-specific determination for significant nexus. *Ibid.*

The agencies repealed this sweeping rule in 2019. 84 Fed. Reg. 56626. Shortly afterwards, they replaced it with a narrower definition that limited jurisdiction to traditional navigable waters and their tributaries, lakes, and "adjacent" wetlands. 85 Fed. Reg. 22340 (2020). They also narrowed the definition of "[a]djacent," limiting it to wetlands that "[a]but" covered waters, are flooded by those waters, or are separated from those waters by features like berms or barriers. *Ibid.* This rule too did not last. After granting the EPA's voluntary motion to remand, a District Court vacated the rule. See *Pascua Yaqui Tribe* v. *EPA*, 557 F. Supp. 3d 949, 957 (D Ariz. 2021).

The agencies recently promulgated yet another rule attempting to define waters of the United States. 88 Fed. Reg. 3004 (2023) (to be codified in 40 CFR §120.2). Under that broader rule, traditional navigable waters, interstate waters, and the territorial seas, as well as their tributaries and adjacent wetlands, are waters of the United States. 88

—————

[11] EPA & Dept. of the Army, Economic Analysis of the EPA-Army Clean Water Rule 11 (2015).

Fed. Reg. 3143. So are any "[i]ntrastate lakes and ponds, streams, or wetlands" that either have a continuous surface connection to categorically included waters or have a significant nexus to interstate or traditional navigable waters. *Id.*, at 3006, 3143. Like the post-*Rapanos* guidance, the rule states that a significant nexus requires consideration of a list of open-ended factors. 88 Fed. Reg. 3006, 3144. Finally, the rule returns to the broad pre-2020 definition of "adjacent." *Ibid.*; see *supra*, at 7. Acknowledging that "[f]ield work is often necessary to confirm the presence of a wetland" under these definitions, the rule instructs local agents to continue using the Corps' Wetlands Delineation Manual. 88 Fed. Reg. 3117.

## B

With the benefit of a half century of practice under the CWA, it is worth taking stock of where things stand. The agencies maintain that the significant-nexus test has been and remains sufficient to establish jurisdiction over "adjacent" wetlands. And by the EPA's own admission, "almost all waters and wetlands" are potentially susceptible to regulation under that test. 80 Fed. Reg. 37056. This puts many property owners in a precarious position because it is "often difficult to determine whether a particular piece of property contains waters of the United States." *Hawkes Co.*, 578 U. S., at 594; see 40 CFR §230.3(t) (2008). Even if a property appears dry, application of the guidance in a complicated manual ultimately decides whether it contains wetlands. See 88 Fed. Reg. 3117; Wetlands Delineation Manual 84–85 (describing "not . . . atypical" examples of wetlands that periodically lack wetlands indicators); see also *Hawkes Co.* v. *United States Army Corps of Engineers*, 782 F. 3d 994, 1003 (CA8 2015) (Kelly, J., concurring) ("This is a unique aspect of the CWA; most laws do not require the hiring of expert consultants to determine if they even apply to you or your property"). And because the CWA can sweep

broadly enough to criminalize mundane activities like moving dirt, this unchecked definition of "the waters of the United States" means that a staggering array of landowners are at risk of criminal prosecution or onerous civil penalties.

What are landowners to do if they want to build on their property? The EPA recommends asking the Corps for a jurisdictional determination, which is a written decision on whether a particular site contains covered waters. Tr. of Oral Arg. 86; see Corps, Regulatory Guidance Letter No. 16–01, at 1 (2016) (RGL 16–01); 33 CFR §§320.1(a)(6), 331.2. But the Corps maintains that it has no obligation to provide jurisdictional determinations, RGL 16–01, at 2, and it has already begun announcing exceptions to the legal effect of some previous determinations, see 88 Fed. Reg. 3136. Even if the Corps is willing to provide a jurisdictional determination, a property owner may find it necessary to retain an expensive expert consultant who is capable of putting together a presentation that stands a chance of persuading the Corps.[12] And even then, a landowner's chances of success are low, as the EPA admits that the Corps finds jurisdiction approximately 75% of the time. Tr. of Oral Arg. 110.

If the landowner is among the vast majority who receive adverse jurisdictional determinations, what then? It would be foolish to go ahead and build since the jurisdictional determination might form evidence of culpability in a prosecution or civil action. The jurisdictional determination could be challenged in court, but only after the delay and expense required to exhaust the administrative appeals

––––––––
[12] See 88 Fed. Reg. 3134; Corps, Questions and Answers for *Rapanos* and *Carabell* Decision 16 (2007); J. Finkle, Jurisdictional Determinations: An Important Battlefield in the Clean Water Act Fight, 43 Ecology L. Q. 301, 314–315 (2016); K. Gould, Drowning in Wetlands Jurisdictional Determination Process: Implementation of *Rapanos* v. *United States*, 30 U. Ark. Little Rock L. Rev. 413, 440 (2008).

process. See 33 CFR §331.7(d). And once in court, the land-owner would face an uphill battle under the deferential standards of review that the agencies enjoy. See 5 U. S. C. §706. Another alternative would be simply to acquiesce and seek a permit from the Corps. But that process can take years and cost an exorbitant amount of money. Many land-owners faced with this unappetizing menu of options would simply choose to build nothing.

## III

With this history in mind, we now consider the extent of the CWA's geographical reach.

### A

We start, as we always do, with the text of the CWA. *Bartenwerfer* v. *Buckley*, 598 U. S. 69, 74 (2023). As noted, the Act applies to "navigable waters," which had a well-estab-lished meaning at the time of the CWA's enactment. But the CWA complicates matters by proceeding to define "nav-igable waters" as "the waters of the United States," §1362(7), which was decidedly not a well-known term of art. This frustrating drafting choice has led to decades of litiga-tion, but we must try to make sense of the terms Congress chose to adopt. And for the reasons explained below, we conclude that the *Rapanos* plurality was correct: the CWA's use of "waters" encompasses "only those relatively perma-nent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordi-nary parlance as 'streams, oceans, rivers, and lakes.'" 547 U. S., at 739 (quoting Webster's New International Diction-ary 2882 (2d ed. 1954) (Webster's Second); original altera-tions omitted).

This reading follows from the CWA's deliberate use of the plural term "waters." See 547 U. S., at 732–733. That term typically refers to bodies of water like those listed above. See, *e.g.*, Webster's Second 2882; Black's Law Dictionary

1426 (5th ed. 1979) ("especially in the plural, [water] may designate a body of water, such as a river, a lake, or an ocean, or an aggregate of such bodies of water, as in the phrases 'foreign waters,' '*waters of the United States*,' and the like" (emphasis added)); Random House Dictionary of the English Language 2146 (2d ed. 1987) (Random House Dictionary) (defining "waters" as "a. flowing water, or water moving in waves: The river's mighty waters. b. the sea or seas bordering a particular country or continent or located in a particular part of the world" (emphasis deleted)). This meaning is hard to reconcile with classifying "'"lands," wet or otherwise, as "waters."'" *Rapanos*, 547 U. S., at 740 (plurality opinion) (quoting *Riverside Bayview*, 474 U. S., at 132).

This reading also helps to align the meaning of "the waters of the United States" with the term it is defining: "navigable waters." See *Bond* v. *United States*, 572 U. S. 844, 861 (2014) ("In settling on a fair reading of a statute, it is not unusual to consider the ordinary meaning of a defined term, particularly when there is dissonance between that ordinary meaning and the reach of the definition"). Although we have acknowledged that the CWA extends to more than traditional navigable waters, we have refused to read "navigable" out of the statute, holding that it at least shows that Congress was focused on "its traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made." *SWANCC*, 531 U. S., at 172; see also *Appalachian Electric*, 311 U. S., at 406–407; *The Daniel Ball*, 10 Wall., at 563. At a minimum, then, the use of "navigable" signals that the definition principally refers to bodies of navigable water like rivers, lakes, and oceans. See *Rapanos*, 547 U. S., at 734 (plurality opinion).

More broadly, this reading accords with how Congress has employed the term "waters" elsewhere in the CWA and

in other laws.  The CWA repeatedly uses "waters" in con-
texts that confirm the term refers to bodies of open water.
See 33 U. S. C. §1267(i)(2)(D) ("the waters of the Chesa-
peake Bay"); §1268(a)(3)(I) ("the open waters of each of the
Great Lakes"); §1324(d)(4)(B)(ii) ("lakes and other surface
waters");       §1330(g)(4)(C)(vii)       ("estuarine       waters");
§1343(c)(1) ("the waters of the territorial seas, the contigu-
ous zone, and the oceans"); §§1346(a)(1), 1375a(a) ("coastal
recreation waters"); §1370 (state "boundary waters").  The
use of "waters" elsewhere in the U. S. Code likewise corre-
lates to rivers, lakes, and oceans.[13]

Statutory history points in the same direction.  The
CWA's predecessor statute covered "interstate or navigable
waters" and defined "interstate waters" as "all *rivers, lakes,
and other waters* that flow across or form a part of State
boundaries."  33 U. S. C. §§1160(a), 1173(e) (1970 ed.) (em-
phasis added); see also Rivers and Harbors Act of 1899, 30
Stat. 1151 (codified, as amended, at 33 U. S. C. §403) (pro-
hibiting unauthorized obstructions "to the navigable capac-
ity of any of the waters of the United States").

This Court has understood the CWA's use of "waters" in
the same way.  Even as *Riverside Bayview* grappled with
whether adjacent wetlands could fall within the CWA's cov-
erage, it acknowledged that wetlands are not included in
"traditional notions of 'waters.'"  474 U. S., at 133.  It ex-
plained that the term conventionally refers to "hydro-
graphic features" like "rivers" and "streams."  *Id.*, at 131.
*SWANCC* went even further, repeatedly describing the
"waters" covered by the Act as "open water" and suggesting

---

[13] See, *e.g.*, 16 U. S. C. §745 ("the waters of the seacoast . . . the waters
of the lakes"); §4701(a)(7) ("waters of the Chesapeake Bay"); 33 U. S. C.
§4 ("the waters of the Mississippi River and its tributaries"); 43 U. S. C.
§390h–8(a) ("the waters of Lake Cheraw, Colorado . . . the waters of the
Arkansas River"); 46 U. S. C. §70051 (allowing the Coast Guard to take
control of particular vessels during an emergency in order to "prevent
damage or injury to any harbor or waters of the United States").

that "the waters of the United States" principally refers to traditional navigable waters.  531 U. S., at 168–169, 172. That our CWA decisions operated under this assumption is unsurprising.  Ever since *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824), this Court has used "waters of the United States" to refer to similar bodies of water, almost always in relation to ships.  *Id.*, at 218 (discussing a vessel's "conduct in the waters of the United States").[14]

The EPA argues that "waters" is "naturally read to encompass wetlands" because the "presence of water is 'universally regarded as the most basic feature of wetlands.'" Brief for Respondents 19.  But that reading proves too much.  Consider puddles, which are also defined by the ordinary presence of water even though few would describe them as "waters."  This argument is also tough to square with *SWANCC*, which held that the Act does not cover isolated ponds, see 531 U. S., at 171, or *Riverside Bayview*, which would have had no need to focus so extensively on the adjacency of wetlands to covered waters if the EPA's reading were correct, see 474 U. S., at 131–135, and n. 8.  Finally, it is also instructive that the CWA expressly "protect[s] the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution" and "to plan the development and use . . . of land and water resources."

————————

[14] See, *e.g.*, *United States* v. *Alvarez-Machain*, 504 U. S. 655, 661, n. 7 (1992) (discussing a treaty "to allow British passenger ships to carry liquor while in the waters of the United States"); *Kent* v. *Dulles*, 357 U. S. 116, 123 (1958) (discussing a prohibition on boarding "vessels of the enemy on waters of the United States"); *New Jersey* v. *New York City*, 290 U. S. 237, 240 (1933) (enjoining employees of New York City from dumping garbage "into the ocean, or waters of the United States, off the coast of New Jersey"); *Cunard S. S. Co.* v. *Mellon*, 262 U. S. 100, 127 (1923) (holding that the National Prohibition Act did not apply to "merchant ships when outside the waters of the United States"); *Keck* v. *United States*, 172 U. S. 434, 444–445 (1899) (holding that concealing imported goods on vessels "at the time of entering the waters of the United States," without more, did not constitute smuggling).

§1251(b). It is hard to see how the States' role in regulating water resources would remain "primary" if the EPA had jurisdiction over anything defined by the presence of water. See *County of Maui* v. *Hawaii Wildlife Fund*, 590 U. S. ___, ___ (2020) (slip op., at 7); *Rapanos*, 547 U. S., at 737 (plurality opinion).

B

Although the ordinary meaning of "waters" in §1362(7) might seem to exclude all wetlands, we do not view that provision in isolation. The meaning of a word "may only become evident when placed in context," *FDA* v. *Brown & Williamson Tobacco Corp.*, 529 U. S. 120, 132 (2000), and statutory context shows that some wetlands qualify as "waters of the United States."

In 1977, Congress amended the CWA and added §1344(g)(1), which authorizes States to apply to the EPA for permission to administer programs to issue permits for the discharge of dredged or fill material into some bodies of water. In simplified terms, the provision specifies that state permitting programs may regulate discharges into (1) any waters of the United States, (2) except for traditional navigable waters, (3) "including wetlands adjacent thereto."[15]

When this convoluted formulation is parsed, it tells us that at least some wetlands must qualify as "waters of the

_____

[15] This provision states in relevant part: "The Governor of any State desiring to administer its own individual and general permit program for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within its jurisdiction may submit to the Administrator a full and complete description of the program it proposes to establish and administer under State law or under an interstate compact." 33 U. S. C. §1344(g)(1).

United States."  The provision begins with a broad category, "the waters of the United States," which we may call category A.  The provision provides that States may permit discharges into these waters, but it then qualifies that States cannot permit discharges into a subcategory of A: traditional navigable waters (category B).  Finally, it states that a third category (category C), consisting of wetlands "adjacent" to traditional navigable waters, is "includ[ed]" within B.  Thus, States may permit discharges into A minus B, which includes C.  If C (adjacent wetlands) were not part of A ("the waters of the United States") and therefore subject to regulation under the CWA, there would be no point in excluding them from that category.  See *Riverside Bayview*, 474 U. S., at 138, n. 11 (recognizing that §1344(g) "at least suggest[s] strongly that the term 'waters' as used in the Act does not necessarily exclude 'wetlands'"); *Rapanos*, 547 U. S., at 768 (opinion of Kennedy, J.).  Thus, §1344(g)(1) presumes that certain wetlands constitute "waters of the United States."

But what wetlands does the CWA regulate?  Section 1344(g)(1) cannot answer that question alone because it is not the operative provision that defines the Act's reach.  See *Riverside Bayview*, 474 U. S., at 138, n. 11.  Instead, we must harmonize the reference to adjacent wetlands in §1344(g)(1) with "the waters of the United States," §1362(7), which is the actual term we are tasked with interpreting.  The formulation discussed above tells us how: because the adjacent wetlands in §1344(g)(1) are "includ[ed]" within "the waters of the United States," these wetlands must qualify as "waters of the United States" in their own right.  In other words, they must be indistinguishably part of a body of water that itself constitutes "waters" under the CWA.  See *supra*, at 14.

This understanding is consistent with §1344(g)(1)'s use of "adjacent."  Dictionaries tell us that the term "adjacent" may mean either "contiguous" or "near."  Random House

Dictionary 25; see Webster's Third New International Dictionary 26 (1976); see also Oxford American Dictionary & Thesaurus 16 (2d ed. 2009) (listing "adjoining" and "neighboring" as synonyms of "adjacent"). But "construing statutory language is not merely an exercise in ascertaining 'the outer limits of a word's definitional possibilities,'" *FCC* v. *AT&T Inc.*, 562 U. S. 397, 407 (2011) (alterations omitted), and here, "only one . . . meanin[g] produces a substantive effect that is compatible with the rest of the law," *United Sav. Assn. of Tex.* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988). Wetlands that are separate from traditional navigable waters cannot be considered part of those waters, even if they are located nearby.

In addition, it would be odd indeed if Congress had tucked an important expansion to the reach of the CWA into convoluted language in a relatively obscure provision concerning state permitting programs. We have often remarked that Congress does not "hide elephants in mouseholes" by "alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman* v. *American Trucking Assns., Inc.*, 531 U. S. 457, 468 (2001). We cannot agree with such an implausible interpretation here.

If §1344(g)(1) were read to mean that the CWA applies to wetlands that are not indistinguishably part of otherwise covered "waters of the United States," see *supra*, at 14, it would effectively amend and substantially broaden §1362(7) to define "navigable waters" as "waters of the United States *and adjacent wetlands*." But §1344(g)(1)'s use of the term "including" makes clear that it does not purport to do—and in fact, does not do—any such thing. See *National Assn. of Home Builders* v. *Defenders of Wildlife*, 551 U. S. 644, 662–664, and n. 8 (2007) (recognizing that implied amendments require "'clear and manifest'" evidence of congressional intent). It merely reflects Congress's assumption that certain "adjacent" wetlands are *part of* "waters of the United States."

This is the thrust of observations in decisions going all the way back to *Riverside Bayview*. In that case, we deferred to the Corps' decision to regulate wetlands actually abutting a navigable waterway, but we recognized "the inherent difficulties of defining precise bounds to regulable waters." 474 U. S., at 134; see also *id.*, at 132 (noting that "the transition from water to solid ground is not necessarily or even typically an abrupt one" due to semi-aquatic features like shallows and swamps). In such a situation, we concluded, the Corps could reasonably determine that wetlands "adjoining bodies of water" were part of those waters. *Id.*, at 135, and n. 9; see also *SWANCC*, 531 U. S., at 167 (recognizing that *Riverside Bayview* "held that the Corps had . . . jurisdiction over wetlands that actually abutted on a navigable waterway").

In *Rapanos*, the plurality spelled out clearly when adjacent wetlands are part of covered waters. It explained that "waters" may fairly be read to include only those wetlands that are "as a practical matter indistinguishable from waters of the United States," such that it is "difficult to determine where the 'water' ends and the 'wetland' begins." 547 U. S., at 742, 755 (emphasis deleted). That occurs when wetlands have "a continuous surface connection to bodies that are 'waters of the United States' in their own right, so that there is no clear demarcation between 'waters' and wetlands." *Id.*, at 742; cf. 33 U. S. C. §2802(5) (defining "coastal waters" to include wetlands "having unimpaired connection with the open sea up to the head of tidal influence"). We agree with this formulation of when wetlands are part of "the waters of the United States." We also acknowledge that temporary interruptions in surface connection may sometimes occur because of phenomena like low tides or dry spells.[16]

_____

[16] Although a barrier separating a wetland from a water of the United States would ordinarily remove that wetland from federal jurisdiction, a

In sum, we hold that the CWA extends to only those wet-
lands that are "as a practical matter indistinguishable from
waters of the United States." *Rapanos*, 547 U. S., at 755
(plurality opinion) (emphasis deleted). This requires the
party asserting jurisdiction over adjacent wetlands to es-
tablish "first, that the adjacent [body of water constitutes]
. . . 'water[s] of the United States,' (*i.e.*, a relatively perma-
nent body of water connected to traditional interstate nav-
igable waters); and second, that the wetland has a continu-
ous surface connection with that water, making it difficult
to determine where the 'water' ends and the 'wetland' be-
gins." *Id.*, at 742.

## IV

The EPA resists this reading of §1362(7) and instead asks
us to defer to its understanding of the CWA's jurisdictional
reach, as set out in its most recent rule defining "the waters
of the United States." See 88 Fed. Reg. 3004. This rule, as
noted, provides that "adjacent wetlands are covered by the
Act if they 'possess a "significant nexus" to' traditional nav-
igable waters." Brief for Respondents 32 (quoting *Rapanos*,
547 U. S., at 759 (opinion of Kennedy, J.)); see 88 Fed. Reg.
3143. And according to the EPA, wetlands are "adjacent"
when they are "neighboring" to covered waters, even if they
are separated from those waters by dry land. Brief for Re-
spondents 20; 88 Fed. Reg. 3144.

### A

For reasons already explained, this interpretation is in-
consistent with the text and structure of the CWA. Beyond
that, it clashes with "background principles of construction"

---

landowner cannot carve out wetlands from federal jurisdiction by ille-
gally constructing a barrier on wetlands otherwise covered by the CWA.
Whenever the EPA can exercise its statutory authority to order a bar-
rier's removal because it violates the Act, see 33 U. S. C. §§1319(a)–(b),
that unlawful barrier poses no bar to its jurisdiction.

that apply to the interpretation of the relevant statutory provisions. *Bond*, 572 U. S., at 857. Under those presumptions, the EPA must provide clear evidence that it is authorized to regulate in the manner it proposes.

1

First, this Court "require[s] Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power and the power of the Government over private property." *United States Forest Service* v. *Cowpasture River Preservation Assn.*, 590 U. S. ___, ___–___ (2020) (slip op., at 15–16); see also *Bond*, 572 U. S., at 858. Regulation of land and water use lies at the core of traditional state authority. See, *e.g.*, *SWANCC*, 531 U. S., at 174 (citing *Hess* v. *Port Authority Trans-Hudson Corporation*, 513 U. S. 30, 44 (1994)); *Tarrant Regional Water Dist.* v. *Herrmann*, 569 U. S. 614, 631 (2013). An overly broad interpretation of the CWA's reach would impinge on this authority. The area covered by wetlands alone is vast—greater than the combined surface area of California and Texas. And the scope of the EPA's conception of "the waters of the United States" is truly staggering when this vast territory is supplemented by all the additional area, some of which is generally dry, over which the Agency asserts jurisdiction. Particularly given the CWA's express policy to "preserve" the States' "primary" authority over land and water use, §1251(b), this Court has required a clear statement from Congress when determining the scope of "the waters of the United States." *SWANCC*, 531 U. S., at 174; accord, *Rapanos*, 547 U. S., at 738 (plurality opinion).

The EPA, however, offers only a passing attempt to square its interpretation with the text of §1362(7), and its "significant nexus" theory is particularly implausible. It suggests that the meaning of "the waters of the United

States" is so "broad and unqualified" that, if viewed in iso-
lation, it would extend to all water in the United States.
Brief for Respondents 32. The EPA thus turns to the "sig-
nificant nexus" test in order to reduce the clash between its
understanding of "the waters of the United States" and the
term defined by that phrase, *i.e.*, "navigable waters." As
discussed, however, the meaning of "waters" is more limited
than the EPA believes. See *supra*, at 14. And, in any event,
the CWA never mentions the "significant nexus" test, so the
EPA has no statutory basis to impose it. See *Rapanos*, 547
U. S., at 755–756 (plurality opinion).

2

Second, the EPA's interpretation gives rise to serious
vagueness concerns in light of the CWA's criminal penal-
ties. Due process requires Congress to define penal statutes
"'with sufficient definiteness that ordinary people can un-
derstand what conduct is prohibited'" and "'in a manner
that does not encourage arbitrary and discriminatory en-
forcement.'" *McDonnell* v. *United States*, 579 U. S. 550, 576
(2016) (quoting *Skilling* v. *United States*, 561 U. S. 358,
402–403 (2010)). Yet the meaning of "waters of the United
States" under the EPA's interpretation remains "hopelessly
indeterminate." *Sackett*, 566 U. S., at 133 (ALITO, J., con-
curring); accord, *Hawkes Co.*, 578 U. S., at 602 (opinion of
Kennedy, J.).

The EPA contends that the only thing preventing it from
interpreting "waters of the United States" to "conceivably
cover literally every body of water in the country" is the
significant-nexus test. Tr. of Oral Arg. 70–71; accord, Brief
for Respondents 32. But the boundary between a "signifi-
cant" and an insignificant nexus is far from clear. And to
add to the uncertainty, the test introduces another vague
concept—"similarly situated" waters—and then assesses
the aggregate effect of that group based on a variety of
open-ended factors that evolve as scientific understandings

change. This freewheeling inquiry provides little notice to landowners of their obligations under the CWA. Facing severe criminal sanctions for even negligent violations, property owners are "left 'to feel their way on a case-by-case basis.'" *Sackett*, 566 U. S., at 124 (quoting *Rapanos*, 547 U. S., at 758 (ROBERTS, C. J., concurring)). Where a penal statute could sweep so broadly as to render criminal a host of what might otherwise be considered ordinary activities, we have been wary about going beyond what "Congress certainly intended the statute to cover." *Skilling*, 561 U. S., at 404.

Under these two background principles, the judicial task when interpreting "the waters of the United States" is to ascertain whether clear congressional authorization exists for the EPA's claimed power. The EPA's interpretation falls far short of that standard.

### B

While mustering only a weak textual argument, the EPA justifies its position on two other grounds. It primarily claims that Congress implicitly ratified its interpretation of "adjacent" wetlands when it adopted §1344(g)(1). Thus, it argues that "waters of the United States" covers any wetlands that are "bordering, contiguous, or neighboring" to covered waters. 88 Fed. Reg. 3143. The principal opinion concurring in the judgment adopts the same position. See *post*, at 10–12 (KAVANAUGH, J., concurring in judgment). The EPA notes that the Corps had promulgated regulations adopting that interpretation before Congress amended the CWA in 1977 to include the reference to "adjacent" wetlands in §1344(g)(1). See 42 Fed. Reg. 37144. This term, the EPA contends, was "'"obviously transplanted from"'" the Corps' regulations and thus incorporates the same definition. Brief for Respondents 22 (quoting *Taggart* v. *Lorenzen*, 587 U. S. ___, ___ (2019) (slip op., at 5)).

This argument fails for at least three reasons. First, as we have explained, the text of §§1362(7) and 1344(g)(1)

shows that "adjacent" cannot include wetlands that are not part of covered "waters." See *supra*, at 22.

Second, this ratification theory cannot be reconciled with our cases. We have repeatedly recognized that §1344(g)(1) "'does not conclusively determine the construction to be placed on . . . the relevant definition of "navigable waters."'" *SWANCC*, 531 U. S., at 171 (quoting *Riverside Bayview*, 474 U. S., at 138, n. 11); accord, *Rapanos*, 547 U. S., at 747–748, n. 12 (plurality opinion). Additionally, *SWANCC* rejected the closely analogous argument that Congress ratified the Corps' definition of "waters of the United States" by including "'other . . . waters'" in §1344(g)(1). 531 U. S., at 168–171. And yet, the EPA's argument would require us to hold that §1344(g)(1) actually did amend the definition of "navigable waters" precisely for the reasons we rejected in *SWANCC*.

Third, the EPA cannot provide the sort of "overwhelming evidence of acquiescence" necessary to support its argument in the face of Congress's failure to amend §1362(7). *Id.*, at 169–170, n. 5. We will infer that a term was "'transplanted from another legal source' . . . only when a term's meaning was 'well-settled' before the transplantation." *Kemp* v. *United States*, 596 U. S. ___, ___–___ (2022) (slip op., at 9–10). Far from being well settled, the Corps' definition was promulgated mere months before the CWA became law, and when the Corps adopted that definition, it candidly acknowledged the "rapidly changing nature of [its] regulatory programs." 42 Fed. Reg. 37122. Tellingly, even the EPA would not adopt that definition for several more years. See 45 Fed. Reg. 85345 (1980). This situation is a far cry from any in which we have found ratification. See, *e.g.*, *George* v. *McDonough*, 596 U. S. ___, ___ (2022) (slip op., at 5) (finding ratification when "Congress used an unusual term that had a long regulatory history in [the] very regulatory context" at issue).

The EPA also advances various policy arguments about

the ecological consequences of a narrower definition of adjacent. But the CWA does not define the EPA's jurisdiction based on ecological importance, and we cannot redraw the Act's allocation of authority. See *Rapanos*, 547 U. S., at 756 (plurality opinion). "The Clean Water Act anticipates a partnership between the States and the Federal Government." *Arkansas* v. *Oklahoma*, 503 U. S. 91, 101 (1992). States can and will continue to exercise their primary authority to combat water pollution by regulating land and water use. See, *e.g.*, Brief for Farm Bureau of Arkansas et al. as *Amici Curiae* 17–27.

## V

Nothing in the separate opinions filed by JUSTICE KAVANAUGH and JUSTICE KAGAN undermines our analysis. JUSTICE KAVANAUGH claims that we have "rewrit[ten]" the CWA, *post*, at 12 (opinion concurring in judgment), and JUSTICE KAGAN levels similar charges, *post*, at 3–4 (opinion concurring in judgment). These arguments are more than unfounded. We have analyzed the statutory language in detail, but the separate opinions pay no attention whatsoever to §1362(7), the key statutory provision that limits the CWA's geographic reach to "the *waters* of the United States." Thus, neither separate opinion even attempts to explain how the wetlands included in their interpretation fall within a fair reading of "waters." Textualist arguments that ignore the operative text cannot be taken seriously.

## VI

In sum, we hold that the CWA extends to only those "wetlands with a continuous surface connection to bodies that are 'waters of the United States' in their own right," so that they are "indistinguishable" from those waters. *Rapanos*, 547 U. S., at 742, 755 (plurality opinion) (emphasis deleted); see *supra*, at 22. This holding compels reversal here. The wetlands on the Sacketts' property are distinguishable

from any possibly covered waters.

*    *    *

We reverse the judgment of the United States Court of Appeals for the Ninth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

──────────

No. 21–454

──────────

## MICHAEL SACKETT, ET UX., PETITIONERS *v.* ENVIRONMENTAL PROTECTION AGENCY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 25, 2023]

JUSTICE THOMAS, with whom JUSTICE GORSUCH joins, concurring.

I join the Court's opinion in full. The Clean Water Act (CWA) confines the Federal Government's jurisdiction to "'navigable waters,'" defined as "the waters of the United States." 33 U. S. C. §§1311(a), 1362(7), (12). And the Court correctly holds that the term "waters" reaches "'only those relatively permanent, standing or continuously flowing bodies of water "'forming geographic[al] features'" that are described in ordinary parlance as "streams, oceans, rivers, and lakes."'" *Ante*, at 14 (quoting *Rapanos* v. *United States*, 547 U. S. 715, 739 (2006) (plurality opinion)). It also correctly holds that for a wetland to fall within this definition, it must share a "'continuous surface connection to bodies that are "waters of the United States" in their own right'" such that "'there is no clear demarcation between "waters" and wetlands.'" *Ante*, at 21 (quoting *Rapanos*, 547 U. S., at 742 (plurality opinion)).

However, like the *Rapanos* plurality before it, the Court focuses only on the term "waters"; it does not determine the extent to which the CWA's other jurisdictional terms— "navigable" and "of the United States"—limit the reach of the statute. *Ante*, at 14–18; *Rapanos*, 547 U. S., at 731 (plurality opinion). I write separately to pick up where the

Court leaves off.

## I

The CWA's jurisdictional terms have a long pedigree and are bound up with Congress' traditional authority over the channels of interstate commerce. *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159, 168, and n. 3, 172, 173–174 (2001) (*SWANCC*). That traditional authority was limited in two ways. First, the water had to be capable of being used as a highway for interstate or foreign commerce. Second, Congress could regulate such waters only for purposes of their navigability— by, for example, regulating obstructions hindering navigable capacity. By the time of the CWA's enactment, the New Deal era arguably had relaxed the second limitation; Congress could regulate navigable waters for a wider range of purposes. But, critically, the statutory terms "navigable waters," "navigable waters of the United States," and "waters of the United States" were still understood as invoking only Congress' authority over waters that are, were, or could be used as highways of interstate or foreign commerce. The CWA was enacted, and must be understood, against that key backdrop.

## A

As the Court correctly states, "land and water use lies at the core of traditional state authority." *Ante*, at 23; see also *ante*, at 2. Prior to Independence, the Crown possessed sovereignty over navigable waters in the Colonies, sometimes held in trust by colonial authorities. See R. Adler, The *Ancient Mariner* of Constitutional Law: The Historical, Yet Declining Role of Navigability, 90 Wash. U. L. Rev. 1643, 1656–1659 (2013); R. Walston, The Federal Commerce and Navigation Powers: *Solid Waste Agency of Northern Cook County*'s Undecided Constitutional Issue, 42 Santa Clara L. Rev. 699, 721 (2002) (Walston). Upon Independence, this

sovereignty was transferred to each of the 13 fully sovereign States. See *Martin* v. *Lessee of Waddell*, 16 Pet. 367, 410 (1842) ("[W]hen the Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government"). Thus, today, States enjoy primary sovereignty over their waters, including navigable waters—stemming either from their status as independent sovereigns following Independence, *ibid.*, or their later admission to the Union on an equal footing with the original States, see *Lessee of Pollard* v. *Hagan*, 3 How. 212, 230 (1845) ("The shores of navigable waters, and the soils under them, were not granted by the Constitution to the United States, but were reserved to the states respectively. . . . The new states have the same rights, sovereignty, and jurisdiction over this subject as the original states"); see also M. Starr, Navigable Waters of the United States—State and National Control, 35 Harv. L. Rev. 154, 169–170 (1921). The Federal Government therefore possesses no authority over navigable waters except that granted by the Constitution.

The Federal Government's authority over certain navigable waters is granted and limited by the Commerce Clause, which grants Congress power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, §8, cl. 3. From the beginning, it was understood that "[t]he power to regulate commerce, includes the power to regulate navigation," but only "as connected with the commerce with foreign nations, and among the states." *United States* v. *Coombs*, 12 Pet. 72, 78 (1838) (Story, J., for the Court); accord, *Gibbons* v. *Ogden*, 9 Wheat. 1, 190 (1824) ("All America understands . . . the word 'commerce,' to comprehend navigation. It was so un-

derstood, and must have been so understood, when the constitution was framed"); see also R. Barnett, The Original Meaning of the Commerce Clause, 68 U. Chi. L. Rev. 101, 125–126 (2001) (Barnett); R. Natelson, The Legal Meaning of "Commerce" in the Commerce Clause, 80 St. John's L. Rev. 789, 807–810 (2006). In fact, "shipping . . . was at that time the indispensable means for the movement of goods." Barnett 123. The Commerce Clause thus vests Congress with a limited authority over what we now call the "channels of interstate commerce." *United States* v. *Lopez*, 514 U. S. 549, 558–559 (1995); see also *American Trucking Assns., Inc.* v. *Los Angeles*, 569 U. S. 641, 656–657 (2013) (THOMAS, J., concurring).

This federal authority, however, does not displace States' traditional sovereignty over their waters. "The power to regulate commerce comprehends the control *for that purpose*, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie." *Gilman* v. *Philadelphia*, 3 Wall. 713, 724–725 (1866) (emphasis added). And, traditionally, this limited authority was confined to regulation of the channels of interstate commerce themselves. *Corfield* v. *Coryell*, 6 F. Cas. 546, 550–551 (No. 3,230) (CC ED Pa. 1823) (Washington, J., for the Court). It encompassed only "the power to keep them open and free from any obstruction to their navigation" and "to remove such obstructions when they exist." *Gilman*, 3 Wall., at 725. Thus, any activity that "interferes with, obstructs, or prevents such commerce and navigation, though done on land, may be punished by congress." *Coombs*, 12 Pet., at 78. But, activities that merely "affect" water-based commerce, such as those regulated by "[i]nspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State," are not within Congress' channels-of-commerce authority. *Gibbons*, 9 Wheat., at 203; see also *Corfield*, 6 F. Cas., at 550.

This understanding of the limits of Congress' channels-of-commerce authority prevailed through the end of the 19th century. The Court's cases consistently recognized that Congress has authority over navigable waters for only the limited "purpose of regulating and improving navigation." *Gibson* v. *United States*, 166 U. S. 269, 271–272 (1897); see also *Port of Seattle* v. *Oregon & Washington R. Co.*, 255 U. S. 56, 63 (1921) ("The right of the United States in the navigable waters within the several States is limited to the control thereof for purposes of navigation"). And, this Court was careful to reaffirm that "technical title to the beds of the navigable rivers of the United States is either in the States in which the rivers are situated, or in the owners of the land bordering upon such rivers" as determined by "local law." *United States* v. *Chandler-Dunbar Water Power Co.*, 229 U. S. 53, 60 (1913).

The River and Harbor Acts of 1890, 1894, and 1899 illustrate the limits of the channels-of-commerce authority. The 1890 Act authorizes the Secretary of War to "prohibi[t]" "the creation of any obstruction, not affirmatively authorized by law, to the navigable capacity of any waters, in respect of which the United States has jurisdiction." §10, 26 Stat. 454. The 1894 Act made it unlawful to deposit matter into "any harbor or river of the United States" that the Federal Government has appropriated money to improve and prohibited injuring improvements built by the United States in "any of its navigable waters." §6, 28 Stat. 363.

Congress consolidated and expanded these authorities in the 1899 Act. Section 10 of the Act prohibits "[t]he creation of any obstruction . . . to the navigable capacity of any of the waters of the United States," requires a permit to build "structures in any . . . water of the United States," and makes it unlawful "to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity" of any water, "within the limits of any breakwater, or of the channel of any navigable water of the United States." 30

Stat. 1151 (codified, as amended, at 33 U. S. C. §403).   In
addition, §13 of the Act, sometimes referred to as the "Re-
fuse Act," prohibits throwing, discharging, or depositing
"any refuse matter . . . into any navigable water of the
United States, or into any tributary of any navigable water
from which the same shall float or be washed into such nav-
igable water."  30 Stat. 1152 (codified, as amended, at 33
U. S. C. §407).   Section 13 also prohibits depositing mate-
rial "on the bank of any navigable water, or on the bank of
any tributary of any navigable water, where the same shall
be liable to be washed into such navigable water . . .
whereby navigation shall or may be impeded or obstructed."
*Ibid.*

Three things stand out about these provisions.  First,
they use the terms "navigable water," "water of the United
States," and "navigable water of the United States" inter-
changeably.  33 U. S. C. §§403 and 407; see also V. Albrecht
& S. Nickelsburg, Could *SWANCC* Be Right? A New Look
at the Legislative History of the Clean Water Act, 32 Env.
L. Rev. 11042, 11044 (2002) (Albrecht & Nickelsburg).  As
a result, courts have done the same in decisions interpret-
ing the River and Harbor Acts.  See, *e.g., United States* v.
*Stoeco Homes, Inc.*, 498 F. 2d 597, 608–609 (CA3 1974);
*New England Dredging Co.* v. *United States,* 144 F. 932,
933–934 (CA1 1906); *Blake* v. *United States*, 181 F. Supp.
584, 587–588 (ED Va. 1960).

Second, Congress asserted its authority only to the extent
that obstructions or refuse matter could impede navigation
or navigable capacity.  Thus, in *United States* v. *Rio Grande
Dam & Irrigation Co.*, 174 U. S. 690 (1899), this Court rec-
ognized that any "act sought to be enjoined" under the 1890
Act must be "one which fairly and directly tends to obstruct
(that is, interfere with or diminish) the navigable capacity
of a stream."  *Id.*, at 709; accord, *Lake Shore & Michigan
Southern R. Co.* v. *Ohio*, 165 U. S. 365, 369 (1897) (holding

that federal jurisdiction over "navigable waters" was limited to preventing "interfering with commerce"). Similarly, in *Wisconsin* v. *Illinois*, 278 U. S. 367 (1929), this Court interpreted the 1899 Act in light of the constitutional prohibition on Congress "arbitrarily destroy[ing] or impair[ing] the rights of riparian owners by legislation which has no real or substantial relation to the control of navigation or appropriateness to that end." *Id.*, at 415.[1] The touchstone, thus, remained actual navigation.

Third, §13 of the Act requires some form of surface water connection between a tributary and traditionally navigable waters. See 33 U. S. C. §407 (prohibiting depositing refuse "into any tributary of any navigable water from which the same shall float or be washed into such navigable water"). To be sure, the Refuse Act also prohibits leaving refuse "on the bank of any navigable water, or on the bank of any tributary of any navigable water, where the same shall be liable to be washed into such navigable water." *Ibid.* But, this prohibition reflects nothing more than Congress' traditional authority to regulate acts done on land that directly impair the navigability of traditionally navigable waters. See *Rio Grande Dam & Irrigation Co.*, 174 U. S., at 708 (explaining that the Act reaches "any obstruction to the navigable capacity, and anything, wherever done or however

_____

[1] Courts had long carefully enforced limits on Congress' navigation authority in prosecutions brought under the Act of July 7, 1838, ch. 191, 5 Stat. 304 (Steamboat Acts of 1838), which prohibited the transportation of goods "upon the bays, lakes, rivers, or other navigable waters of the United States" by certain steamboats. See, *e.g.*, *The Seneca*, 27 F. Cas. 1021 (No. 16,251) (DC Wis. 1861); see also *The James Morrison*, 26 F. Cas. 579, 582 (No. 15,465) (DC Mo. 1846) (holding that the 1838 Act did not reach a ship whose "employment ha[d] no other than a remote connection with 'commerce or navigation among the several states;' no more connection than has the farmer who cultivates hemp, tobacco or cotton for a market in other states—the miner who digs and smelts lead—the manufacturer who manufactures for the same market, or the traveler who intends purchasing any of these articles").

done, . . . which tends to destroy the navigable capacity of one of the navigable waters of the United States"); see also *Northern Pacific R. Co.* v. *United States*, 104 F. 691, 693 (CA8 1900); *Coombs*, 12 Pet., at 78. It does not mean that the land itself is a navigable water.[2]

The history of federal regulation of navigable waters demonstrates that Congress' authority over navigation, as traditionally understood, was narrow but deep. It only applied to a discrete set of navigable waters and could only be used to keep those waters open for interstate commerce. See *Port of Seattle*, 255 U. S., at 63; *Rio Grande Dam & Irrigation Co.*, 174 U. S., at 709. Yet, where Congress had authority, it displaced the States' traditional sovereignty over their navigable waters and allowed Congress to regulate activities even on land that could directly cause obstructions to navigable capacity. *Gilman*, 3 Wall., at 724–725; *Coombs*, 12 Pet., at 78.

In light of the depth of this new federal power, it was carefully limited—mere "effects" on interstate commerce were not sufficient to trigger Congress' navigation authority. As one District Court presciently observed in interpreting the term "navigable waters of the United States" in the Steamboat Act of 1838:

"To make a particular branch of commerce or trade within a state, a part of the commerce among the several states, it would not be sufficient that it was remotely connected with that commerce among the several states; for almost everything and every occupation and employment in life are remotely connected with

---

[2]The early 20th century also saw the Reclamation Act of 1902, ch. 1093, 32 Stat. 388; Federal Power Act, ch. 285, 41 Stat. 1063; Oil Pollution Act, 1924, ch. 316, 43 Stat. 604; and Flood Control Act of 1936, ch. 688, 49 Stat. 1570, all of which relied on navigability. See Walston 724–726. Although the Acts were also designed to achieve incidental benefits such as pollution control, Congress located its authority in preserving navigation. *Ibid.*

that commerce or navigation. And if congress has the right to regulate every employment or pursuit thus remotely connected with that commerce, of which they have the control, then it has the right to regulate nearly the entire business and employment of the citizens of the several states. . . . Yet, if congress has the power to regulate all these employments, and a thousand others equally connected with that commerce, then it can regulate nearly all the concerns of life, and nearly all the employments of the citizens of the several states; and the state governments might as well be abolished. It is not sufficient, then, that navigation, or trade, or business of any kind, within a state, be remotely connected, or, perhaps, connected at all with 'commerce with foreign nations, or among the several states, or with the Indian tribes,' it should be a part of that commerce, to authorize congress to regulate it." *The James Morrison*, 26 F. Cas. 579, 581 (No. 15,465) (DC Mo. 1846).

The Court's observation that "federal regulation was largely limited to ensuring that 'traditional navigable waters' . . . remained free of impediments," *ante*, at 2, thus does no more than reflect the original understanding of the federal authority over navigable waters.

## B

As noted above, the scope of Congress' authority over waters was defined by the traditional concept of navigability, imported with significant modifications from the English common law.[3] Thus, Congress could regulate only "naviga-

---

[3] The English rule tied navigability to the ebb and flow of the tides, but began to be eroded in America as early as the Northwest Ordinance of 1787 due to the superior commercial capacity of American inland rivers. See *The Daniel Ball*, 10 Wall. 557, 563 (1871); *Propeller Genesee Chief* v. *Fitzhugh*, 12 How. 443, 454–457 (1852); see also *Economy Light & Power*

ble waters." Consistent with that backdrop, the term "navigable waters"—used interchangeably with "waters of the United States" and "navigable waters of the United States"—referred to the waters subject to Congress' traditional authority over navigable waters until the enactment of the CWA.

### 1

The term "navigable waters" has been in use since the founding to refer to the highways of commerce that were key to the Nation's development. Great cities like Philadelphia and St. Louis emerged at first as commercial ports along these navigable waters. The Framers recognized that "Providence has in a particular manner blessed" our country with "[a] succession of navigable waters" that "bind [the Nation] together; while the most noble rivers in the world, running at convenient distances, present [Americans] with highways for the easy communication of friendly aids and the mutual transportation and exchange of their various commodities." The Federalist No. 2, p. 38 (C. Rossiter ed. 1961) (J. Jay). These "vast rivers, stretching far inland" have been of "transcendent importance" to our Nation's economic expansion by forming "great highways" for commerce. L. Houck, Law of Navigable Rivers xiii (1868).

This Court authoritatively set out the scope of the term "navigable waters of the United States" in the seminal case of *The Daniel Ball*, 10 Wall. 557 (1871). That case arose under the Steamboat Act of 1838, which prohibited the transportation of goods "upon the bays, lakes, rivers, or other navigable waters of the United States." §2, 5 Stat.

---

*Co.* v. *United States*, 256 U. S. 113, 120 (1921) ("[I]t is curious and interesting that the importance of these inland waterways, and the inappropriateness of the tidal test in defining our navigable waters, was thus recognized by the Congress of the Confederation [in the Northwest Ordinance] more than 80 years before this court decided *The Daniel Ball . . .* and more than 60 years before *The Propeller Genesee Chief*").

304. This Court held that the term "navigable" refers to waters that are "navigable in fact," meaning that "they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 10 Wall., at 563. The Court then explained that navigable waters are "of the United States," "in contradistinction from the navigable waters of the States, when they form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *Ibid.*; see also *The Montello*, 11 Wall. 411, 415 (1871) ("If . . . the river is not of itself a highway for commerce with other States or foreign countries, or does not form such highway by its connection with other waters, and is only navigable between different places within the State, then it is not a navigable water of the United States, but only a navigable water of the State"). It is this "junction" between waters to "for[m] a continued highway for commerce, both with other States and with foreign countries," that brings the water "under the direct control of Congress in the exercise of its commercial power." *The Daniel Ball*, 10 Wall., at 564. The definition of a "navigable water of the United States" was thus linked directly to the limits on Congress' commerce authority: A navigable water of the United States was one that was ordinarily used for interstate or foreign commerce.

Wetlands were generally excluded from this definition. In *Leovy* v. *United States*, 177 U. S. 621 (1900), for example, the Court employed the *Daniel Ball* test to hold that the term "navigable waters of the United States," as used in the 1890 River and Harbor Act, did not "prevent the exercise by the State of Louisiana of its power to reclaim swamp and overflowed lands by regulating and controlling the current

of small streams not used habitually as arteries of interstate commerce." 177 U. S., at 632. The Court observed that applying the Act to wetlands reclamation "would extend the paramount jurisdiction of the United States over all the flowing waters in the States." *Id.*, at 633. "If such were the necessary construction of the" term "navigable water," the Court explained, the River and Harbor Act's "validity might well be questioned." *Ibid.* But, the Court declined to interpret the Act to reach the wetlands, because it recognized that the phrase "navigable waters of the United States" encompassed only those waters reached by the traditional channels-of-commerce authority:

> "When it is remembered that the source of the power of the general government to act at all in this matter arises out of its power to regulate commerce with foreign countries and among the States, it is obvious that what the Constitution and the acts of Congress have in view is the promotion and protection of commerce in its international and interstate aspect, and a practical construction must be put on these enactments as intended for such large and important purposes." *Ibid.*

The Court thus held that the mere use of a wetland by fishermen was not sufficient to make the wetland a navigable water of the United States; it "was not shown that passengers were ever carried through it, or that freight destined to any other State than Louisiana, or, indeed, destined for any market in Louisiana, was ever, much less habitually, carried through it." *Id.*, at 627.[4]

---

[4] *Leovy* v. *United States* also reflected the law's longstanding hostility to wetlands: "If there is any fact which may be supposed to be known by everybody, and, therefore, by courts, it is that swamps and stagnant waters are the cause of malarial and malignant fevers, and that the police power is never more legitimately exercised than in removing such nuisances." 177 U. S., at 636. Traditionally, the only time wetlands were the subject of federal legislation was to aid the States in draining them.

The *Daniel Ball* test, with minor variations, marked the limits of federal jurisdiction over waters up to the enactment of the CWA. For instance, in *Economy Light & Power Co.* v. *United States*, 256 U. S. 113 (1921), the Court applied *The Daniel Ball* but expanded it to hold that the River and Harbor Act of 1899 reaches waters that are not currently capable of supporting interstate commerce, though they once did. 256 U. S., at 123–124. And, in *United States* v. *Appalachian Elec. Power Co.*, 311 U. S. 377 (1940), the Court applied *The Daniel Ball* to reach waters that could be made navigable with reasonable and feasible improvement. 311 U. S., at 408–409. While these cases expanded the outer boundaries of the term, creating an expanded form of the *Daniel Ball* test, they reflect the Court's longstanding view that the statutory term "navigable water" required application of the *Daniel Ball* test.

### 2

In the New Deal era, as is well known, this Court adopted a greatly expanded conception of Congress' commerce authority by permitting Congress to regulate any private intrastate activity that substantially affects interstate commerce, either by itself or when aggregated with many similar activities. See *Wickard* v. *Filburn*, 317 U. S. 111, 127–129 (1942); see also *United States* v. *Darby*, 312 U. S. 100, 119 (1941). Yet, this expansion did not fundamentally change the Court's understanding that the term "navigable waters" referred to waters used for interstate commerce. Thus, in *Appalachian Elec.*, the Court continued to apply the concept of navigability to determine the scope of Congress' Commerce Clause authority to require licenses under

––––––––––
See, *e.g.*, Swamp Land Act of 1850, ch. 84, 9 Stat. 519; see also S. Johnson, Wetlands Law: A Course Source 25–26 (2d ed. 2018). Wetlands preservation only gained traction due, in large part, to advances in firearms technology that made waterfowl hunting feasible. G. Baldassarre & E. Bolen, Waterfowl Ecology and Management 10–14 (1994).

the Federal Water Power Act for the construction of hydro-
electric dams in "navigable waters." 311 U. S., at 406–410.
Only after applying the *Daniel Ball* definition to determine
that the river in question was navigable did the Court hold
that Congress had plenary authority over the erection of
structures in the river, regardless of whether the structure
actually impeded navigability. 311 U. S., at 423–426.
While this represented an expansive application of the old
concept that Congress can prevent obstructions to naviga-
ble capacity, see *supra*, at 4, 7–8, *Appalachian Elec.* made
clear that the *term* "navigable waters" remained tethered to
Congress' traditional channels-of-commerce authority—not
to the broader conceptions of the commerce authority
adopted by the Court at that time.

The next year, in *Oklahoma ex rel. Phillips* v. *Guy F. At-
kinson Co.*, 313 U. S. 508 (1941), the Court reaffirmed that
the term "navigable waters," this time as used in the Flood
Control Act of 1936, was to be interpreted in light of the
expanded *Daniel Ball* test. 313 U. S., at 522–525. Signifi-
cantly, *Oklahoma* was decided mere months after *Darby*,
one of the most significant cases expanding the scope of the
commerce authority. 312 U. S., at 119. However, *Okla-
homa* did not so much as mention *Darby* in construing the
jurisdiction Congress conveyed in the term "navigable wa-
ters." Instead, it cited *Darby* only in passing and to support
the argument that, once a river is deemed navigable under
the channels-of-commerce authority, Congress has author-
ity to protect "the nation's arteries of commerce" by regulat-
ing intrastate activities on nonnavigable parts and tribu-
taries of the navigable river lest such activities "impai[r]
navigation itself." *Oklahoma*, 313 U. S., at 525. This was
nothing more than an application of the principle that Con-
gress can regulate activities that obstruct navigable capac-
ity. Thus, even as the Court expanded the Commerce
Clause in other contexts, it continued to understand that
the term "navigable waters" refers solely to the aquatic

channels of interstate commerce over which Congress traditionally exercised authority.

3

This understanding of the term "navigable waters"—*i.e.*, as shorthand for waters subject to Congress' authority under the *Daniel Ball* test—persisted up to the enactment of the CWA. See, *e.g.*, *Stoeco Homes, Inc.*, 498 F. 2d, at 608–609; *United States* v. *Joseph G. Moretti, Inc.*, 478 F. 2d 418, 428–429 (CA5 1973); see also D. Guinn, An Analysis of Navigable Waters of the United States, 18 Baylor L. Rev. 559, 579 (1966) ("[T]he test of *The Daniel Ball* and *Appalachian Power Co.* are religiously cited as being the basis for the holding on the issue of navigability"). As a court observed near the time of the CWA's enactment, "[a]lthough the definition of 'navigability' laid down in *The Daniel Ball* has subsequently been modified and clarified, its definition of 'navigable water of the United States,' insofar as it requires a navigable interstate linkage by water, appears to remain unchanged." *Hardy Salt Co.* v. *Southern Pacific Transp. Co.*, 501 F. 2d 1156, 1167 (CA10 1974) (citations omitted). This Court's cases, too, continued to apply traditional navigability concepts in cases under the River and Harbor Acts right up to the CWA's enactment. See *United States* v. *Standard Oil Co.*, 384 U. S. 224, 226 (1966) (holding that spilling oil in a navigable water was prohibited by the Refuse Act (§13 of the 1899 Act) because "its presence in our rivers and harbors is both a menace to navigation and a pollutant"); *United States* v. *Republic Steel Corp.*, 362 U. S. 482, 487–491 (1960) ("diminution of the navigable capacity of a waterway" required for violation of the Refuse Act). Thus, on the eve of the CWA's enactment, the term "navigable waters" meant those waters that are, were, or could be used as highways of interstate or foreign commerce.

## II

This history demonstrates that Congress was not writing on a blank slate in the CWA, which defines federal jurisdiction using the same terms used in the River and Harbor Acts: "navigable waters" and "the waters of the United States," 33 U. S. C. §§1311(a), 1362(7), (12). As explained above, courts and Congress had long used the terms "navigable water," "navigable water of the United States," and "the waters of the United States" interchangeably to signify those waters to which the traditional channels-of-commerce authority extended. See *supra*, at 6. The terms "navigable waters" and "waters of the United States" shared a core requirement that the water be a "highway over which commerce is or may be carried," with the term "of the United States" doing the independent work of requiring that such commerce "be carried on with other States or foreign countries." *The Daniel Ball*, 10 Wall., at 563. The text of the CWA thus reflects the traditional balance between federal and state authority over navigable waters, as set out by *The Daniel Ball*. It would be strange indeed if Congress sought to effect a fundamental transformation of federal jurisdiction over water through phrases that had been in use to describe the traditional scope of that jurisdiction for well over a century and that carried a well-understood meaning.[5]

---

[5] In fact, when Congress has wished to depart from this traditional meaning, it has done so expressly, as in parts of the Federal Power Act, §23, 41 Stat. 1075 (requiring approval for dam construction "across, along, over, or in any stream or part thereof, other than those defined herein this chapter as navigable waters"); the Federal Water Pollution Control Act, ch. 758, §2(a), 62 Stat. 1155 (as amended, 86 Stat. 816) (authorizing federal-state cooperation to abate water pollution in "interstate waters" and their tributaries); and the Water Quality Act of 1965, 79 Stat. 905–906 (authorizing grants to research abatement of pollution into "any waters"); see *Hardy Salt Co.* v. *Southern Pacific Transp. Co.*, 501 F. 2d 1156, 1168 (CA10 1974) (noting that Congress only departs from the expanded *Daniel Ball* test by using "clear and explicit language," as it did in parts of the Federal Power Act).

The Army Corps of Engineers originally understood the CWA in precisely this way. In its 1974 regulation establishing the first CWA §404 permitting program,[6] the Corps interpreted the term "the waters of the United States" to establish jurisdiction over the traditional navigable waters as determined by the expanded *Daniel Ball* test, noting also that the term is limited by Congress' navigation authority. 39 Fed. Reg. 12115. The Corps anchored its jurisdiction in the expanded *Daniel Ball* test, defining "navigable waters" to include "those waters of the United States which are subject to the ebb and flow of the tide, and/or are presently, or have been in the past, or may be in the future susceptible for use for purposes of interstate or foreign commerce." 33 CFR §209.120(d)(1) (1974); see also §§209.260(d)(1)–(3) (requiring "[p]ast, present, or potential presence of interstate or foreign commerce," "[p]hysical capabilities for use by commerce," and "[d]efined geographic limits of the water body"). The regulations also made clear that traditional navigability factors were the baseline for CWA jurisdiction: "It is the water body's capability of use by the public for purposes of transportation or commerce which is the determinative factor." §209.260(e)(1).

Almost immediately, however, a few courts and the recently created Environmental Protection Agency (EPA) rejected this interpretation. Instead, they interpreted the CWA to assert the full extent of Congress' New Deal era authority to regulate anything that substantially affects interstate commerce by itself or in the aggregate. See *United States* v. *Ashland Oil & Transp. Co.*, 504 F. 2d 1317, 1323–1329 (CA6 1974); *P. F. Z. Properties, Inc.* v. *Train*, 393 F. Supp. 1370, 1381 (DC 1975); *National Resource Defense Council, Inc.* v. *Callaway*, 392 F. Supp. 685, 686 (DC 1975);

_____

[6]Section 404 authorizes the Corps to "issue permits . . . for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U. S. C. §§1344(a), (d).

*United States* v. *Holland*, 373 F. Supp. 665, 669, 672–674 (MD Fla. 1974); 40 CFR §125.1(o) (1974) (initial EPA CWA definition). The courts that reached this conclusion relied almost exclusively on legislative history and statutory purpose. See, *e.g.*, *Holland*, 373 F. Supp., at 672 ("The foregoing [legislative history] compels the Court to conclude that the former test of navigability was indeed defined away in the [CWA]"). But signals from legislative history cannot rebut clear statutory text, and the text of the CWA employs words that had long been universally understood to reach only those waters subject to Congress' channels-of-commerce authority. See *supra*, at 15.

These courts and the EPA had only one textual hook for their interpretation: In defining the term "navigable waters" as "the waters of the United States," the CWA seemed to drop the term "navigable" from the operative part of the definition. Seizing on this phrasing, the EPA's general counsel asserted in 1973 that "the deletion of the word 'navigable' eliminates the requirement of navigability. The only remaining requirement, then, is that pollution of waters covered by the bill must be capable of affecting interstate commerce." 1 EPA Gen. Counsel Op. 295 (1973). Similarly, the District Court that vacated the Corps' original CWA definition held, without any analysis or citation, that the term "the waters of the United States" in the CWA is "not limited to the traditional tests of navigability." *National Resource Defense Council*, 392 F. Supp., at 671.

That interpretation cannot be right. For one, the terms "navigable waters" and "the waters of the United States" had long been used synonymously by courts and Congress. The CWA simply used the terms in the same manner as the River and Harbor Acts. Moreover, no source prior to the CWA had ever asserted that the term "the waters of the United States," when not modified by "navigable," reached any water that may affect interstate commerce. Instead, *The Daniel Ball* made clear that "[t]he phrase 'waters of the

United States, in contradistinction from the navigable waters of the States,' . . . distinguishes interstate from intrastate waters." Albrecht & Nickelsburg 11049 (quoting *The Daniel Ball*, 10 Wall., at 563); accord, 1 A. Knauth, Benedict on Admiralty §44, p. 96 (6th ed. 1940) ("The inland lakes of various States are navigable but, having no navigable outlet linking them with our system of water-ways, have never been held to be public *waters of the United States*" (emphasis added)). The text of the CWA extends jurisdiction to "navigable waters," and—precisely tracking *The Daniel Ball*—clarifies that it reaches "the waters of the United States," rather than the navigable waters of the States.

Thus, the CWA's use of the phrase "the waters of the United States" reinforces, rather than lessens, the need for a water to be at least part of "a continued highway over which commerce is or may be carried on with other States or foreign countries in the customary modes in which such commerce is conducted by water." *The Daniel Ball*, 10 Wall., at 563. At most, the omission of the word "navigable" signifies that the CWA adopts the expanded *Daniel Ball* test—that includes waters that are, have been, or can be reasonably made navigable in fact—in its statutory provisions. The Federal Government's interpretation, by contrast, renders the use of the term "navigable" a nullity and involves an unprecedented and extravagant reading of the well-understood term of art "the waters of the United States." See Albrecht & Nickelsburg 11049 ("EPA's conclusion is ahistorical as well as illogical").[7]  *"[T]he* waters *of the*

————————
[7] To be sure, the CWA is more aggressive in regulating navigable waters than the River and Harbor Acts. But, the increased stringency is not accomplished by expanding jurisdiction. The Acts use the same jurisdictional terms. Instead, the difference between them lies in the expanded scope of activities that the CWA regulates and its shift from an enforcement and injunctive regime to a previolation licensing regime. See Albrecht & Nickelsburg 11046. I express no view on the constitutionality of this regime as applied to navigable waters or on the Court's holding in *United States* v. *Appalachian Elec. Power Co.*, 311 U. S. 377

United States" does not mean *any* water *in* the United States.

There would be little need to explain any of this if the agencies had not effectively flouted our decision in *SWANCC*, which restored navigability as the touchstone of federal jurisdiction under the CWA, and rejected the key arguments supporting an expansive interpretation of the CWA's text. We expressly held that Congress' "use of the phrase 'waters of the United States'" in the CWA is not "a basis for reading the term 'navigable waters' out of the statute"—directly contradicting the EPA's 1973 interpretation, upon which every subsequent expansion of its authority has been based. 531 U. S., at 172. We also held that the Corps did not "mist[ake] Congress' intent" when it promulgated its 1974 regulations, under which "'the determinative factor'" for navigability was a "'water body's capability of use by the public for purposes of transportation or commerce.'" *Id.*, at 168 (quoting 33 CFR §209.260(e)(1)). In doing so, we rejected reliance on the CWA's "ambiguous" legislative history, which the EPA had used "to expand the definition of 'navigable waters'" to the outer limit of the commerce authority as interpreted in the New Deal. 531 U. S., at 168, n. 3.[8] Instead, we made clear that Congress did not intend

_____

(1940), that Congress can regulate things in navigable waters for purposes other than removing obstructions to navigable capacity. I note, however, that before the New Deal era, courts consistently construed statutes to authorize only federal actions preserving navigable capacity in order to avoid exceeding Congress' navigation authority. See *supra*, at 8–13.

[8] The historical context demonstrates that it was the Corps' failure to regulate to the full extent of Congress' navigation power, not its commerce power generally, that led to the enactment of the CWA. See Albrecht & Nickelsburg, 11047 (explaining that the CWA's legislative history is better interpreted "as the Supreme Court in *SWANCC* read it, to mean simply that Congress intended to override previous, unduly narrow agency interpretations to assert its broadest constitutional authority over *the traditional navigable waters*"); see also S. Bodine, Examining the Term "Waters of the United States" in Its Historical Context, C.

"to exert anything more than its commerce power over navigation." *Ibid.*; see also *id.*, at 173 (rejecting the Government's argument that the CWA invokes "Congress' power to regulate intrastate activities that 'substantially affect' interstate commerce").

*SWANCC* thus interpreted the text of the CWA as implementing Congress' "traditional jurisdiction over waters that were or had been navigable in fact or which could reasonably be so made"—*i.e.*, the expanded *Daniel Ball* test. 531 U. S., at 172 (citing *Appalachian Elec.*, 311 U. S., at 407–408).[9]   And, consistent with the traditional link between navigability and the limits of Congress' regulatory

––––––––
Boyden Gray Center for the Study of the Administrative State Policy Brief No. 4 (2022).

[9] Section 404(g), added by the 1977 CWA Amendments, does not demonstrate that the CWA departs from traditional conceptions of navigability. That provision states that States may administer permit programs for discharges into "navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce . . . , including wetlands adjacent thereto)." 91 Stat. 1601 (codified, as amended, at 33 U. S. C. §1344(g)). This provision thus authorizes States to establish their own permit programs over a discrete class of traditionally navigable waters of the United States: those that once were navigable waters of the United States, but are no longer navigable in fact. See *Economy Light & Power Co.*, 256 U. S., at 123–124. Some have asserted that this nonjurisdictional provision—the function of which in the statute is to *expand* state authority—signals that Congress actually intended an unprecedented expansion of federal authority over the States. *Rapanos* v. *United States*, 547 U. S. 715, 805–806 (2006) (Stevens, J., dissenting); see also *post*, at 3–5 (KAVANAUGH, J., concurring in judgment); *post*, at 1–3 (KAGAN, J., concurring in judgment). But, as the Court explains, not only is §404(g) not the relevant definitional provision, its reference to "wetlands" is perfectly consistent with the commonsense recognition that some wetlands are indistinguishable from navigable waters with which they have continuous surface connections. *Ante*, at 18–22, 27. To infer Congress' intent to upend over a century of settled understanding and effect an unprecedented transfer of authority over land and water to the Federal Government, based on nothing more

authority, *SWANCC* noted that any broader interpretation would raise "significant constitutional and federalism questions" and "result in a significant impingement of the States' traditional and primary authority over land and water use." 531 U. S., at 174. Both in its holdings and in its mode of analysis, *SWANCC* cannot be reconciled with the agencies' sharp departure from the centuries-old understanding of navigability and the traditional limits of Congress' channels-of-commerce authority.

In sum, the plain text of the CWA and our opinion in *SWANCC* demonstrate that the CWA must be interpreted in light of Congress' traditional authority over navigable waters. See Albrecht & Nickelsburg 11055 (noting that *SWANCC* "states more than once that Congress' use of the term 'navigable waters' signifies that Congress intended to exercise its traditional authority over navigable waters, and not its broader power over all things that substantially affect commerce"). Yet, for decades, the EPA (of its own license) and the Corps (under the compulsion of an unreasoned and since discredited District Court order) have issued substantively identical regulatory definitions of "the waters of the United States" that completely ignore navigability and instead expand the CWA's coverage to the outer limits of the Court's New Deal-era Commerce Clause precedents.

## III

This case demonstrates the unbounded breadth of the jurisdiction that the EPA and the Corps have asserted under the CWA. The regulatory definition applied to the Sacketts' property declares "intrastate" waters, wetlands, and various other wet things to be "waters of the United States" if their "use, degradation or destruction . . . *could affect* inter-

––––––––––

than a negative inference from a parenthetical in a subsection that preserves state authority, is counterintuitive to say the least.

state or foreign commerce." 40 CFR §230.3(s)(3) (2008) (emphasis added). To leave no doubt that the agencies have entirely broken from traditional navigable waters, they give several examples of qualifying waters: those that "are or could be used by interstate or foreign travelers for recreational or other purposes," those "[f]rom which fish or shellfish are or could be taken and sold in interstate or foreign commerce," those that "are used or could be used for industrial purposes by industries in interstate commerce," "[t]ributaries of" any such waters, and "[w]etlands adjacent to" any such waters. §§230.3(s)(3)(i)–(iii), (5), (7). This definition and others like it are premised on the fallacy repudiated in *SWANCC*: that the text of the CWA expands federal jurisdiction beyond Congress' traditional "commerce power over navigation." 531 U. S., at 168, n. 3.

Nonetheless, under these boundless standards, the agencies have "asserted jurisdiction over virtually any parcel of land containing a channel or conduit . . . through which rainwater or drainage may occasionally or intermittently flow," including "storm drains, roadside ditches, ripples of sand in the desert that may contain water once a year, and lands that are covered by floodwaters once every 100 years." *Rapanos*, 547 U. S., at 722 (plurality opinion). The agencies' definition "engulf[s] entire cities and immense arid wastelands" alike. *Ibid.* Indeed, because "the entire land area of the United States lies in some drainage basin, and an endless network of visible channels furrows the entire surface," "any plot of land containing such a channel may potentially be regulated." *Ibid.*

If this interpretation were correct, the only prudent move for any landowner in America would be to ask the Federal Government for permission before undertaking any kind of development. See Tr. of Oral Arg. 86, 116–117. This regime turns Congress' traditionally limited navigation authority on its head. The baseline under the Constitution, the CWA, and the Court's precedents is state control of waters. See

*SWANCC*, 531 U. S., at 174 (reaffirming "the States' traditional and primary power over land and water use"); *Leovy*, 177 U. S., at 633 (repudiating an interpretation of the 1899 Act that would render practically every "creek or stream in the entire country" a "navigable water of the United States" and "subject the officers and agents of a State . . . to fine and imprisonment" for draining a swamp "unless permission [was] first obtained from the Secretary of War"). By contrast, the agencies' interpretation amounts to a federal police power, exercised in the most aggressive possible way.

Thankfully, applying well-established navigability rules makes this a straightforward case. The "wetlands" on the Sacketts' property are not "waters of the United States" for several independently sufficient reasons. First, for the reasons set out by the Court, the Sacketts' wetlands are not "waters" because they lack a continuous surface connection with a traditional navigable water. See *ante*, at 27. Second, the nonnavigable so-called "tributary" (really, a roadside ditch) across the street from the Sacketts' property is not a water of the United States because it is not, has never been, and cannot reasonably be made a highway of interstate or foreign commerce. See *SWANCC*, 531 U. S., at 172. Third, the agencies have not attempted to establish that Priest Lake is a navigable water under the expanded *Daniel Ball* test. The lake is purely intrastate, and the agencies have not shown that it is a highway of interstate or foreign commerce. Instead, the agencies rely primarily upon interstate tourism and the lake's attenuated connection to navigable waters. See U. S. Army Corps of Engineers, G. Rayner, Priest Lake Jurisdictional Determination (Feb. 27, 2007); see also Brief for National Association of Home Builders of the United States as *Amicus Curiae* 21–24. But, this is likely insufficient under the traditional navigability tests to which the CWA pegs jurisdiction. See *supra*, at 10–13; accord, Tr. of Oral Arg. 119 (EPA counsel conceding that Congress "hasn't used its full Commerce Clause authority" in

the CWA). Finally, even assuming that a navigable water is involved, the agencies have not established that the Sacketts' actions would obstruct or otherwise impede navigable capacity or the suitability of the water for interstate commerce. See *Rio Grande Dam & Irrigation Co.*, 174 U. S., at 709.

This is not to say that determining whether a water qualifies under the CWA is *always* easy. But, it is vital that we ask the right question in determining what constitutes "the waters of the United States": whether the water is within Congress' traditional authority over the interstate channels of commerce. Here, no elaborate analysis is required to know that the Sacketts' *land* is not a *water*, much less a water of the United States.

## IV

What happened to the CWA is indicative of deeper problems with the Court's Commerce Clause jurisprudence. The eclipse of Congress' well-defined authority over the channels of interstate commerce tracks the Court's expansion of Congress' power "[t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes." Art. I, §8, cl. 3. As I have explained at length, the Court's Commerce Clause jurisprudence has significantly departed from the original meaning of the Constitution. See *Gonzales* v. *Raich*, 545 U. S. 1, 58–59 (2005) (dissenting opinion); *Lopez*, 514 U. S., at 586–602 (concurring opinion). "The Clause's text, structure, and history all indicate that, at the time of the founding, the term '"commerce" consisted of selling, buying, and bartering, as well as transporting for these purposes.'" *Raich*, 545 U. S., at 58. This meaning "stood in contrast to productive activities like manufacturing and agriculture," and founding era sources demonstrate that "the term 'commerce' [was] consistently used to mean trade or exchange—not all economically gainful activity that has some attenuated connection

to trade or exchange." *Ibid.* (citing *Lopez*, 514 U. S., at 586–587 (THOMAS, J., concurring); Barnett 112–125).[10]  By departing from this limited meaning, the Court's cases have licensed federal regulatory schemes that would have been "unthinkable" to the Constitution's Framers and ratifiers. *Raich*, 545 U. S., at 59 (opinion of THOMAS, J.).

Perhaps nowhere is this deviation more evident than in federal environmental law, much of which is uniquely dependent upon an expansive interpretation of the Commerce Clause.  See *Hodel* v. *Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U. S. 264, 281–283 (1981); see also Brief for Claremont Institute's Center for Constitutional Jurisprudence as *Amicus Curiae* 17–25.  And many environmental regulatory schemes seem to push even the limits of the Court's New Deal era Commerce Clause precedents, see *Hodel*, 452 U. S*.,* at 309–313 (Rehnquist, J., concurring in judgment), to say nothing of the Court's more recent precedents reining in the commerce power.  See, *e.g.*, *SWANCC*, 531 U. S., at 173–174; cf. *Rancho Viejo, LLC* v. *Norton*, 334 F. 3d 1158, 1160 (CADC 2003) (Roberts, J., dissenting from denial of rehearing en banc) ("The panel's approach in this case leads to the result that regulating the taking [under the Endangered Species Act] of a hapless toad that, for reasons of its own, lives its entire life in California constitutes regulating 'Commerce among the several States'" (ellipsis omitted)).

---

[10] Further scholarship notes that the term "commerce" as originally understood "was bound tightly with the *Lex Mercatoria* and the sort of activities engaged in by merchants: buying and selling products made by others (and sometimes land), associated finance and financial instruments, navigation and other carriage, and intercourse across jurisdictional lines."  R. Natelson, The Legal Meaning of "Commerce" in the Commerce Clause, 80 St. John's L. Rev. 789, 845 (2006).  This "did not include agriculture, manufacturing, mining, *malum in se* crime, or land use.  Nor did it include activities that merely 'substantially affected' commerce; on the contrary, the cases included wording explicitly distinguishing such activities from commerce."  *Ibid.*

The Court's opinion today curbs a serious expansion of federal authority that has simultaneously degraded States' authority and diverted the Federal Government from its important role as guarantor of the Nation's great commercial water highways into something resembling "a local zoning board." *Rapanos*, 547 U. S., at 738 (plurality opinion). But, wetlands are just the beginning of the problems raised by the agencies' assertion of jurisdiction in this case. Despite our clear guidance in *SWANCC* that the CWA extends only to the limits of Congress' traditional jurisdiction over navigable waters, the EPA and the Corps have continued to treat the statute as if it were based on New Deal era conceptions of Congress' commerce power. But, while not all environmental statutes are so textually limited, Congress chose to tether federal jurisdiction under the CWA to its traditional authority over navigable waters. The EPA and the Corps must respect that decision.

# SUPREME COURT OF THE UNITED STATES

_____

No. 21–454

_____

## MICHAEL SACKETT, ET UX., PETITIONERS *v.* ENVIRONMENTAL PROTECTION AGENCY, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 25, 2023]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and JUSTICE JACKSON join, concurring in the judgment.

Like JUSTICE KAVANAUGH, "I would stick to the text." *Post*, at 14 (opinion concurring in judgment). As he explains in the principal concurrence, our normal method of construing statutes identifies which wetlands the Clean Water Act covers—and the answer provided exceeds what the Court says today. Because the Act covers "the waters of the United States," and those waters "includ[e]" all wetlands "adjacent" to other covered waters, the Act extends to those "adjacent" wetlands. 33 U. S. C. §§1362(7), 1344(g)(1). And in ordinary language, one thing is adjacent to another not only when it is touching, but also when it is nearby. See *post*, at 4–5 (quoting multiple dictionaries). So, for example, one house is adjacent to another even when a stretch of grass and a picket fence separate the two. As applied here, that means—as the EPA and Army Corps have recognized for almost half a century—that a wetland comes within the Act if (i) it is "contiguous to or bordering a covered water, *or* (ii) if [it] is separated from a covered water only by a man-made dike or barrier, natural river berm, beach dune, or the like." *Post*, at 14 (emphasis in original). In excluding all the wetlands in category (ii), the majority's "'continuous surface connection' test disregards the ordinary meaning of

'adjacent.'" *Post*, at 9.  The majority thus alters—more pre-
cisely, narrows the scope of—the statute Congress drafted.

   And make no mistake: Congress wrote the statute it
meant to.  The Clean Water Act was a landmark piece of
environmental legislation, designed to address a problem of
"crisis proportions."  R. Adler, J. Landman, & D. Cameron,
The Clean Water Act: 20 Years Later 5 (1993).  How bad
was water pollution in 1972, when the Act passed?  Just a
few years earlier, Ohio's Cuyahoga River had "burst into
flames, fueled by oil and other industrial wastes."  *Ibid.*
And that was merely one of many alarms.  Rivers, lakes,
and creeks across the country were unfit for swimming.
Drinking water was full of hazardous chemicals.  Fish were
dying in record numbers (over 40 million in 1969); and those
caught were often too contaminated to eat (with mercury
and DDT far above safe levels).  See *id.*, at 5–6.  So Congress
embarked on what this Court once understood as a "total
restructuring and complete rewriting" of existing water pol-
lution law.  *Milwaukee* v. *Illinois*, 451 U. S. 304, 317 (1981)
(internal quotation marks omitted).  The new Act estab-
lished "a self-consciously comprehensive" and "all-
encompassing program of water pollution regulation."  *Id.*,
at 318–319.  Or said a bit differently, the Act created a pro-
gram broad enough to achieve the codified objective of "res-
tor[ing] and maintain[ing] the chemical, physical, and bio-
logical integrity of the Nation's waters."  §1251(a).  If you've
lately swum in a lake, happily drunk a glass of water
straight from the tap, or sat down to a good fish dinner, you
can appreciate what the law has accomplished.

   Vital to the Clean Water Act's project is the protection of
wetlands—both those contiguous to covered waters and
others nearby.  As this Court (again, formerly) recognized,
wetlands "serve to filter and purify water draining into ad-
jacent bodies of water, and to slow the flow of surface runoff
into lakes, rivers, and streams."  *United States* v. *Riverside
Bayview Homes, Inc.*, 474 U. S. 121, 134 (1985) (citation

omitted).  Wetlands thus "function as integral parts of the aquatic environment"—protecting neighboring water if themselves healthy, imperiling neighboring water if instead degraded.  *Id.*, at 135.  At the same time, wetlands play a crucial part in flood control (if anything, more needed now than when the statute was enacted).  And wetlands perform those functions, as JUSTICE KAVANAUGH explains, not only when they are touching a covered water but also when they are separated from it by a natural or artificial barrier—say, a berm or dune or dike or levee.  See *post*, at 12–13 (giving examples).  Those barriers, as he says, "do not block all water flow," and in fact are usually evidence of a significant connection between the wetland and the water.  *Ibid.*  Small wonder, then, that the Act—as written, rather than as read today—covers wetlands with that kind of connection.  Congress chose just the word needed to meet the Act's objective.  A wetland is protected when it is "adjacent" to a covered water—not merely when it is "adjoining" or "contiguous" or "touching," or (in the majority's favorite made-up locution) has a "continuous surface connection." See, *e.g.*, *ante*, at 27.

Today's majority, though, believes Congress went too far. In the majority's view, the Act imposes unjustifiably "crushing consequences" for violations of its terms.  *Ante*, at 3. And many of those violations, it thinks, are of no real concern, arising from "mundane" land-use conduct "like moving dirt."  *Ante*, at 13.  Congress, the majority scolds, has unleashed the EPA to regulate "swimming pools[] and puddles," wreaking untold havoc on "a staggering array of landowners."  *Ante*, at 1, 13.  Surely something has to be done; and who else to do it but this Court?  It must rescue property owners from Congress's too-ambitious program of pollution control.

So the majority shelves the usual rules of interpretation—reading the text, determining what the words used there mean, and applying that ordinary understanding

even if it conflicts with judges' policy preferences.  The ma-
jority's first pass through the statute is, as JUSTICE
KAVANAUGH says, "unorthodox."  *Post*, at 9.  "A minus B,
which includes C"?  *Ante*, at 19.  The majority could use
every letter of the alphabet, and graduate to quadratic
equations, and still not solve its essential problem.  As the
majority concedes, the statute "tells us that at least some
wetlands must qualify as 'waters of the United States.'"
*Ante*, at 18–19.  More, the statute tells us what those "some
wetlands" are: the "adjacent" ones.  And again, as JUSTICE
KAVANAUGH shows, "adjacent" does not mean adjoining.
See *post*, at 4–6; *supra*, at 1–2.  So the majority proceeds to
its back-up plan.  It relies as well on a judicially manufac-
tured clear-statement rule.  When Congress (so says the
majority) exercises power "over private property"—particu-
larly, over "land and water use"—it must adopt "exceed-
ingly clear language."  *Ante*, at 23 (internal quotation
marks omitted).  There is, in other words, a thumb on the
scale for property owners—no matter that the Act (*i.e.*, the
one Congress enacted) is all about stopping property own-
ers from polluting.  See *supra*, at 2.

Even assuming that thumb's existence, the majority still
would be wrong.  As JUSTICE KAVANAUGH notes, clear-
statement rules operate (when they operate) to resolve
problems of ambiguity and vagueness.  See *post*, at 11; see
also *Bond* v. *United States*, 572 U. S. 844, 859 (2014);
*United States* v. *Bass*, 404 U. S. 336, 347 (1971).  And no
such problems are evident here.  One last time: "Adjacent"
means neighboring, whether or not touching; so, for exam-
ple, a wetland is adjacent to water on the other side of a
sand dune.  That congressional judgment is as clear as clear
can be—which is to say, as clear as language gets.  And so
a clear-statement rule must leave it alone.  The majority
concludes otherwise because it is using its thumb not to re-
solve ambiguity or clarify vagueness, but instead to "cor-
rect" breadth.  Those paying attention have seen this move

before—actually, just last Term. In another case of environmental regulation (involving clean air), the Court invoked another clear-statement rule (the so-called major questions doctrine) to diminish another plainly expansive term ("system of emission reduction"). See *West Virginia* v. *EPA*, 597 U. S. ___, ___, ___ (2022) (slip op., at 2, 19). "[C]ontra the majority," I said then, "a broad term is not the same thing as a 'vague' one." *Id.*, at ___ (dissenting opinion) (slip op., at 8). And a court must treat the two differently. A court may, on occasion, apply a clear-statement rule to deal with statutory vagueness or ambiguity. But a court may not rewrite Congress's plain instructions because they go further than preferred. That is what the majority does today in finding that the Clean Water Act excludes many wetlands (clearly) "adjacent" to covered waters.

And still more fundamentally, why ever have a thumb on the scale against the Clean Water Act's protections? The majority first invokes federalism. See *ante*, at 23–24. But as JUSTICE KAVANAUGH observes, "the Federal Government has long regulated the waters of the United States, including adjacent wetlands." *Post*, at 11. The majority next raises the specter of criminal penalties for "indeterminate" conduct. See *ante*, at 24–25. But there is no peculiar indeterminacy in saying—as regulators have said for nearly a half century—that a wetland is covered *both* when it touches a covered water *and* when it is separated by only a dike, berm, dune, or similar barrier. (That standard is in fact more definite than a host of criminal laws I could name.) Today's pop-up clear-statement rule is explicable only as a reflexive response to Congress's enactment of an ambitious scheme of environmental regulation. It is an effort to cabin the anti-pollution actions Congress thought appropriate. See *ante*, at 23 (complaining about Congress's protection of "vast" and "staggering" "additional area"). And that, too, recalls last Term, when I remarked on special canons "magically appearing as get-out-of-text-free cards"

to stop the EPA from taking the measures Congress told it
to. See *West Virginia*, 597 U. S., at ___–___ (dissenting
opinion) (slip op., at 28–29). There, the majority's non-tex-
tualism barred the EPA from addressing climate change by
curbing power plant emissions in the most effective way.
Here, that method prevents the EPA from keeping our
country's waters clean by regulating adjacent wetlands.
The vice in both instances is the same: the Court's appoint-
ment of itself as the national decision-maker on environ-
mental policy.

So I'll conclude, sadly, by repeating what I wrote last
year, with the replacement of only a single word. "[T]he
Court substitutes its own ideas about policymaking for Con-
gress's. The Court will not allow the Clean [Water] Act to
work as Congress instructed. The Court, rather than Con-
gress, will decide how much regulation is too much." *Id.*, at
___ (slip op., at 32). Because that is not how I think our
Government should work—more, because it is not how the
Constitution thinks our Government should work—I re-
spectfully concur in the judgment only.

# SUPREME COURT OF THE UNITED STATES

————

No. 21–454

————

## MICHAEL SACKETT, ET UX., PETITIONERS *v.* ENVIRONMENTAL PROTECTION AGENCY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 25, 2023]

JUSTICE KAVANAUGH, with whom JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON join, concurring in the judgment.

The Clean Water Act generally prohibits dumping dredged or fill material without a permit into the "waters of the United States." 33 U. S. C. §§1311(a), 1344(a), 1362. The "waters of the United States" include wetlands that are "adjacent" to waters covered by the Act—for example, wetlands that are adjacent to covered rivers or lakes. §§1344(g), 1362(7). The question in this case is whether the wetlands on the Sacketts' residential property are adjacent to covered waters and therefore covered under the Act.

The Ninth Circuit held that the wetlands on the Sacketts' property are covered by the Clean Water Act because, as relevant here, the wetlands have a "significant nexus" to covered waters nearby. 8 F. 4th 1075, 1093 (2021). The Court today reverses the Ninth Circuit's judgment.

I agree with the Court's reversal of the Ninth Circuit. In particular, I agree with the Court's decision not to adopt the "significant nexus" test for determining whether a wetland is covered under the Act. And I agree with the Court's bottom-line judgment that the wetlands on the Sacketts'

property are not covered by the Act and are therefore not subject to permitting requirements.

I write separately because I respectfully disagree with the Court's new test for assessing when wetlands are covered by the Clean Water Act. The Court concludes that wetlands are covered by the Act only when the wetlands have a "continuous surface connection" to waters of the United States—that is, when the wetlands are "adjoining" covered waters. *Ante,* at 20, 22 (internal quotation marks omitted). In my view, the Court's "continuous surface connection" test departs from the statutory text, from 45 years of consistent agency practice, and from this Court's precedents. The Court's test narrows the Clean Water Act's coverage of "adjacent" wetlands to mean only "adjoining" wetlands. But "adjacent" and "adjoining" have distinct meanings: Adjoining wetlands are contiguous to or bordering a covered water, whereas adjacent wetlands include both (i) those wetlands contiguous to or bordering a covered water, *and* (ii) wetlands separated from a covered water only by a man-made dike or barrier, natural river berm, beach dune, or the like. By narrowing the Act's coverage of wetlands to only adjoining wetlands, the Court's new test will leave some long-regulated adjacent wetlands no longer covered by the Clean Water Act, with significant repercussions for water quality and flood control throughout the United States. Therefore, I respectfully concur only in the Court's judgment.

## I

The Clean Water Act generally prohibits dumping a "pollutant"—including dredged or fill material—into "navigable waters" without a permit. 33 U. S. C. §§1311(a), 1344(a), 1362. The Act defines "navigable waters" as "the waters of the United States, including the territorial seas." §1362(7).

As the Court today ultimately agrees, see *ante,* at 19, and

the Sacketts acknowledge, see Tr. of Oral Arg. 7–8, 33–34, 56–57, the statutory term "waters of the United States" covers wetlands "adjacent" to waters of the United States— for example, wetlands adjacent to a river or lake that is itself a water of the United States. 33 U. S. C. §1344(g).

As enacted in 1972, the Clean Water Act protected "the waters of the United States." §§1311(a), 1362(7), 1362(12). In 1975, the Army Corps interpreted "waters of the United States" to include wetlands "adjacent to other navigable waters." 40 Fed. Reg. 31324. In 1977, Congress expressly adopted that same understanding of the Act, amending the Act to make clear that only the Federal Government, and not the States, may issue Clean Water Act permits for dumping dredged or fill material into certain "waters of the United States," "including wetlands adjacent" to those covered waters. Clean Water Act, 91 Stat. 1601; 33 U. S. C. §1344(g). In that 1977 Act, Congress thus expressly recognized "adjacent wetlands" as "waters of the United States."

Interpreting the text of the Act as amended in 1977, this Court has long held that the Act covers "adjacent" wetlands. See *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 134–135, 138 (1985) ("Congress expressly stated that the term 'waters' included adjacent wetlands."); see also *Rapanos* v. *United States*, 547 U. S. 715, 742 (2006) (plurality opinion) (wetlands that "are 'adjacent to'" waters of the United States are "covered by the Act"); *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159, 167, 172 (2001) (recognizing "Congress' unequivocal" "approval of, the Corps' regulations interpreting the [Act] to cover wetlands adjacent to navigable waters"). The Court has also ruled that the Act's coverage of adjacent wetlands does not extend to "isolated" wetlands. *Id.*, at 168–172.

So the question here becomes the meaning of "adjacent" wetlands under the Clean Water Act. As a matter of

ordinary meaning and longstanding agency practice, a
wetland is "adjacent" to a covered water (i) if the wetland is
adjoining—that is, contiguous to or bordering—a covered
water—*or* (ii) if the wetland is separated from a covered
water only by a man-made dike or barrier, natural river
berm, beach dune, or the like.

The Court and I agree that wetlands in the first
category—that is, wetlands adjoining a covered water—are
covered as adjacent wetlands. *Ante,* at 19–22. But the
Court and I disagree about the second category—that is,
wetlands separated from a covered water only by a man-
made dike or barrier, natural river berm, beach dune, or the
like. The Court concludes that wetlands in that second
category are not covered as adjacent wetlands because
those wetlands do not have a continuous surface connection
to a covered water—in other words, those wetlands are not
adjoining the covered water. I disagree because the
statutory text ("adjacent") does not require a continuous
surface connection between those wetlands and covered
waters.

The ordinary meaning of the term "adjacent" has not
changed since Congress amended the Clean Water Act in
1977 to expressly cover "wetlands adjacent" to waters of the
United States. 91 Stat. 1601; 33 U. S. C. §1344(g). Then as
now, "adjacent" means lying near or close to, neighboring,
or not widely separated. Indeed, the definitions of
"adjacent" are notably explicit that two things need not
touch each other in order to be adjacent. "Adjacent"
includes "adjoining" but is not limited to "adjoining." See,
*e.g.,* Black's Law Dictionary 62 (rev. 4th ed. 1968) (defining
"adjacent" as "Lying near or close to; sometimes,
contiguous; neighboring; . . . may not actually touch");
Black's Law Dictionary 50 (11th ed. 2019) (defining
"adjacent" as "Lying near or close to, but not necessarily
touching"); see also, *e.g.,* Webster's Third New
International Dictionary 26 (1976) (defining "adjacent" as

"to lie near, border on"; "not distant or far off"; "nearby but not touching").

By contrast to the Clean Water Act's express inclusion of "adjacent" wetlands, other provisions of the Act use the narrower term "adjoining." Compare 33 U. S. C. §1344(g) with §§1321(b)–(c) ("adjoining shorelines" and "adjoining shorelines to the navigable waters"); §1346(c) ("land adjoining the coastal recreation waters"); see also §1254(n)(4) ("estuary" includes certain bodies of water "having unimpaired natural connection with open sea"); §2802(5) ("'coastal waters'" includes wetlands "having unimpaired connection with the open sea up to the head of tidal influence"). The difference in those two terms is critical to this case. Two objects are "adjoining" if they "are so joined or united to each other that no third object intervenes." 1968 Black's 62 (comparing "adjacent" with "adjoining"); see *ibid.* ("Adjoining" means "touching or contiguous, as distinguished from lying near to or adjacent"); see also Black's Law Dictionary 38–39 (5th ed. 1979) (same); Webster's Third 26–27 (similar). As applied to wetlands, a marsh is adjacent to a river even if separated by a levee, just as your neighbor's house is adjacent to your house even if separated by a fence or an alley.

In other contexts, this Court has recognized the important difference in the meaning of the terms "adjacent" and "adjoining" and has held that "adjacent" is broader than "adjoining or actually contiguous." *United States* v. *St. Anthony R. Co.*, 192 U. S. 524, 533 (1904). As an example, the *St. Anthony* case concerned a federal statute granting railroads the right to cut timber from "public lands adjacent" to a railroad right of way. *Id.,* at 526, n. 1, 530. The Court held that timber could be taken from "adjacent" sections of land that were *not* "contiguous to or actually touching" the right of way. *Id.,* at 538. The Court explained that if "the word 'adjoining' had been used instead of 'adjacent,'" a railroad could not have taken the relevant

timber. *Ibid.*

In short, the term "adjacent" is broader than "adjoining" and does not require that two objects actually touch. We must presume that Congress used the term "adjacent" wetlands in 1977 to convey a different meaning than "adjoining" wetlands. See *Russello* v. *United States*, 464 U. S. 16, 23 (1983).

## II

Longstanding agency practice reinforces the ordinary meaning of adjacency and demonstrates, contrary to the Court's conclusion today, that the term "adjacent" is broader than "adjoining."

After the Act was passed in 1972, a key question quickly arose: Did "waters of the United States" include wetlands? By 1975, the Army Corps concluded that the term "waters of the United States" included "adjacent" wetlands. 40 Fed. Reg. 31324. In 1977, Congress itself made clear that "adjacent" wetlands were covered by the Act by amending the Act and enacting §1344(g). 91 Stat. 1601.

Since 1977, when Congress explicitly included "adjacent" wetlands within the Act's coverage, the Army Corps has adopted a variety of interpretations of its authority over those wetlands—some more expansive and others less expansive. But throughout those 45 years and across all eight Presidential administrations, the Army Corps has *always* included in the definition of "adjacent wetlands" not only wetlands adjoining covered waters but also those wetlands that are separated from covered waters by a man-made dike or barrier, natural river berm, beach dune, or the like.

- In 1977 and 1980, under President Carter, the Army Corps and EPA defined "adjacent" wetlands as including wetlands "separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like." 42 Fed. Reg.

37144; see 45 Fed. Reg. 85345.

- In 1986, under President Reagan, the Army Corps adopted a new regulatory provision defining "waters of the United States" and reaffirmed that "adjacent" wetlands include wetlands "separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like." 51 Fed. Reg. 41210, 41251.

- From 1986 until 2015, under Presidents Reagan, George H. W. Bush, Clinton, George W. Bush, and Obama, the regulations continued to cover wetlands "separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes and the like." See 33 CFR §328.3(c) (1991); 40 CFR §230.3(b) (1991); 33 CFR §328.3(c) (1998); 40 CFR §230.3(b) (1998); 33 CFR §328.3(c) (2005); 40 CFR §230.3(b) (2005); 33 CFR §328.3(c) (2010); 40 CFR §230.3(b) (2010).

- In 2015, under President Obama, the Army Corps and EPA promulgated a new rule, which again specified that "adjacent" wetlands include wetlands "separated by constructed dikes or barriers, natural river berms, beach dunes, and the like." 80 Fed. Reg. 37105, 37116.

- In 2019 and 2020, under President Trump, the Army Corps and EPA repealed the 2015 rule and issued a new rule. But even following the repeal and new rule, adjacent wetlands included wetlands that are "physically separated" from certain covered waters "only by a natural berm, bank, dune, or similar natural feature" or "only by an artificial dike, barrier, or similar artificial structure so long as that structure allows for a direct hydrologic surface connection . . . in a typical year, such as through a culvert, flood or tide gate, pump, or similar artificial feature." 85 Fed. Reg. 22338, 22340 (2020).

- In 2023, under President Biden, the Army Corps and EPA once again issued a new rule that defined "adjacent" wetlands to include wetlands "separated from other waters of the United States by man-made dikes or barriers, natural river berms, beach dunes, and the like." 88 Fed. Reg. 3143–3144.

That longstanding and consistent agency interpretation reflects and reinforces the ordinary meaning of the statute. The eight administrations since 1977 have maintained dramatically different views of how to regulate the environment, including under the Clean Water Act. Some of those administrations promulgated very broad interpretations of adjacent wetlands. Others adopted far narrower interpretations. Yet *all* of those eight different administrations have recognized as a matter of law that the Clean Water Act's coverage of adjacent wetlands means more than adjoining wetlands and also includes wetlands separated from covered waters by man-made dikes or barriers, natural river berms, beach dunes, or the like. That consistency in interpretation is strong confirmation of the ordinary meaning of adjacent wetlands.

## III

The Act covers "adjacent" wetlands. And adjacent wetlands is a broader category than adjoining wetlands. But instead of adhering to the ordinary meaning of "adjacent" wetlands, to the 45 years of consistent agency practice, and to this Court's precedents, the Court today adopts a test under which a wetland is covered only if the wetland has a "continuous surface connection" to a covered water—in other words, if it adjoins a covered water. *Ante,* at 22 (internal quotation marks omitted). The Court says that the wetland and the covered water must be "indistinguishable" from one another—in other words, there must be no "clear demarcation" between wetlands and covered waters. *Ante,* at 21 (internal quotation marks

omitted).

The Court's "continuous surface connection" test disregards the ordinary meaning of "adjacent." The Court's mistake is straightforward: The Court essentially reads "adjacent" to mean "adjoining." As a result, the Court excludes wetlands that the text of the Clean Water Act covers—and that the Act since 1977 has *always* been interpreted to cover.

In support of its narrower "continuous surface connection" interpretation of covered wetlands, the Court emphasizes that the 1972 Act's overarching statutory term is "waters of the United States." *Ante,* at 19. And the Court suggests that the term "waters of the United States" cannot be interpreted to cover "adjacent wetlands" but only "adjoining wetlands." See *ante,* at 19–22. But in 1977, Congress itself expressly made clear that the "waters of the United States" include "adjacent" wetlands. 91 Stat. 1601. And Congress would not have used the word "adjacent" in 1977 if Congress actually meant "adjoining," particularly because Congress used the word "adjoining" in several other places in the Clean Water Act. 33 U. S. C. §§1321(b)–(c), 1346(c); see also §§1254(n)(4), 2802(5).

To bolster its unorthodox statutory interpretation, the Court resorts to a formula: "A minus B, which includes C." *Ante,* at 19. That just seems to be a fancier way of arguing (against all indications of ordinary meaning) that "adjacent" means "adjoining." But again the Court is imposing a restriction nowhere to be found in the text. In the end, the Court has no good answer for why Congress used the term "adjacent" instead of "adjoining" when Congress enacted §1344(g) in 1977.[1]

---

[1] Perhaps recognizing the difficulty of reading the Act to mean "adjoining" when it actually says "adjacent," the Court at one point suggests that "adjoining" is equivalent to "adjacent." *Ante,* at 19–20. As a matter of ordinary meaning, as explained at length above, that is incorrect. Adjoining wetlands are a subset of adjacent wetlands, not the

Recall again how the 1977 Act came about. In 1975, the Army Corps concluded that the 1972 Act's coverage of "waters of the United States" included "adjacent" wetlands. 40 Fed. Reg. 31324. Then in 1977, Congress adopted a new permitting program for a category of "waters of the United States." Congress allocated to the Federal Government exclusive authority to issue Clean Water Act permits for dumping dredged or fill material into certain "waters of the United States," "including wetlands adjacent thereto." 91 Stat. 1601. Through that statutory text, Congress made clear its understanding that "waters of the United States" included "adjacent" wetlands—and indeed, Congress designed important federal-state permitting authorities around that precise understanding. Congress's 1977 amendment did not "merely" express "an opinion" about the meaning of the Clean Water Act; rather, it reflected what Congress understood "its own prior acts to mean." *Bell* v. *New Jersey*, 461 U. S. 773, 785, n. 12 (1983) (internal quotation marks omitted).

Moreover, Congress's 1977 decision was no accident. As this Court has previously recognized, "the scope of the Corps' asserted jurisdiction over wetlands"—including the Corps' decision to cover adjacent wetlands—"was specifically brought to Congress' attention" in 1977, "and Congress rejected measures designed to curb the Corps' jurisdiction." *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 137 (1985). Subsequently, this Court has recognized that Congress's 1977 amendment made clear that the Act "cover[s] wetlands adjacent to navigable waters." *Solid Waste Agency of Northern Cook Cty.* v. *Army Corps of Engineers*, 531 U. S. 159, 167 (2001); see *Riverside Bayview*, 474 U. S., at 138 ("Congress expressly stated that the term 'waters' included adjacent wetlands").

Not surprisingly, in the years since 1977, no one has

---

whole set of adjacent wetlands.

seriously disputed that the Act covers adjacent wetlands. And in light of the text of the Act, eight consecutive Presidential administrations have recognized that the Act covers adjacent wetlands and that adjacent wetlands include more than simply adjoining wetlands. The Court's analysis today therefore seems stuck in a bit of a time warp—relitigating an issue that Congress settled in 1977 and that this Court has long treated as settled: The Act covers adjacent wetlands. By adopting a test that substitutes "adjoining" for "adjacent," the Court today errs.

The Court also invokes federalism and vagueness concerns. The Court suggests that ambiguities or vagueness in federal statutes regulating private property should be construed in favor of the property owner, particularly given that States have traditionally regulated private property rights. See *ante*, at 23–25; see also *Solid Waste Agency of Northern Cook Cty.*, 531 U. S., at 173–174. To begin with, the Federal Government has long regulated the waters of the United States, including adjacent wetlands.

In any event, the decisive point here is that the term "adjacent" in this statute is unambiguously broader than the term "adjoining." On that critical interpretive question, there is no ambiguity. We should not create ambiguity where none exists. And we may not rewrite "adjacent" to mean the same thing as "adjoining," as the Court does today.

Finally, contrary to the Court's suggestion otherwise, the analysis in this separate opinion centers on the "operative" text, "waters of the United States." *Ante,* at 27. To recap: The 1972 Act covered "waters of the United States." In 1977, when Congress allocated permitting authority, Congress expressly included "adjacent" wetlands within the "waters of the United States." Since then, the Executive Branch and this Court have recognized that "waters of the United States" covers "adjacent" wetlands. Based on the

text of the statute, as well as 45 years of consistent agency practice and this Court's precedents, I respectfully disagree with the Court's decision to interpret "waters of the United States" to include only adjoining wetlands and not adjacent wetlands.

## IV

The difference between "adjacent" and "adjoining" in this context is not merely semantic or academic. The Court's rewriting of "adjacent" to mean "adjoining" will matter a great deal in the real world. In particular, the Court's new and overly narrow test may leave long-regulated and long-accepted-to-be-regulable wetlands suddenly beyond the scope of the agencies' regulatory authority, with negative consequences for waters of the United States. For example, the Mississippi River features an extensive levee system to prevent flooding. Under the Court's "continuous surface connection" test, the presence of those levees (the equivalent of a dike) would seemingly preclude Clean Water Act coverage of adjacent wetlands on the other side of the levees, even though the adjacent wetlands are often an important part of the flood-control project. See Brief for Respondents 30. Likewise, federal protection of the Chesapeake Bay might be less effective if fill can be dumped into wetlands that are adjacent to (but not adjoining) the bay and its covered tributaries. See *id.*, at 35. Those are just two of many examples of how the Court's overly narrow view of the Clean Water Act will have concrete impact.

As those examples reveal, there is a good reason why Congress covered not only adjoining wetlands but also adjacent wetlands. Because of the movement of water between adjacent wetlands and other waters, pollutants in wetlands often end up in adjacent rivers, lakes, and other waters. Natural barriers such as berms and dunes do not block all water flow and are in fact evidence of a regular connection between a water and a wetland. 85 Fed. Reg.

22307; 88 Fed. Reg. 3095, 3118. Similarly, artificial barriers such as dikes and levees typically do not block all water flow, 85 Fed. Reg. 22312; 88 Fed. Reg. 3076, and those artificial structures were often built to control the surface water connection between the wetland and the water. 85 Fed. Reg. 22315; 88 Fed. Reg. 3118. The scientific evidence overwhelmingly demonstrates that wetlands separated from covered waters by those kinds of berms or barriers, for example, still play an important role in protecting neighboring and downstream waters, including by filtering pollutants, storing water, and providing flood control. See 88 Fed. Reg. 3118; 33 CFR §320.4(b)(2) (2022); see also *United States* v. *Riverside Bayview Homes, Inc.*, 474 U. S. 121, 134 (1985). In short, those adjacent wetlands may affect downstream water quality and flood control in many of the same ways that adjoining wetlands can.

The Court's erroneous test not only will create real-world consequences for the waters of the United States, but also is sufficiently novel and vague (at least as a single standalone test) that it may create regulatory uncertainty for the Federal Government, the States, and regulated parties. As the Federal Government suggests, the continuous surface connection test raises "a host of thorny questions" and will lead to "potentially arbitrary results." Brief for Respondents 29. For example, how difficult does it have to be to discern the boundary between a water and a wetland for the wetland to be covered by the Clean Water Act? How does that test apply to the many kinds of wetlands that typically do not have a surface water connection to a covered water year-round—for example, wetlands and waters that are connected for much of the year but not in the summer when they dry up to some extent? How "temporary" do "interruptions in surface connection" have to be for wetlands to still be covered? *Ante,* at 21. How does the test operate in areas where

storms, floods, and erosion frequently shift or breach natural river berms?  Can a continuous surface connection be established by a ditch, swale, pipe, or culvert?  See 88 Fed. Reg. 3095.  The Court covers wetlands separated from a water by an artificial barrier constructed *illegally*, see *ante,* at 21–22, n. 16, but why not also include barriers authorized by the Army Corps at a time when it would not have known that the barrier would cut off federal authority?  The list goes on.

Put simply, the Court's atextual test—rewriting "adjacent" to mean "adjoining"—will produce real-world consequences for the waters of the United States and will generate regulatory uncertainty.  I would stick to the text.  There can be no debate, in my respectful view, that the key statutory term is "adjacent" and that adjacent wetlands is a broader category than adjoining wetlands.  To be faithful to the statutory text, we cannot interpret "adjacent" wetlands to be the same thing as "adjoining" wetlands.

\*      \*      \*

In sum, I agree with the Court's decision not to adopt the "significant nexus" test for adjacent wetlands.  I respectfully disagree, however, with the Court's new "continuous surface connection" test.  In my view, the Court's new test is overly narrow and inconsistent with the Act's coverage of adjacent wetlands.  The Act covers adjacent wetlands, and a wetland is "adjacent" to a covered water (i) if the wetland is contiguous to or bordering a covered water, *or* (ii) if the wetland is separated from a covered water only by a man-made dike or barrier, natural river berm, beach dune, or the like.  The wetlands on the Sacketts' property do not fall into either of those categories and therefore are not covered under the Act as I would interpret it.  Therefore, like the Court, I would reverse the judgment of the U. S. Court of Appeals for the Ninth Circuit and remand for further proceedings.  But I respectfully

concur only in the Court's judgment.